**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SABA CAPITAL MASTER FUND, LTD., | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) )   No. 1:24-CV-01701-MMG |
| BLACKROCK ESG CAPITAL ALLOCATION TRUST; R. GLENN HUBBARD, W. CARL KESTER, CYNTHIA L. EGAN, FRANK J. FABOZZI, LORENZO A. FLORES, STAYCE D. HARRIS, J. PHILLIP HOLLOMAN, CATHERINE A. LYNCH, ROBERT FAIRBAIRN, and JOHN M. PERLOWSKI, in their capacity as Trustees of the BlackRock ESG Capital Allocation Trust, | ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) ) |

**SABA'S MEMORANDUM OF LAW IN FURTHER SUPPORT OF
ITS MOTION FOR PRELIMINARY INJUNCTION AND
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................................1

ARGUMENT .................................................................................................................................5

I.     The Entrenchment Bylaw Plainly Violates the ICA and Must Be Rescinded. ................................................................................................................5

    A.    Defendants Do Not Even Attempt to Establish the Attainability of ECAT's Preclusive Voting Standard. .................................................6

    B.    The ICA's Requirement that Directors Be "Elected" Necessarily Requires Holding Real Elections at which Directors Can Actually Be Elected. .........................................................9

    C.    The ICA Does Not Permit Directors to Remain in Office in Perpetuity Without Election by the Shareholders. .....................................11

    D.    The ICA Requires "Annual" Elections and, at Minimum, Requires ECAT to Hold an Election in 2024 Given the Expired Terms of a Majority of Trustees. ........................................................13

    E.    Saba Appropriately Asserts Federal Claims under the ICA. ...................15

    F.    Defendants Find No Refuge in Maryland Law. ........................................17

    G.    The Entrenchment Bylaw Also Violates Section 18(i). ...........................18

    H.    The ICA's Policies and Purposes Support Saba's Interpretation and Application of the ICA's Requirements. ............................................19

II.    Under Any Standard for a Preliminary Injunction, this Court Should Enjoin the Application of the Entrenchment Bylaw. ..............................................21

    A.    Saba Has Shown a Clear or Substantial Likelihood of Success on the Merits. ..........................................................................................21

    B.    The Balance of Equities Decidedly Favors a Preliminary Injunction. ................................................................................................21

    C.    Saba Has Made a Strong Showing of Irreparable Harm. ..........................26

    D.    The Public Interest Favors an Injunction. ................................................27

III.    Defendants' Procedural Arguments are Meritless. ...............................................28

i

A.     Saba's Private Right of Action Includes the Customary
       Incident of Preliminary Injunctive Relief. ...................................................28

B.     Saba's Claims Are Timely. ..........................................................................30

C.     Saba's Claims Are Not Barred by *Res Judicata*. .......................................32

CONCLUSION.............................................................................................................35

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amalgamated Clothing & Textile Workers Union v. SEC,*
15 F.3d 254 (2d Cir. 1994).................................................................................12

*Aprahamian v. HBO & Co.,*
531 A.2d 1204 (Del. Ch. 1987)........................................................................26

*Badlands Tr. Co. v. First Fin. Fund, Inc.,*
65 F.App'x 876 (4th Cir. 2003).....................................................................12, 15

*Bancroft Convertible Fund, Inc. v. Zico Inv. Holdings Inc.,*
825 F.2d 731 (3d Cir. 1987).............................................................................29

*Bellikoff v. Eaton Vance Corp.,*
481 F.3d 110 (2d Cir. 2007).............................................................................29

*Custer v. S. New England Tel. Co.,*
No. 3:05CV1444 (SRU), 2008 WL 222558 (D. Conn. Jan. 25, 2008)...................33

*Deckert v. Indep. Shares Corp.,*
311 U.S. 282 (1940).......................................................................................30

*Deferio v. City of Syracuse,*
193 F.Supp.3d 119 (N.D.N.Y. 2016)..................................................................25

*Dimartile v. Cuomo,*
478 F.Supp.3d 372 (N.D.N.Y. 2020), *order vacated and appeal dismissed as
moot*, 834 F. App'x 677 (2d Cir. 2021) .................................................................8

*Dimartile v. Cuomo,*
No. 1:20-CV-0859, 2020 WL 4877239 (N.D.N.Y. Aug. 19, 2020)..........................8

*Dong v. Miller,*
No. 16-CV-5836, 2017 WL 8676442 (E.D.N.Y. Sept. 29, 2017), *R&R
adopted as modified*, 2018 WL 1445573 (E.D.N.Y. Mar. 23, 2018) ........................8

*Eastman Kodak Co. v. Photaz Imports Ltd., Inc.,*
853 F. Supp. 667 (W.D.N.Y. 1993), *aff'd*, 28 F.3d 102 (2d Cir. 1994) ..................32

*Eaton Vance Sr. Income Tr. v. Saba Cap. Master Fund, Ltd.,*
No. 2084CV01533BLS2 (Mass. Super.) .......................................................*passim*

*ER Holdings, Inc. v. Norton Co.,*
735 F. Supp. 1094 (D. Mass. 1990)..................................................................27

*Felder v. Casey*,
    487 U.S. 131 (1988).................................................................................................18

*Herman v. Fashion Headquarters, Inc.*,
    992 F. Supp. 677 (S.D.N.Y. 1998) ..........................................................................8

*King v. Innovation Books*,
    976 F.2d 824 (2d Cir. 1992)....................................................................................32

*Monahan v. New York City Dep't of Corr.*,
    214 F.3d 275 (2d Cir. 2000)....................................................................................33

*N.Y.C. Employees' Retirement Sys.*, 45 F.3d 7, 12 (2d Cir. 1995)................................12

*New York Progress & Prot. PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013)....................................................................................25

*Olmsted v. Pruco Life Ins. Co. of N.J.*,
    283 F.3d 429 (2d Cir. 2002)....................................................................................29

*Oxford Univ. Bank v. Lansuppe Feeder, LLC*,
    933 F.3d 99 (2d Cir. 2019)...........................................................................3, 28, 29

*Pell v. Kill*,
    135 A.3d 764 (Del. Ch. 2016)...........................................................................20, 26

*Phoenix Four, Inc. v. Strategic Res. Corp.*,
    No. 05 CIV. 4837 (HB), 2006 WL 399396 (S.D.N.Y. Feb. 21, 2006)...................31

*PLIVA, Inc. v. Mensing*,
    564 U.S. 604 (2011)................................................................................................18

*Prudential Ins. Co. of Am.*,
    41 S.E.C. 335, 1963 WL 62725 (Jan. 22, 1963) ...................................................12

*Saba Cap. CEF Oppors. 1, Ltd. v. Nuveen Floating Rate Income Fund*,
    88 F.4th 103 (2d Cir. 2023) .......................................................................... *passim*

*Saba Cap. CEF Oppors. 1, Ltd. v. Nuveen Floating Rate Income Fund*,
    No. 21-CV-327 (JPO), 2022 WL 493554 (S.D.N.Y. Feb. 17, 2022) .....................12

*Saba Cap. CEF Oppors. 1 Ltd. v. Voya Prime Rate Tr.*,
    2020 WL 5087054 (Ariz. Super. Ct. June 26, 2020) ............................................16

*Saba Cap. Master Fund, Ltd. v. BlackRock Mun. Income Fund, Inc.*,
    No. 23-CV-5568 (JSR), 2024 WL 43344 (S.D.N.Y. Jan. 4, 2024) ............... *passim*

*Sanofi-Synthelabo v. Apotex Inc.*,
    488 F.Supp.2d 317 (S.D.N.Y.), *aff'd*, 470 F.3d 1368 (Fed. Cir. 2006)..................25

*Santa Fe Indus., Inc. v. Green,*
    430 U.S. 462 (1977) ........................................................................................17

*SEC v. First Jersey Sec., Inc.,*
    101 F.3d 1450 (2d Cir. 1996) ...........................................................................34

*Serio v. Black, Davis & Shue Agency, Inc.,*
    No. 05 CIV. 15 (MHD), 2005 WL 3642217 (S.D.N.Y. Dec. 30, 2005) ................25

*Talib v. SkyWay Commc'ns Holding Corp.,*
    No. 8:05-CV-282-T-17TBM, 2005 WL 8160176 (M.D. Fla. Apr. 5, 2005) ..........30

*Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis,*
    444 U.S. 11 (1979) ....................................................................................3, 29

*Tripathy v. Lockwood,*
    No. 22-949-PR, 2022 WL 17751273 (2d Cir. Dec. 19, 2022) ...........................25

*Whitman v. Fuqua,*
    549 F. Supp. 315 (W.D. Pa. 1982) ....................................................................30

*Williams v. Binance,*
    96 F.4th 129 (2d Cir. 2024) .............................................................................31

**Statutes**

15 U.S.C. § 77a et seq. (Securities Act of 1933) .........................................................30

15 U.S.C. § 80a-1 .................................................................................... *passim*

15 U.S.C. § 80a-16(a) .............................................................................. *passim*

15 U.S.C. § 80a-18(i) ............................................................................... *passim*

15 U.S.C. § 80a-46(b) .............................................................................. *passim*

15 U.S.C. § 80b-15 ................................................................................28, 29

Md. Code, Corps. & Ass'ns § 12-306(d) ....................................................................17

**Miscellaneous**

*Boulder Total Return Fund, Inc.,*
    2010 WL 4630835 (S.E.C. No-Action Letter Nov. 15, 2010) ..............................16

*Investment Company Institute* No-Action Letter
    1992 WL 400454 (S.E.C. No-Action Letter Nov. 6, 1992). ...................................12

*John Nuveen & Co.*,
    1986 SEC No-Act. LEXIS 2943 (S.E.C. No-Action Letter Nov. 18, 1986) ....................13, 14

*NYSE Listed Company Manual*
    https://nyseguide.srorules.com/listed-company-manual/09013e2c8503fca9 .........................24

## INTRODUCTION

Defendants' Entrenchment Bylaw plainly violates the Investment Company Act of 1940 ("ICA") and should be enjoined before Defendants have any further opportunity to use it to deprive shareholders of their electoral rights—a well-recognized form of irreparable harm.

Astoundingly, Defendants make no effort to rebut Saba's evidence—including the historical record of ECAT's failed elections and the testimony of John Grau, a proxy solicitor with decades of experience in closed-end fund elections—that the Entrenchment Bylaw's voting standard deprives ECAT's shareholders of any meaningful opportunity to elect their trustees. Defendants do not even attempt to argue that its Entrenchment Bylaw set a realistically attainable standard for electing directors in 2023, nor that it sets a realistically attainable standard in 2024. Defendants' silence speaks volumes. They have effectively conceded that the Entrenchment Bylaw caused the 2023 election to fail, will cause the contested election in 2024 to fail, and will result in 7 of ECAT's 10 incumbent Trustees remaining in office without having been elected by the shareholders after their terms have expired. It is no wonder that ISS—a leading independent proxy advisory service—has described the voting standard set forth in ECAT's Entrenchment Bylaw as the "worst-of-all-worlds vote standard for director elections," and one that is a "***transparent attempt to disenfranchise shareholders***." Park Ex. I at p.7 (all emphases throughout brief added unless otherwise noted).[1]

This cannot be how Congress intended for federally registered investment companies to be run. There is no reasonable construction of Congress's mandate that investment company directors be "***elected***" by the shareholders at an "***annual*** or special meeting," 15 U.S.C. § 80a-16(a), that

---

[1] "Park Ex." refers to exhibits attached to the accompanying Declaration of Gloria Park. For ease of reference, the lettering of exhibits to the Park Declaration picks up where the exhibits to the Kazarian Declaration left off. *See* Dkt. 11 (Kazarian Declaration and Exhibits A-H).

allows incumbent managers to hold sham elections to maintain themselves in office by fiat—let alone a construction that comports with the ICA's fundamental purposes of preventing management abuse and entrenchment, *see generally Saba Cap. CEF Oppors. 1, Ltd. v. Nuveen Floating Rate Income Fund*, 88 F.4th 103, 120-21 (2d Cir. 2023). ECAT punches at a strawman when it repeats over and over that the ICA does not require a "particular" voting standard for director elections. Dkt. 28 ("MTD") at 2, 13-16, 20; Dkt. 25 ("PI Opp.") at 2, 11. While Congress may have given funds leeway to prescribe the "particular" voting standard for elections, it also mandated a clear and wholly unremarkable baseline: that directors actually be ***elected*** by the shareholders. By guaranteeing that any contested election for ECAT's trustees will fail (and thus that the incumbent Trustees will remain permanently in their seats), the Entrenchment Bylaw deprives shareholders of any meaningful opportunity to elect directors, forecloses any real possibility that directors will actually be elected, and thereby violates the ICA.

The illegality of the Entrenchment Bylaw is particularly apparent because its application to this year's election will result in not just a majority but a supermajority of ECAT's directors remaining in office unelected, after their terms have expired under the express terms of the ICA. ECAT tries to argue that the initial appointment of the Trustees by BlackRock, as the sole sponsor at the origination of the fund, somehow allows the Trustees to remain in office in perpetuity, without ever being elected by the public shareholders of the fund. MTD at 9-10, 16; PI Opp. at 5, 12. That proposition is as astonishing as it sounds, and conflicts with myriad provisions of the ICA. For example, while the ICA allows classes of directors to serve terms of one to five years before coming back up for election, the ICA explicitly requires that "the term of office of at least one class ***shall expire each year***." 15 U.S.C. § 80a-16(a). Section 16(a) also requires the election

of directors by the "***holders***"—plural—of the funds' securities, not just an initial sponsor, and calls for election of directors at an "***annual***" meeting, not just at origination.

The foregoing strongly indicates that Congress intended for funds to hold ***annual*** elections, and, at an absolute minimum, Congress required elections to be held when a majority of directors have not stood for election within the past year. Vacancies—including those occurring when directors' terms "expire"—"may be filled in any otherwise legal manner," but only if "immediately after filling any such vacancy at least two-thirds of the directors then holding office shall have been elected to such office by the holders" at "such an annual or special meeting." *Id.* And, if "***at any time*** less than a majority of the directors" are "elected by the holders," the fund must hold a meeting "for the purpose of electing directors to fill any existing vacancies." *Id.* The upshot of these provisions, taken together, is that when the term of more than a majority of directors has "expired"—as will be the case for ECAT in 2024—the fund must hold a real election to ensure that at least a majority of the directors are actually "elected" by the shareholders. The Entrenchment Bylaw prevents ECAT from complying with this basic mandate.

Likely recognizing that their blatant disenfranchisement tactics cannot be consistent with federal law, Defendants fall back on a raft of procedural arguments in an attempt to escape judgment. But none of those arguments holds water either.

First, Supreme Court and Second Circuit precedent confirms that Saba's right of action for rescission must come with all of its "customary incidents," which include the customary equitable right to seek preliminary injunctive relief. *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 19 (1979); *Oxford Univ. Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99, 106-07 (2d Cir. 2019). Those precedents, moreover, reflect that there is little, if any, daylight between seeking rescission and seeking an injunction against continued operation of a contract. *TAMA*, 444 U.S. at

19 n.9; *see Nuveen*, 88 F.4th 103, 116 n.11 (analogizing Saba's cause of action for rescission under the ICA to cause of action for "forward-looking, ***injunctive relief***").

Second, Saba's claims are timely. Saba promptly and appropriately sought relief at the beginning of March 2024, just two months after ECAT failed to hold an actual election at any point in 2023, and at least four months before the anticipated shareholder meeting in July 2024, leaving ample time for orderly relief to be granted in advance of the election. Defendants can only muster an argument for "unjustifiable delay" by using improper baselines for when they say Saba should have brought suit—namely, (1) when Saba first purchased shares in 2022, or (2) the last time the 2023 shareholder meeting was adjourned in August 2023. The first is foreclosed to Defendants given their inconsistent position in Saba's prior suit to invalidate Defendants' unlawful Control Share Provisions, where Defendants prevailed in convincing the District Court that Saba was not harmed simply by purchasing shares and becoming a party to a contract with Defendants that included the illegal Provisions. *See Saba Cap. Master Fund, Ltd. v. BlackRock Mun. Income Fund, Inc.*, No. 23-CV-5568 (JSR), 2024 WL 43344, at *3 n.7 (S.D.N.Y. Jan. 4, 2024) ("*BlackRock Control Share Litig.*"). The second is an improper baseline because Saba had no way to know in August 2023 whether Defendants would reschedule the meeting for later in 2023—as they had twice before. In fact, Saba had every reason to expect that Defendants ***would*** attempt to reschedule the meeting again, consistent with their obligations under the ICA, ECAT's own Bylaws, and New York Stock Exchange ("NYSE") regulations. In any event, Saba initiated this action at least four months before an anticipated July 2024 shareholder meeting—with potential adjournments until later in the year, if ECAT's 2023 meeting is any guide—which is more than sufficient to allow for orderly resolution of the issues presented, and results in no unfair prejudice to Defendants.

Third, Saba's claims are not barred by *res judicata*. In the *BlackRock* Control Share Litigation, Saba successfully brought suit to invalidate ECAT's Control Share Provision—a separate entrenchment mechanism also adopted by ECAT and the Defendant Trustees—but *res judicata* principles did not require Saba to include every unlawful action ever taken by Defendants in that prior litigation. Saba has taken aim at two different entrenchment mechanisms, causing different harms, based on different evidence, some of the most salient of which was not even available when Saba initiated the first action. *Res judicata* does not preclude Saba from bringing these challenges separately.

Application of Defendants' Entrenchment Bylaw to another election will irreparably harm Saba and all of ECAT's shareholders by depriving them of their federally protected right to elect their trustees. Defendants' blatantly unlawful attempt to disenfranchise shareholders and entrench themselves in office, in plain violation of federal law, calls out for injunctive relief.

## ARGUMENT

### I.   The Entrenchment Bylaw Plainly Violates the ICA and Must Be Rescinded.

Under the ICA, ECAT must allow shareholders to elect their directors—and, at the very least, elect a majority of their directors even when vacancies have been temporarily filled by other means. That means holding an actually meaningful election on an annual basis or, at an absolute minimum, when more than a majority of the Board's term is expiring or otherwise becomes vacant. The Entrenchment Bylaw forecloses any meaningful election from occurring in 2024, leaving a supermajority of the Board with expired terms and no ability for any candidate to be elected to fill those empty seats, in violation of Section 16(a) of the ICA. The Entrenchment Bylaw also gives disproportionate voting rights to shareholders who vote in favor of incumbents, in violation of Section 18(i)'s equal voting rights mandate.

**A.      Defendants Do Not Even Attempt to Establish the Attainability of ECAT's Preclusive Voting Standard.**

Defendants make no effort to rebut Saba's evidence that the Entrenchment Bylaw's voting standard deprives ECAT's shareholders of any meaningful opportunity to elect their trustees.

Defendants do not contest that ECAT failed to reach quorum for the July 10, July 25, and August 7 shareholder meetings. And Defendants do not contest that such failure necessarily means no candidate obtained or could have obtained the vote of 50% of the shares outstanding as required to be elected under the Entrenchment Bylaw. Defendants only quibble with how Saba counts the number of failed elections. MTD at 11. But, whether counted as one or three "elections," it is undisputed that the 2023 meeting was adjourned three separate times due to lack of quorum; that no candidates were elected in 2023 despite three attempts to do so; that no candidates could have been elected in 2023 under the Entrenchment Bylaw; and that the four incumbent Trustees up for election in 2023 remained in office as holdovers.

Defendants also offer no response to the testimony of John Grau—based on his 35 years of proxy solicitation experience, shareholder voting patterns in closed-end funds, the history of ECAT's failed elections, and the history of contested elections at other closed-end funds similar to ECAT—that "it is not realistically feasible for any candidate to obtain the votes of a majority of all outstanding shares in ECAT." Dkt. 10 at ¶ 7; PI Mot. at 11-14. Defendants offer no competing declaration and do nothing to dispute Grau's testimony regarding shareholder voting patterns, the history of contested elections at ECAT and other similar closed-end funds, or any other issue.

Rather than even attempt to rebut Saba's evidentiary presentation, ECAT demurs that it "has not had an opportunity to test the accuracy or reasonableness" of Grau's statements. PI Opp. at 11 n.7. This response—almost as disingenuous as it is anemic—effectively concedes for

purposes of Saba's Motion that the Entrenchment Bylaw sets an unattainable standard in contested elections in ECAT.

As an initial matter, if Defendants wanted more time to respond to Saba's submissions, they could have asked for it. The parties actively negotiated, and Defendants consented to, the schedule to file its Preliminary Injunction Opposition. Saba proposed giving Defendants a full four weeks to respond to its Preliminary Injunction Motion, in part to give Defendants a fair amount of time to prepare "any supporting declarations and materials." Dkt. 13 at 3. Defendants accepted that proposal, with minor adjustments to accommodate Saba's time to respond to Defendants' proposed Motion to Dismiss. Dkt. 19 (Defendants' Consent Ltr. Mot. for Extension of Time).

In any event, Defendants do not and cannot explain what has deprived them of the "opportunity to test the accuracy or reasonableness" of Saba's evidence, which draws on public information about closed-end funds that is equally available to Defendants—and, as to any ECAT-specific information, more readily available to Defendants. Defendants cannot claim to have needed discovery from Saba to respond to its presentation of publicly available evidence. And it is not as if Defendants needed to reinvent the wheel to compile or analyze the publicly available information at issue, given their demonstrated familiarity with *Eaton Vance Sr. Income Tr. v. Saba Cap. Master Fund, Ltd*., No. 2084CV01533BLS2 (Mass. Super.), in which Saba challenges a preclusive voting standard substantially similar to ECAT's Entrenchment Bylaw. *See* MTD at 7-8, 11, 23, 25; PI Opp. at 6, 7 (including extensive citation to and discussion of *Eaton Vance*). The same data concerning prior contested closed-end fund elections was disclosed in *Eaton Vance*, including in the joint pre-trial memo (which attached both parties' expert reports), filed on January 26, 2024. *See* Park Decl. ¶ 5 & Ex. J.

In short, everything ECAT might have needed to attempt to rebut Saba's evidentiary submissions is in the public domain—and, to a significant degree, already packaged and analyzed in *Eaton Vance*, with which Defendants are intimately familiar. Defendants, for whatever reason, chose not to use that information or submit any competing declaration or evidence in an attempt to rebut Saba's evidence of the unattainability of the Entrenchment Bylaw in ECAT's 2023 or 2024 elections. Occam's razor suggests it is because Defendants knew any such effort would be futile. In any event, it is disingenuous for ECAT to argue that it "has not had an opportunity" to do so.

Given ECAT's failure to rebut Saba's evidentiary submissions, the Court can and should find, at least for purposes of adjudicating Saba's Preliminary Injunction Motion, that the Entrenchment Bylaw sets a voting standard that—for ***any*** candidate, incumbent or challenger— could not be attained in ECAT's 2023 contested election and cannot be attained in ECAT's 2024 contested election. *See, e.g.*, *Herman v. Fashion Headquarters, Inc.*, 992 F. Supp. 677, 680 (S.D.N.Y. 1998) (granting preliminary injunction where "[t]he substantial and unrebutted evidence presented to the Court is ample to support the conclusion that plaintiff is clearly likely to succeed on the merits of her suit for a preliminary injunction"); *Dong v. Miller*, No. 16-CV-5836, 2017 WL 8676442, at *5 (E.D.N.Y. Sept. 29, 2017) ("Given the unrebutted evidence of the defendants' past fraudulent activities and the defendants' lack of any opposition to this point, I conclude that Dong has met his burden of demonstrating irreparable harm in the absence of injunctive relief."), *R&R adopted as modified*, 2018 WL 1445573 (E.D.N.Y. Mar. 23, 2018); *Dimartile v. Cuomo*, No. 1:20-CV-0859, 2020 WL 4877239, at *6, *12 (N.D.N.Y. Aug. 19, 2020) (denying motion to stay preliminary injunction that court had granted based on "unrebutted declaration" and "unrebutted evidence"); *accord Dimartile v. Cuomo*, 478 F.Supp.3d 372, 385 (N.D.N.Y. 2020) (holding that

plaintiffs established presumption of irreparable harm and "no evidence or argument adduced by Defendants have rebutted that presumption"), *order vacated and appeal dismissed as moot*, 834 F. App'x 677 (2d Cir. 2021).[2]

**B.     The ICA's Requirement that Directors Be "Elected" Necessarily Requires Holding Real Elections at Which Directors Can Actually Be Elected.**

Having effectively conceded that the Entrenchment Bylaw imposes an unattainable voting standard in ECAT and thus preordains all contested director elections to fail, ECAT tries to defend this illegal scheme by questioning whether the ICA really gives shareholders a meaningful right to elect Trustees.[3] *See* MTD at 18. This argument tells the Court all it needs to know about ECAT's attitude toward the federal protections afforded to its shareholders. ECAT seeks to render illusory the ICA's requirement that directors be "elected" such that even a sham election at which no directors can actually be elected satisfies the requirement. The ICA tolerates no such result.

---

[2] While leaving unrebutted Saba's evidence of the Entrenchment Bylaw's unattainable voting standard, ECAT makes tangential remarks about "Saba never bother[ing] to vote the shares for which it had been appointed as proxy." MTD at 12. ECAT's account is highly misleading and ultimately inapposite. Saba did not "officially" submit its proxies because the meeting was adjourned for lack of quorum. ECAT apparently did submit its proxy cards to the inspector of elections, but that was a meaningless act given that the meeting was not actually held. Saba was not even aware that ECAT had meaninglessly submitted its proxy cards until ECAT publicly reported as much after the fact. And, tellingly, ECAT reported the submission of its votes in its own public filings, not through any official report from the inspector of elections. *See* MTD at 12 & n.11. The inspector, of course, provided no such official report because the meeting was not held, and so there were no official votes to report. In any event, Defendants do not dispute that a quorum was not reached—and so, necessarily, no candidate received the affirmative vote of 50% of the outstanding shares—even when Saba's shares are included in the count. The bottom line remains that there was no quorum for any of the three director elections in 2023, and no election of any candidates to the Board, even counting the votes Saba never had a chance to "officially" cast because the meeting was adjourned.

[3] Defendants also attempt a sleight of hand when they say ECAT's shareholders "have a meaningful opportunity to ***vote***." MTD at 18. While Saba disagrees (a technical opportunity to "vote" in a sham election is effectively no vote at all), the fundamental point is that the Entrenchment Bylaw prevents ECAT from holding a real "***election***" and prevents ECAT's shareholders from having a real opportunity to "***elect***" their directors, as required by the ICA.

Defendants' invocation of the dictionary definition of "elect," MTD at 14, only reinforces that they have violated the plain text of the ICA. As Defendants say, "elect" means "to **select**," "to determine **by choice**," or "**to select** or take for an office **by vote**." This is exactly Saba's point: "election" by definition implies "selection" and "choice." Accordingly, a voting standard that deprives shareholders of any real "choice" or ability to "select" their directors necessarily runs afoul of Congress's plain requirement that directors be "elected." By stripping shareholders of any actual ability to select or choose directors, the Entrenchment Bylaw illegally deprives them of their federally protected right to "elect" directors.

Defendants' only textual hook for their argument is their repeated incantation that Congress did not prescribe a "**particular**" voting standard for director elections. MTD at 2, 13-16, 20; PI Opp. at 2, 11. This is true enough so far as it goes: Congress did not specify a "particular" standard in the sense of a specific percentage of votes required to elect directors. But so what? Congress may have given funds leeway to set "particular" voting standards for director elections, but that does not mean Congress also gave them free rein to violate the ICA's clear and unequivocal mandate that directors actually be **elected** to office. Congress's "election" requirement sets a baseline: that the standard a fund adopts must allow for an actual **election**. Inherent in the requirement that directors be "elected" is a prohibition on preclusive voting standards that prevent directors from actually being elected and deprive shareholders of their right to elect directors.

For similar reasons, Defendants' incredulity that "Section 16(a) somehow mandates plurality voting" mischaracterizes Saba's argument. *See* PI Opp. at 12. Saba seeks a prohibitive injunction against application of the Entrenchment Bylaw, not a mandatory injunction ordering Defendants to adopt a "particular" voting standard. *See* Dkt. 1 at 14 (Request for Relief); PI Mot. at 1. This Court's injunction will leave Defendants with the leeway to set a "particular" standard

they are so adamant Congress left open to them, provided they comply with the ICA's fundamental requirement that the standard actually allow shareholders to "elect" their directors. To be sure, the most natural candidate to replace the unattainable standard Defendants have set in contested elections is the plurality standard to which the incumbent Trustees hold themselves in uncontested settings. This will also be ECAT's only operative standard for electing trustees once the 50%-outstanding standard is enjoined. But, for now, the only relief at issue is an injunction against application of the Entrenchment Bylaw's 50%-outstanding standard given its plain inconsistency with the ICA. Defendants' strawman arguments should not distract or dissuade the Court from granting that relief.

**C.   The ICA Does Not Permit Directors to Remain in Office in Perpetuity Without Election by the Shareholders.**

ECAT's next line of defense in its quest to hold utterly meaningless elections is to say that all the incumbent Trustees were "duly elected" because BlackRock, as ECAT's sole initial shareholder, appointed them to office at the fund's inception. Putting aside that it is only under a bylaw written by BlackRock itself that the appointment by BlackRock is "treated . . .  as a vote taken at a meeting of shareholders," MTD at 10, the logical conclusion of Defendants' argument is that ECAT *never* has to hold an election because the incumbents were "elected" by the sole initial sponsor. The Court should not indulge this absurd result.

The ICA does not permit directors to be installed by insiders at origination, never to be elected again; in fact, the ICA expressly prohibits ECAT's classified board from serving in perpetuity without further election. Specifically, the ICA requires that "the term of office of at least one class *shall expire each year*." 15 U.S.C. § 80a-16(a). The ICA's provision that one class of directors' terms must "*expire each year*" would be rendered a nullity if those same directors could rely on some *prior year's election* to qualify as having been "elected" by the shareholders.

Other textual indications of Congress's intent abound. Section 16(a), for example, requires the election of directors by the "***holders***"—plural—of the funds' securities, not just the initial sponsor. Section 16(a) also calls for election of directors at an "***annual***" meeting, not just at origination. And, if there were any ambiguity in these provisions, crediting Defendants' argument would make a mockery of the ICA's efforts to protect shareholders and prevent funds from being "organized, operated, [and] managed . . . in the interest of directors" instead of shareholders. 15 U.S.C. § 80a-1; *Nuveen*, 88 F.4th at 120-21; *Prudential Ins. Co. of Am.,* 41 S.E.C. 335, 1963 WL 62725 (Jan. 22, 1963) (Section 16(a)'s requirement that directors be elected by shareholders provides further assurances that "those having funds at risk in the equity securities of an investment fund elect its directors" (cited in *Badlands Tr. Co. v. First Fin. Fund, Inc.*, 65 F.App'x 876, 880 (4th Cir. 2003))).

Unsurprisingly, Defendants' cited authority does not support their audacious position that BlackRock's initial appointment of the incumbent Trustees means they never have to stand for election again. The two-page *Investment Company Institute* No-Action Letter, cited MTD at 16 n.14, includes so little substantive analysis as to have basically no persuasive value.[4] But the little substantive analysis it does include supports Saba's position. The Letter recognizes that the SEC Staff was prepared to tolerate appointment by the sole initial shareholder only because later vacancies would be "filled by the vote of the then 'outstanding voting securities', i.e., the public shareholders." 1992 WL 400454 (S.E.C. No-Action Letter Nov. 6, 1992). As just discussed, the ICA-mandated ***expiration*** of the incumbent Trustees terms has left such vacancies on the Board, which Defendants' own cited authority confirms must be filled by vote of the public shareholders.

---

[4] No-action letters like these are not binding and only have the force of their power to persuade. *See Saba Cap. CEF Oppors. 1, Ltd. v. Nuveen Floating Rate Income Fund*, No. 21-CV-327 (JPO), 2022 WL 493554, at *3 (S.D.N.Y. Feb. 17, 2022); *N.Y.C. Employees' Retirement Sys.*, 45 F.3d 7, 12 (2d Cir. 1995); *Amalgamated Clothing & Textile Workers Union v. SEC*, 15 F.3d 254, 257 (2d Cir. 1994).

Under the plain terms of the ICA, BlackRock's initial appointment of Trustees does not and cannot render them "elected" forever.

### D.     The ICA Requires "Annual" Elections and, at Minimum, Requires ECAT to Hold an Election in 2024 Given the Expired Terms of a Majority of Trustees.

In a footnote, Defendants suggest that the ICA does not actually require "annual" elections. MTD at 16 n.15. Defendants are incorrect, and never grapple with the ICA's clear textual indications that an election is required annually. But the Court need not decide this issue. At minimum, as Defendants' own authority confirms, the ICA requires Defendants to hold an actual election this year, as a majority of the incumbent Trustees' terms will have "expired" in 2024.

Defendants' sole cited authority on the issue of "annual" elections is a no-action letter from the SEC staff, where the applicant did not even "request an interpretation" of the "annual meeting" requirement. *John Nuveen & Co.*, SEC No-Action Letter, 1986 SEC No-Act. LEXIS 2943, at *3 (Nov. 18, 1986). While the SEC staff nevertheless took "th[e] opportunity to state [its] views" on the issue, it never explained how to square its position that annual meetings are not required with Section 16(a)'s provision that "the term of office of at least one class **shall expire each year**," which the Staff recognized supported the requirement of annual elections. *Id.* at *4 n.2. The staff also recognized that the SEC previously characterized Section 16(a) as imposing a "requirement . . . that directors of an investment company be elected annually." *Id.* at *5 n.5. Given that the *John Nuveen* letter does not grapple with or resolve the ways in which its position conflicts with the ICA's plain text and the SEC's own prior position, it again is of no persuasive value. *See supra.*

In any event, given ECAT's supermajority of directors with expired or expiring terms in 2024, the ICA's mandate that ECAT hold an election this year is unequivocal. Even the *John Nuveen* no-action letter recognizes that an election is required "to elect directors to fill existing vacancies on the board in the event that less than a majority of directors were elected by

shareholders." 1986 SEC No-Act. LEXIS 2943, at *3-4. With the term of 7 of ECAT's 10 directors having "expired" by 2024, even *John Nuveen* recognizes that the ICA compels ECAT to hold an actual "election" this year.

In these circumstances, the "election" requirement flows directly from the express provisions of Section 16(a). While the ICA allows classes of directors to serve terms of one to five years before being up for re-election, the ICA explicitly requires that "the term of office of at least one class ***shall expire each year***." 15 U.S.C. § 80a-16(a). As discussed, the foregoing strongly indicates that Congress intended for funds to hold ***annual*** elections. But, at an absolute minimum, Congress required elections to be held when a majority of directors have not stood for election within the past year. Vacancies—including those occurring when directors' terms "expire"—"may be filled in any otherwise legal manner" only if "immediately after filling any such vacancy at least two-thirds of the directors then holding office shall have been elected to such office by the holders" at "such annual or special meeting." *Id.* And, if "***at any time*** less than a majority of the directors" have been duly "elected by the holders," the fund must hold a meeting "for the purpose of electing directors to fill any existing vacancies." *Id.*

The upshot of these provisions, taken together, is that when the term of more than a majority of directors has "expired"—as will be the case for ECAT in 2024, with the term of 4 directors having expired in 2023 and another 3 expiring in 2024, for a total of 7 out of 10 directors whose terms have "expired"—the fund must hold a real election to ensure that at least a majority of the directors are actually "elected" by the shareholders. The Entrenchment Bylaw puts ECAT in violation of this basic mandate.

Defendants try to brush aside these provisions as applying only to "filling vacancies that arise between meetings." MTD at 17. But, as explained, there ***are*** such vacancies on ECAT's

Board by operation of the ICA-required "expiration" of directors' terms. The terms of the four Class I directors "expired" in 2023. They were not elected in 2023. So those seats were, by operation of the ICA itself, "vacant" and temporarily filled by virtue of ECAT's holdover provision. Putting aside whether the ICA tolerated the Class I directors remaining in office as holdovers at that point, the term of another three Class II directors "expire" in 2024. With the term of 7 out of ECAT's 10 directors having "expired," a supermajority of ECAT's Board seats is vacant this year, and Section 16(a) thus forecloses otherwise available means of temporarily filling the seats. Instead, what Section 16(a) requires, under these circumstances, is an actual "election."

For the same reasons, Defendants' all-too-predictable invocation of *Badlands*, 65 F. App'x 876 (MTD at 17), gets them nowhere. As Saba previewed in its opening brief, *see* PI Mot. at 14, *Badlands* involved just **two** holdover directors who had previously been elected "at a prior shareholder meeting." 65 F.App'x at 881. And *Badlands* emphasized that the use of holdover directors was an "only **temporary**" "**stopgap** measure" to "give[] time for shareholders to hold new elections." *Id.* For ECAT—with [a] 4 directors whose terms already expired and who failed to be elected but serve as holdovers, and [b] another 3 directors whose terms expire this year, [c] totaling a supermajority of 7 directors whose terms already expired or expire this year, and [d] none of whom have ever been elected by the fund's public shareholders—the ICA plainly mandates that the time for an actual "election" has come.

### E.    Saba Appropriately Asserts Federal Claims under the ICA.

Defendants baselessly suggest that because Saba has (successfully!) challenged other unlawful voting standards under state law, Saba is somehow required to assert its current claims under state law instead of under the ICA. MTD at 18-19. There is no authority for this proposition.

Defendants complain about Saba re-packaging "fiduciary duty" claims as federal claims but admit, as they must, that Saba also previously challenged unlawful voting standards on **breach**

*of contract* grounds. Those contracts, in language substantively similar to the ICA, require directors to be "elected" by the shareholders. Park Decl. ¶¶ 6-7, Exs. K, L. And courts have construed those contracts to require the use of a voting standard that gives shareholders an actually meaningful right to "elect." PI Mot. at 18; *Eaton Vance*, 2021 WL 2785120, at *3 (Mass. Super. Ct. Apr. 7, 2021) (a "bylaw amendment that effectively deprives shareholders of the power to remove a trustee would likely violate" shareholders' rights to elect and vote for directors); *Saba Cap. CEF Oppors. 1 Ltd. v. Voya Prime Rate Tr.*, 2020 WL 5087054, at *6 (Ariz. Super. Ct. June 26, 2020) (invalidating 60%-outstanding standard because the "likelihood that sufficient shareholders will participate such that *any* nominee could reach 60% is *so low* as to render the new standard a legal impossibility").[5]

The takeaway from these cases is not that Saba's claims necessarily sound in state law. To the contrary, the cases merely highlight how bizarre and improper it would be to construe the ICA's similarly worded *federal requirement* that directors be "elected" by shareholders any more *narrowly* than such language has been construed as a matter of state contract law. This is especially true given the ICA's shareholder-protective provisions, policies, and purposes with respect to shareholders' electoral and voting rights that go *beyond* state law protections. *See, e.g.*, *Nuveen*, 88 F.4th at 121 n.18 ("overarching" concern of ICA is ensuring that investors have the "opportunity to supplant the management of his investment company when the conduct of those representatives no longer meets with his approval"); *Boulder Total Return Fund, Inc.*, 2010 WL 4630835, at *6 n.27 (S.E.C. No-Action Letter Nov. 15, 2010) ("suffrage-based system" is "the very essence of the [ICA]").

---

[5] In addition, while conspicuously missing from ECAT's brief, in *Eaton Vance*, Saba challenges and seeks rescission of a substantively similar 50%-outstanding standard *under Section 18(i) of the ICA*. That federal-law claim remains live and will be tried alongside Saba's state-law claims.

ECAT's authorities are inapposite because there *is* a "clear indication of congressional intent" in the ICA to protect shareholders against investment companies like ECAT being "organized, operated, and managed" in the interest of its "directors," and because no "established state policies of corporate regulation would be overridden" were the Court to enjoin the Entrenchment Bylaw here. *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977) (cited MTD at 19); *Nuveen*, 88 F.4th at 120 (citing 15 U.S.C. § 80a-1(b)(2)). Nor is Saba "bootstrap[ing]" a state-law claim to the federal securities law when it is going directly to the font of shareholder rights, the ICA, to vindicate those rights. *Contra* MTD at 19 (citing *Panter v. Marshall Field & Co.*, 646 F.2d 271, 288 (7th Cir. 1981)).

### F.    <u>Defendants Find No Refuge in Maryland Law.</u>

Defendants also cannot save their Entrenchment Bylaw from being invalidated under federal law by invoking Maryland law. *See* MTD at 12-13.

Specifically, Defendants cannot take refuge in Maryland's provision that: "***[e]xcept as provided in this title or the governing instrument of a statutory trust***, any act requiring the approval of the beneficial owners shall be approved by the affirmative vote of a majority of all the votes entitled to be cast on the matter." Md. Code, Corps. & Ass'ns § 12-306(d). That provision expressly allows ECAT, a statutory trust, to deviate from the Maryland "default" of the "affirmative vote of a majority of all the votes entitled to be case." Accordingly, to the extent federal law precludes ECAT's use of a 50%-outstanding standard—which, as discussed, it plainly does—ECAT can and must deviate from Maryland's "default." Conspicuously, ECAT ***already*** took full advantage of its freedom to deviate from Maryland's "default" standard when it adopted its self-serving, incumbent-entrenching ***plurality standard only for uncontested elections***.

Defendants are thus wrong, in two ways, when they say that "Saba's proposed interpretation of Section 16(a) would override that permissive statute, and instead require that a

plurality of votes cast be sufficient in all director elections." MTD at 16. First, as already discussed, Saba seeks to invalidate ECAT's 50%-outstanding standard for contested elections, not to mandate a "particular" voting standard. Second, Saba's proffered interpretation and application of the ICA does not override the Maryland statute, whose proviso expressly allows for ECAT to deviate from the 50%-outstanding standard (as it already did when doing so benefits management).

ECAT manufactures a false conflict between state and federal law and suggests a preemption issue where there is none.[6]

### G.    The Entrenchment Bylaw Also Violates Section 18(i).

Defendants have also failed to rebut Saba's arguments that the Entrenchment Bylaw is unlawful under Section 18(i).

First, much like sham "elections" cannot possibly be consistent with Section 16(a)'s requirement that directors be "elected" by the shareholders, neither can sham elections be consistent with Section 18(i)'s requirement that all stock be "voting stock" that entitles the "holder thereof to vote for the ***election*** of directors." *See* PI Mot. at 15-16. An entitlement to vote in an election-in-name-only is, by definition under the ICA, no right to vote at all.

Second, Defendants fail to explain how the disproportionate voting rights that the Entrenchment Bylaw provides to votes in favor of the incumbents can be consistent with

---

[6] Even if there were an actual conflict with the ICA, Maryland law would have to yield. Congress legislated on the issue of fund director elections and shareholder electoral rights, with the express purpose of mitigating the adverse impact on the national public interest of "investment companies [that] are organized, operated, managed . . . in the interest of directors" and that "fail to protect the preferences and privileges of the holders of their outstanding securities." 15 U.S.C. § 80a-1; *Nuveen*, 88 F.4th at 121 n.18 ("overarching" concern of ICA is ensuring that investors have the "opportunity to supplant the management of his investment company when the conduct of those representatives no longer meets with his approval"). A state law that "is inconsistent in both purpose and effect" with these objectives of federal law "must give way to vindication of the federal right." *Felder v. Casey*, 487 U.S. 131, 153 (1988); *see also PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011) ("Where state and federal law 'directly conflict,' state law must give way.").

Section 18(i)'s mandate of "equal voting rights." Defendants try to conjure a conflict between Saba's position here and Saba's position in *Nuveen*, but there is none. The inequality at issue here is the mirror image of the harms at issue in *Nuveen*. Rather than creating unequal voting rights by encumbering the voting power of certain shareholders' shares, the Entrenchment Bylaw creates unequal voting rights by disproportionately supercharging the voting power of certain shareholders' shares. Just like the Control Share Provision at issue in *Nuveen*, the Entrenchment Bylaw "affects both the shares and the shareholders, the two are not mutually exclusive." *Id.* at 120.

Defendants' cited authorities from the municipal-election context under equal protection principles are readily distinguishable. *See* MTD at 21. Those cases did not involve a statute like the ICA, which requires courts to construe and apply the statutorily mandated "equal voting rights" in a manner that will "mitigate and, so far as is feasible, to eliminate the conditions" Congress identifies as being adverse to the "national public interest and the interest of investors." 15 U.S.C. § 80a-1(b) (final clause). That means construing Section 18(i)'s "equal voting rights" mandate to mitigate and, if possible, eliminate management-entrenching tactics like Defendants' Entrenchment Bylaw, in light of the statutory purposes to protect against investment companies like ECAT being "organized, operated, and managed" in the interest of its "directors, officers, investment advisers, depositors, or other affiliated persons thereof," *Nuveen*, 88 F.4th at 120 (citing 15 U.S.C. § 80a–1(b)(2)).

### H.    The ICA's Policies and Purposes Support Saba's Interpretation and Application of the ICA's Requirements.

Based on the text of Sections 16(a) and 18(i) alone, this Court should apply those provisions to invalidate ECAT's Entrenchment Bylaw. But, to the extent there are any lingering doubts, the ICA's provisions must be construed in Saba's favor, consistent with this Court's duty

to interpret the statute to further "Congress's policy considerations," which the Second Circuit recently held "lean in Saba's favor." *Nuveen*, 88 F.4th at 120.

Defendants cast aspersions about Saba, its intentions, and its business practices, but this is all water under the bridge after *Nuveen*. Defendants, for example, invoke tired bugaboos about Saba's "concentrated" holdings, MTD at 5-6 & n.3, that the Second Circuit squarely rejected. *Nuveen*, 88 F.4th at 120-21 & n.17 (rejecting Nuveen's citations to SEC reports and characterization of Saba as an "affiliated person" under ICA). And without any evidentiary support, Defendants posit that ECAT's shareholders' choice to buy shares in a closed-end fund with a long-term investment strategy means that "they understood that the fund had a structural bias favoring stability in strategy and governance," and that the Entrenchment Bylaw "gives effect to the preferences of retail investors who support the status quo." MTD at 18. This of course ignores that Saba had to have purchased its shares from someone; the owners of the 25.89% of ECAT's shares who sold them to Saba apparently had no interest in sticking with ECAT for the "long term." In any event, ECAT cannot substitute a meaningful election with its unsubstantiated assumptions about investor preferences. *See, e.g.*, *Pell v. Kill*, 135 A.3d 764, 790 (Del. Ch. 2016) (incumbent management's mere "belief that directors know better than stockholders is not a legitimate justification when the question involves who should serve on the board").

As the Second Circuit recently held, whatever tension might exist between "management's inequitable entrenchment mechanisms" and management's supposed interest in limiting "concentrated investors" with supposedly shorter-term objectives, the ICA's "overarching" concern about protecting investors against management abuse wins out: "Of primary importance to the investor is his opportunity to supplant the management of his investment company when the conduct of those representatives no longer meets with his approval." *Nuveen*, 88 F.4th at 120-21

& n.18 (citation omitted). Only Saba's interpretation and application of the ICA further its overriding policy and purpose to protect shareholders' electoral rights.

## II.   Under Any Standard for a Preliminary Injunction, this Court Should Enjoin the Application of the Entrenchment Bylaw.

Defendants argue that a "heightened" standard for preliminary relief should apply because the requested injunction would be "tantamount to a final judgment on the merits, and would provide Saba with substantially all the relief it seeks in the litigation, and that cannot be meaningfully undone." PI Opp. at 8 (internal modifications and quotations omitted). While the argument contradicts Defendants' own position on the availability of "post-election remedies," PI Opp. at 21-22, it is irrelevant because Saba easily meets both the traditional and "heightened" standards for injunctive relief.

### A.   Saba Has Shown a Clear or Substantial Likelihood of Success on the Merits.

For the reasons discussed above and in Saba's opening brief, Saba has demonstrated clear or substantial likelihood of success on the merits of invalidating ECAT's Entrenchment Bylaw under the ICA. *See* PI Mot. at 10-19; *supra* at 5-20. ECAT cannot square its concededly unattainable voting standard with the text or purposes of the ICA.

### B.   The Balance of Equities Decidedly Favors a Preliminary Injunction.

On the equities, Defendants have no response to Saba's arguments that shareholders' electoral and voting rights are of tantamount concern. PI Mot. at 20-22. They rehearse their same speculation of harm that may occur *if* elected Saba's nominees *might* take some action that would not be preferred by "long-term" shareholders. PI Opp. at 16. As Saba explained in its Motion, these arguments have been rejected time and again. *See* PI Mot. at 21-22.

At bottom, Defendants' main argument on the equities is that Saba supposedly waited too long to seek relief. PI Opp. at 13-16. Not so. In fact, in prior litigation, Defendants have argued

that Saba's ICA claims against Defendants' entrenchment tactics came too early. Defendants' attempt to trap Saba in a "Goldilocks" scenario, where Saba is always suing too early or too late depending on which position is better for Defendants that day, is the real inequity at play.

In all events, Saba promptly and appropriately sought relief at the beginning of March 2024, just two months after ECAT failed to hold an actual election at any point in 2023, and at least four months before the anticipated shareholder meeting in July 2024—which, as ECAT's 2023 meeting demonstrates, could well be adjourned into later in 2024 as well. Saba's timing leaves ample time for orderly relief to be granted in advance of the 2024 election. Defendants can only muster an argument for "unjustifiable delay" by using improper baselines for when they say Saba should have brought suit—namely, (1) when Saba first purchased shares in 2022, or (2) the last time the 2023 shareholder meeting was adjourned in August 2023.

First, as discussed further below in connection with the statute of limitations and laches defenses, Saba's first purchase of shares cannot be a reasonable baseline for when Saba should have brought suit. The deprivation of shareholders' statutory right to "elect" directors occurs when there is actually an "election" at which that right is deprived. Here, that deprivation first occurred last year, when Defendants applied ECAT's Entrenchment Bylaw to render the 2023 election a nullity.

In another recent case in which Saba challenges Defendants' Control Share Provisions, which impermissibly strip voting rights when a shareholder accumulates a >10% stake in the fund, Defendants took a position diametrically opposed to their current position that Saba was required to have sued when Saba first purchased shares. With respect to another BlackRock fund in which

Saba held a <10% stake—a fund also managed by the Defendant Trustees[7]—Defendants took the position that Saba sued **too soon**, and did not even have standing to sue because the alleged harm to Saba's voting rights would occur only at some unspecified point in the future. *See BlackRock Control Share Litig.*, No. 23-CV-5568 (JSR), Dkt. 97 (BlackRock Municipal Income Fund, Inc.'s ("MUI") Motion to Dismiss for Lack of Standing). Saba prevailed in convincing the District Court that Saba's future harms were sufficiently "imminent and concrete" to maintain standing (and Saba alleged other *ongoing* harms as well). *Id.*, 2024 WL 43344, at *3-4. But Defendants prevailed in convincing the District Court that Saba was not harmed simply by purchasing shares and becoming a party to a contract with MUI, the other BlackRock-managed fund at issue. *See id.* at *3 n.7 ("The Court rejects Saba's alternate theory of standing, that it has suffered an actual and concrete injury merely because it is a 'party to an illegal contract -- the Funds' bylaw provisions adopting the Control Share Provisions.'"). Having advocated for, and prevailed on, one position about Saba's harms in that prior case, Defendants are estopped from taking an entirely inconsistent position here. The Court should not countenance Defendants' opportunistic, inconsistent positions.

Formal estoppel aside, the point remains that Defendants well know that Saba was not required to bring suit merely upon acquiring shares. And, if Saba had, Defendants' position in the *BlackRock* Control Share Litigation suggests that they would have argued Saba was suing too early because there was not yet even a contested election on the horizon, or because Saba could not yet say whether the Entrenchment Bylaw would cause a contested election to fail, or any number of other arguments directly contrary to their self-serving arguments about delay here.

---

[7] *See* Park Ex. M (2023 Annual Report of BlackRock Municipal Income Fund, Inc. ("MUI")) at 118-19 (listing Hubbard, Kester, Egan, Fabozzi, Flores, Harris, Holloman, Lynch, Fairbairn, and Perlowski as Trustees).

Second, the August 2023 adjournment of last year's meeting is an improper baseline because Saba had no way to know at that point in time whether Defendants would reschedule the meeting for later in 2023—as they had twice before. In fact, Saba had every reason to expect that Defendants **would** attempt to reschedule the meeting again in 2023. Putting aside the parties' dispute about what was required under the ICA, Defendants do not and cannot dispute that ECAT's own bylaws and NYSE regulations required Defendants to hold a meeting to elect directors in 2023. *See* Dkt. 11-2 (ECAT Bylaws) Art. I, Sec. 2 (requiring an "annual meeting of shareholders for the election of Directors" and "[d]irectors may **only** be elected at an annual meeting of shareholders"); NYSE Listed Company Manual, Sec. 302 (listed companies "are required to hold an annual shareholders' meeting for the holders of such securities during each fiscal year");[8] ECAT 2023 Annual Report, Form N-CSR, at 93 (Dec. 31, 2023) (cited MTD at 12 & n.11) (ECAT's fiscal year ended December 31, 2023). Saba could not have predicted that ECAT would violate its own bylaws and the NYSE regulations until fiscal year 2023 came and went without another election. ECAT, the party holding all the cards about the timing and administration of its director elections, kept Saba in the dark and now seeks to benefit from its lack of transparency by arguing that Saba filed suit too late. Crediting this argument would result in an inequitable outcome by rewarding Defendants for their nondisclosure and by incentivizing other funds to act similarly.

In any event, Saba's initiation of this action at least four months before a potential 2024 shareholder meeting—with potential adjournments until later in the year, if 2023's meeting is any guide—is more than sufficient to allow for orderly resolution of the issues presented. Defendants' cries of prejudice ring hollow given that they had ample time not only to respond to the preliminary injunction motion but also to file their motion to dismiss. Defendants have not been "limited in

---

[8] https://nyseguide.srorules.com/listed-company-manual/09013e2c8503fca9.

their ability to respond," *Deferio v. City of Syracuse*, 193 F.Supp.3d 119, 132 (N.D.N.Y. 2016)—particularly given Defendants' privileged position with respect to information about the fund itself, and the trove of information regarding voting standards and historical closed-end fund elections from the *Eaton Vance* matter readily available to both sides. *See Deferio*, 193 F.Supp.3d at 132 (rejecting defendants' argument of prejudice when afforded a "full, unexpedited briefing schedule in accordance with the Local Rules," and rejecting efforts to analogize to cases in which preliminary injunction motions were filed just days before the events in question); *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 489 (2d Cir. 2013) (reversing denial of preliminary injunction on grounds of supposed "artificial urgency," even where the lawsuit was filed only 41 days before the election at issue); *Serio v. Black, Davis & Shue Agency, Inc.*, No. 05 CIV. 15 (MHD), 2005 WL 3642217, at *19 (S.D.N.Y. Dec. 30, 2005) ("[D]elay, while pertinent to the irreparable-harm question, is not necessarily dispositive, particularly in the absence of any demonstrated prejudice to the defendant. In this case, the significant justification for much of the passage of time, the compelling equities that favor preliminary injunctive relief and the lack of any evidence of prejudice to defendant flowing from the delay, justify the conclusion that plaintiff's motion should not be denied based on that delay." (citation omitted)); *Tripathy v. Lockwood*, No. 22-949-PR, 2022 WL 17751273, at *2 (2d Cir. Dec. 19, 2022) ("The district court erred in holding that Tripathy's 29-month delay in moving for a preliminary injunction was, on its own, a sufficient reason to deny the motion."); *Sanofi-Synthelabo v. Apotex Inc.*, 488 F.Supp.2d 317, 347 (S.D.N.Y.), *aff'd,* 470 F.3d 1368 (Fed. Cir. 2006) (holding that "[a]ny delay by Sanofi in bringing this motion for a preliminary injunction was not 'unreasonable and unexcusable'" and rejecting defendant's argument that the motion should have been brought fifteen months earlier (citation omitted)).

The equities favor preventing Defendants from using their plainly unlawful Entrenchment Bylaw to disenfranchise shareholders in yet another election.

C. **Saba Has Made a Strong Showing of Irreparable Harm.**

Without an order enjoining the Entrenchment Bylaw, Saba (and all of ECAT's shareholders) will suffer irreparable harm because they will be stripped of their right to elect trustees. *See* PI Mot. at 22-24. Defendants' efforts to explain away this harm actually reinforce the manner in which Saba relies on a quintessential form of irreparable harm in the corporate governance context. Defendants, for example, try to distinguish *Pell*, 135 A.3d 764, and similar Delaware Chancery cases by framing the harm in those cases in terms of "impossibility." *See* PI Opp. at 19. But just as the board in *Pell* made it "'*impossible* for stockholders to elect directors' . . . and 'ensured that *no matter how the stockholders voted*,' the directors would retain their majority," *id.*, the Defendants' Entrenchment Bylaw has made it effectively impossible for ECAT's shareholders to elect any director other than themselves.

Defendants also pluck out of context a quote from Saba's filing in the *BlackRock* Control Share Litigation to say Saba's positions are "contradict[ory]," *see* PI Opp. at 21, but that is demonstrably false. Saba argued there that **incumbent directors** cannot demonstrate irreparable harm from a possible loss of board control. *See* No. 23-cv-5568 (JSR), Dkt. 128 at 3 (S.D.N.Y. Jan. 12, 2024). This is the exact same position that Saba took in its opening motion here: **Incumbent managers** do not suffer irreparable harm by losing their iron-grip on a fund, but **shareholders** suffer irreparable harm by losing their opportunity to oust management and to exercise their right to vote in a real election. *See* PI Mot. at 20-21; *accord Aprahamian v. HBO & Co.*, 531 A.2d 1204, 1208 (Del. Ch. 1987) ("[T]here is little possibility of hardship to the individual defendants. The incumbent directors have no vested right to continue to serve as directors and

therefore will suffer no harm if they are defeated. If the will of the stockholders is thwarted, however, there may be considerable hardship to the stockholders and their corporation.").

Finally, Defendants say that Saba should wait and seek post-election relief, in the form of a "new election under a different voting standard," after the 2024 director election fails (as BlackRock has not disputed it will) and 7 out of 10 Trustees remain in office unelected after their terms have expired. *See* PI Opp. at 21-22. But if the availability of such a post-election mandatory injunction defeated irreparable harm, then parties would ***never*** be able to demonstrate irreparable harm or obtain an injunction in ***advance*** of an election. As discussed above and in Saba's opening brief, that is not the law. When even mere ***delay*** in allowing shareholders to exercise their electoral and voting rights constitutes irreparable harm, post-election remedies cannot sufficiently alleviate the irreparable harm that results from the application of draconian defense mechanisms like the Entrenchment Bylaw to ***any*** election. *See, e.g.*, *ER Holdings, Inc. v. Norton Co.*, 735 F. Supp. 1094, 1101-02 (D. Mass. 1990) ("[S]hareholder disenfranchisement creates serious risk of irreparable harm" and even mere "delay in these contexts is deadly"); PI Mot. at 23-24 (collecting cases). Requiring ECAT's shareholders to wait out another sham election before vindicating their federally protected rights would, in itself, constitute irreparable harm.

### D.     The Public Interest Favors an Injunction.

The public interest favors an injunction to put a swift end to Defendants' assault on the shareholder franchise, and to deter others who may try to follow in their footsteps. Defendants' public interest arguments repackage various arguments they have made elsewhere, so Saba will not debunk them again here. Ultimately, the public interest lies in protecting shareholders against Defendants' blatantly unlawful Entrenchment Bylaw, in furthering the ICA's fundamental purposes of defending investors against management abuse by zealously guarding the shareholder

franchise, and in deterring other funds from even attempting to implement ECAT's "worst-of-all-worlds vote standard for director elections" that is nothing but a "transparent attempt to disenfranchise shareholders." Park Ex. I at 7.

## III.   Defendants' Procedural Arguments are Meritless.

Without a path to success on the merits or the other preliminary injunction factors, Defendants rely on a raft of procedural arguments in an effort to preclude Saba from vindicating its federally protected electoral rights. None has merit. Saba's private right of action for rescission comes with all of its "customary incidents," including the equitable right to seek preliminary injunctive relief. Saba's claims, moreover, are timely and are not barred by *res judicata*.

### A.   Saba's Private Right of Action Includes the Customary Incident of Preliminary Injunctive Relief.

The Second Circuit has repeatedly foreclosed Defendants' argument that Saba lacks a private right of action for rescission under 15 U.S.C. § 80a–46(b). *See Oxford*, 933 F.3d 99; *Nuveen*, 88 F.4th 103; *contra* MTD at 25.[9] Nevertheless, Defendants now argue that the ICA gives Saba only a "skim milk" right of action that lacks the usual equitable incidents of that right to bring suit—including a right to seek preliminary injunctive relief. PI Opp. at 9-10. The argument is baseless and should be rejected with ease.

The Supreme Court has treated actions for rescission and for an injunction against the operation of a contract as being effectively interchangeable—including specifically in the context of the ICA's "companion legislation," the Investment Advisors Act (IAA). In fact, in construing the private right of action available under § 80a-46(b), *Oxford* relied heavily on the Supreme Court's interpretation of a "similar provision" of the IAA, 15 U.S.C. § 80b-15. *Oxford*, 933 F.3d

---

[9] Defendants' motion to dismiss argues that Saba lacks a private right of action for purposes of issue preservation, but this Court has no occasion or authority to deviate from the Second Circuit's recent, well-reasoned precedents in *Oxford* and *Nuveen*.

at 106-07 (discussing *TAMA*, 444 U.S. 11). In *TAMA*, the Supreme Court concluded that 15 U.S.C. § 80b-15 included "the customary legal incidents of voidness . . . including the availability of a suit for rescission ***or for an injunction against continued operation of the contract***." 444 U.S. at 19. The *TAMA* Court, moreover, reasoned that the IAA's jurisdictional provision "though referring in terms only to 'suits in equity to ***enjoin*** any violation,' would equally sustain actions where . . . ***rescission*** is sought." *Id.* at 19 n.9.

Defendants' reliance on pre-*Oxford* cases like *Bellikoff* and *Olmsted* to undermine the "customary incidents" of Saba's right of action for rescission is squarely foreclosed by *Oxford* itself. *See* PI Opp. at 9-10 (citing *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 116 (2d Cir. 2007); *Olmsted v. Pruco Life Ins. Co. of N.J.*, 283 F.3d 429, 433 (2d Cir. 2002)). As the Second Circuit reasoned, "the proposition that the *Bellikoff* plaintiffs did not have a private right of action for damages does not support the conclusion that Intervenors here have no private right of action for rescission." *Oxford*, 933 F.3d at 105. The right of action for rescission, in turn, must come with all its "customary legal incidents," *id.* at 107, including the right to seek preliminary injunctive relief.

Consonantly, and more recently, the Second Circuit specifically analogized Saba's cause of action for rescission and declaratory relief under the ICA to a cause of action for "forward-looking, ***injunctive relief*** to prevent . . . harm from occurring." *See Nuveen*, 88 F.4th at 116 n.11; *accord BlackRock Control Share Litig.*, 2024 WL 43344, at *3. Saba's request for relief here is substantively no different: Saba seeks preliminary injunctive relief to prevent the harm that would occur if the Entrenchment Bylaw were allowed to be applied to another contested election.

Saba's invocation of the customary incidents of its private right of action is entirely unremarkable. Courts have routinely granted preliminary injunctive relief under other provisions of the ICA, and other federal securities laws, providing a private right of action. *Bancroft*

*Convertible Fund, Inc. v. Zico Inv. Holdings Inc.*, 825 F.2d 731, 733 (3d Cir. 1987) (upholding grant of preliminary injunction against tender offer in a suit then brought under implied private right of action under Section 12(d)(1)(A) of the ICA); *Whitman v. Fuqua*, 549 F. Supp. 315, 321, 323-326 (W.D. Pa. 1982) (granting preliminary injunctive relief in favor of plaintiffs who brought suit to enjoin management's violation of Section 36 of ICA); *Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 287-90 (1940) (recognizing that granting of temporary injunction was "within the sound discretion of the trial court" pending final adjudication of the issues, which included a request for rescission under Securities Act of 1933); *Talib v. SkyWay Commc'ns Holding Corp.*, No. 8:05-CV-282-T-17TBM, 2005 WL 8160176, at *5 (M.D. Fla. Apr. 5, 2005) (entering temporary restraining order in case seeking rescission under Section 12(a)(1) and 12(a)(2) of Securities Act).

    **B**.    <u>**Saba's Claims Are Timely.**</u>

Largely for reasons already discussed in connection with balancing the equities, Saba's claims are timely and are not barred by laches.

<u>Statute of Limitations</u>. Defendants' statute of limitations argument—articulated only in a cursory paragraph—turns on the inaccurate premise that Saba's claims accrued when ECAT first "adopted" and "publicized" its Entrenchment Bylaw in May 2021, and "no later than the date Saba first acquired shares in ECAT" in March 2022. MTD at 22. As discussed above, Defendants are estopped from arguing that harm to Saba occurred, and that its claims accrued, merely upon acquiring shares in ECAT and thus becoming party to a contract with Defendants. *See supra*; *BlackRock Control Share Litig.*, 2024 WL 43344, at *3 n.7 (accepting Defendants' argument that Saba did not suffer "actual and concrete injury" merely by becoming "party to an illegal contract").

Rather, Saba's cause of action accrued, at earliest, when the Entrenchment Bylaw deprived Saba of its electoral and voting rights under the ICA—namely, when the Entrenchment Bylaw was

applied to ECAT's election in the summer of 2023. Even under the shortest possible one-year statute of limitations, Saba's claims are timely. In fact, by Defendants' own arguments that the ICA does not require them to hold "annual" elections, meaning Saba will not be harmed until the Entrenchment Bylaw is applied to ECAT's election in 2024, Saba brings suit to prevent a "future harm" from occurring. The Second Circuit blessed this approach in *Nuveen*. 88 F.4th at 116 n.11. Defendants cannot seriously argue that Saba's time to bring suit with respect to future harms has already run.

Although Defendants do not say so explicitly, their citation to *Phoenix Four, Inc. v. Strategic Res. Corp.* (cited MTD at 22), suggests they are taking the position that an action for rescission **must** always accrue "when the contract is executed." No. 05 CIV. 4837 (HB), 2006 WL 399396, at *6 (S.D.N.Y. Feb. 21, 2006). Not so. In fact, the Second Circuit recently rejected that absolutist position in the context of a claim for rescission under the Exchange Act. *See Williams v. Binance*, 96 F.4th 129, 143 (2d Cir. 2024). As the *Williams* Court held, where a contract itself constitutes a "completed . . . transaction" that "in and of itself" violates the securities laws, a cause of action for rescission might run from the date of execution. *Id.* at 143-44.[10] But where a contract "simply outline[s] the governing rules" for future transactions that may or may not occur, the cause of action accrues if and when such transaction actually occurs. *Id.* at 144. Defendants' Entrenchment Bylaw falls into the latter bucket. The Entrenchment Bylaw sets forth the "governing rules"—*i.e.*, the applicable voting standard—if and when a contested election occurs,

---

[10] In those circumstances, "subsequent payments" on the completed transaction go to the "amount of damages but do not constitute separate wrongs." *Id.* at 144. Saba, of course, does not seek to recover installment payments on a transaction completed more than three years in the past; Saba does not seek damages at all.

and so a claim to rescind the Entrenchment Bylaw accrues no earlier than its application to a contested election—*i.e.*, in the summer of 2023.

Saba's claims are timely under any possible limitations period.

<u>Laches</u>. Defendants' laches defense fails for the reasons already discussed in connection with the equities and Defendants' statute of limitations arguments. Saba acted with appropriate diligence after it became apparent Defendants did not intend to hold an actual election in 2023, contrary at least to ECAT's own bylaws and NYSE regulations, if not also the ICA, and with ample lead time for there to be an orderly adjudication of Saba's request for an injunction in advance of the 2024 election. *See supra*. And even taking the last adjournment of last year's election in August 2023 as a "baseline" (which, again, is improper for the reasons already discussed) Defendants' own cited case belies the notion that Saba acted with inadequate diligence. *See King v. Innovation Books*, 976 F.2d 824, 832 (2d Cir. 1992) (cited MTD at 23) (rejecting laches defense where King brought suit eight months after first learning about the movie he sought to enjoin and three months after viewing the movie); *see also Eastman Kodak Co. v. Photaz Imports Ltd., Inc.*, 853 F. Supp. 667, 676 (W.D.N.Y. 1993), *aff'd*, 28 F.3d 102 (2d Cir. 1994) (rejecting laches defense where plaintiff filed suit and moved for preliminary injunction eight months after learning about the wrongdoing at issue). Any inequity in the timing of Saba's suit (and there is none) pales in comparison to the inequity of allowing Defendants' Entrenchment Bylaw to continue to thwart the will of the shareholders.

### C.   <u>Saba's Claims Are Not Barred by *Res Judicata*.</u>

Finally, Saba's claims are not barred by res judicata. Defendants incorrectly suggest that absolutely any possible claim Saba "could" have brought against ECAT and its Trustees in the *BlackRock* Control Share Litigation is now barred by *res judicata*. That is not the law. *See, e.g.*,

*Custer v. S. New England Tel. Co.*, No. 3:05CV1444 (SRU), 2008 WL 222558, at *6 (D. Conn. Jan. 25, 2008) (*res judicata* did not require plaintiffs suing to recover "benefits under a pension plan" to "bring every conceivable claim related to the plan").

Specifically, Defendants ignore the "transactional" nature of the inquiry: "Whether or not the first judgment will have preclusive effect depends in part on [1] whether the same transaction or connected series of transactions is at issue, [2] whether the same evidence is needed to support both claims, and [3] whether the facts essential to the second were present in the first." *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 289 (2d Cir. 2000) (citation omitted). Defendants have not met their burden to establish any of these criteria in support of their *res judicata* affirmative defense.

First, the "same transaction" is not at issue. In the prior *BlackRock* matter, Saba sought to invalidate the Control Share Provisions adopted in ECAT's ***Declaration of Trust***, setting forth a standard that improperly stripped shareholders voting rights when they accumulated a >10% stake. *BlackRock Control Share Litig.*, No. 23-CV-5568 (JSR), Dkt. 1 (Complaint), at ¶¶ 38, 40-44; *id.* at Dkt. 95 (ECAT's Answer), at ¶ 1. Here, Saba seeks to invalidate an entirely independent provision in ECAT's ***Bylaws***, setting forth an unlawful standard for electing directors that effectively deprives shareholders of any right to elect trustees in a contested election. Dkt. 1 at ¶¶ 36-37. Nor can Defendants characterize ECAT's governance documents more generally, or Saba's becoming subject to the provisions in those governing documents by acquiring shares, as the relevant "series of transactions"; as already discussed, Defendants have boxed themselves out of any such position given their own argument in the prior *BlackRock* matter (on which they prevailed) that Saba's merely entering into the illegal contract with Defendants was not itself a form of harm. *See supra* at 4, 23.

Second, different evidence supports the claims. The evidence in the *BlackRock* Control Share Litigation involved the operation of ECAT's Declaration of Trust and, for purposes of standing, the historical record of Saba's positions in closed-end funds and the harms the Control Share Provisions cause to Saba's trading activity and business practices. *See BlackRock Control Share Litig.*, No. 23-CV-5568 (JSR), Dkt. 23, 23-1, 23-2; *see also id.*, 2024 WL 43344, at *2-4, *6. Here, as the Court can see from the evidentiary submissions accompanying Saba's Preliminary Injunction Motion, the evidence is very different and involves ECAT's prior failed elections, the results of contested closed-end fund elections more generally, and the testimony of a veteran proxy solicitor. *See* Dkts. 10, 11.

Third, many of the most "essential" facts at issue in this case—namely, the details of ECAT's failed elections in July and August 2023, Dkt. 1 at ¶¶ 41-48—were not even available when Saba filed the *BlackRock* Control Share Litigation on June 29, 2023, No. 23-cv-05568 (JSR), at Dkt. 1. And as Defendants own cited authority confirms, *res judicata* principles did not require Saba to amend its pleadings to account for later-occurring events. *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1464 (2d Cir. 1996) (cited MTD at 25) (plaintiff "may" supplement pleadings to assert claims based on later-occurring conduct, but "his election not to do so is not penalized by application of res judicata to bar a later suit"); *accord id.* at 1465.[11]

To be sure, Saba's prior litigation against Defendants and this one are related in the sense that, in both, Saba seeks relief from Defendants' seemingly never-ending efforts to disenfranchise

---

[11] ECAT repeats that Saba challenged both a control share provision and a 50%-outstanding voting standard in one action in *Eaton Vance*. *See* MTD at 7-8, 25. *Eaton Vance* involved different parties, different circumstances, and a different procedural posture than this case. For one, Eaton Vance sued Saba (not vice versa) in *Eaton Vance* for declaratory judgment on the legality of the 50%-outstanding standard provision. In any event, that Saba litigated both provisions at once in *Eaton Vance* does not mean Saba was **required** to do so under principles of *res judicata*, and, as discussed, Defendants have provided no authority holding as much.

shareholders and entrench themselves in office. But Saba has taken aim at two different entrenchment mechanisms, causing different harms, based on different evidence, some of the most salient of which was not even available when Saba initiated the first action. *Res judicata* does not preclude Saba from bringing these challenges separately.

## **CONCLUSION**

Defendants complain that Saba "has used litigation as a tool to support its activist campaigns, advocating for novel and increasingly expansive interpretations of the 1940 Act." MTD at 1. The Courts, however, have resoundingly agreed with Saba—time and again endorsing Saba's interpretation of the ICA's text, policy, and purposes, and granting Saba relief. PI Mot. at 25. If underperforming closed-end fund managers like Defendants would stop using plainly illegal defensive mechanisms to entrench themselves in office, and instead give shareholders a full and fair opportunity to vote for directors of their choosing, Saba would not have to keep coming to court to stop them.

In the meantime, Saba and all of ECAT's shareholders require this Court's intervention to put an end to Defendants' entrenchment tactics. Saba prays that this Court will not allow Defendants to apply their Entrenchment Bylaw to another election, in violation of the federally protected electoral rights of Saba and all of ECAT's shareholders. Saba respectfully requests that the Court grant Saba's Motion for Preliminary Injunction and deny ECAT's Motion to Dismiss.

Dated: New York, New York
      April 22, 2024                      Respectfully submitted,

                                     */s/ Mark Musico*
                                     Mark Musico (SDNY No.: MM8001)
                                     Jacob W. Buchdahl (SDNY No.: JB1902)
                                     Y. Gloria Park (SDNY No.: GP0913)
                                     SUSMAN GODFREY LLP
                                     One Manhattan West, 50th Floor

New York, NY 10001
Tel: 212-336-8330
Fax: 212- 336-8340
mmusico@susmangodfrey.com
jbuchdahl@susmangodfrey.com
gpark@susmangodfrey.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 22, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

*/s/ Gloria Park*
Gloria Park
