O6CDSabO

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
3   SABA CAPITAL MASTER FUND,
    LTD.,
4
                Plaintiff,
5
            v.                          24 CV 01701
6
    BLACKROCK ESG CAPITAL
7   ALLOCATION TERM TRUST, ET AL.,
8               Defendants.
                                    Oral Argument
9   ------------------------------x
                                    New York, N.Y.
10                                  June 12, 2024
                                    2:00 p.m.
11
    Before:
12
                    HON. MARGARET M. GARNETT,
13
                                    District Judge
14
15                      APPEARANCES
16  SUSMAN GODFREY, LLP
         Attorneys for Plaintiff
17  BY:  JACOB W. BUCHDAHL
         YOONHEE GLORIA PARK
18       MARK P. MUSICO
19  WILLKIE FARR & GALLAGHER, LLP
         Attorneys for Defendants
20  BY:  TARIQ MUNDIYA
         VANESSA RICHARDSON
21
22  STRADLEY RONON STEVENS & YOUNG, LLP
         Attorney for Defendants
    BY:  MICHAEL DAVID O'MARA
23
24
25

O6CDSabO

```
 1              (Case called.)

 2              THE DEPUTY CLERK:  Counsel, please state your

 3    appearances, starting with plaintiff.

 4              MR. BUCHDAHL: Good afternoon, your Honor.  For

 5    plaintiff, Jacob Buchdahl, Mark Musico, and Gloria Park of

 6    Susman Godfrey.

 7              THE COURT:  Good afternoon.

 8              MR. MUNDIYA:  Good afternoon, your Honor.  Tariq

 9    Mundiya, Willkie Farr and Gallager for BlackRock ESG Capital

10    Allocation Trust, Mr. Perlowski and Mr. Fairbairn.  I'm here

11    with my partner, Vanessa Richardson.

12              THE COURT:  Good afternoon.

13              MR. O'MARA:  Good afternoon, your Honor.  Michael

14    O'Mara from Stradley Ronon Stevens & Young on behalf of

15    Trustees Hubbard, Kester, Egan, Fabozzi, Flores, Harris,

16    Holloman, and Lynch.

17              THE COURT:  Good afternoon.

18              So we're here today for oral argument on both Saba's

19    motion for preliminary injunction, as well as the defendant's

20    motion to dismiss.  I just want to note for the record, as I

21    said in a previous order, that I know Mr. Buchdahl.  We served

22    together in the U.S. Attorney's Office, and we've maintained

23    what I would characterize as a friendly professional

24    relationship since then, although we don't socialize

25    independently outside of a group.  Likewise, I know Mr. Feldman
```

O6CDSabO

quite well.  We served in the U.S. Attorney's Office together,

and the same, I frequently see him at professional events

related to the U.S. Attorney's Office.

I see no reason why these circumstances merit recusal,

but I just wanted to raise it at the outset and see if either

party had any objection.

Mr. Buchdahl?

MR. BUCHDAHL:  No objection on behalf of the

plaintiff.

MR. MUNDIYA:  Nothing from us, your Honor.

THE COURT:  Great.  So I propose we'll begin with

Saba's counsel, and then give the defendants' counsel an

opportunity to respond.  I don't know, counsel, if you intend

to speak separately or if one counsel is going to address -- is

going to speak for the BlackRock defendants as a group.

MR. MUNDIYA:  Your Honor, we will be if -- the

BlackRock defense, and we'll do most if not all of the talking

for the defendants' side.

THE COURT:  Thank you.

I assume, Mr. Buchdahl, you are going to be arguing

for Saba?

MR. BUCHDAHL:  Your Honor, Mr. Musico is going to

present argument on behalf of Saba Capital.

With regard to the witnesses, we do not intend to call

them, and we understand from defense counsel they do not intend

O6CDSabO

1   to call them, unless your Honor wished to call them to question

2   them.

3           THE COURT:  No.  I mean, I appreciate you updating my

4   clerk about your intentions, but my expectation is we're only

5   here for lawyers' argument, and unless something -- I think I

6   have a good grasp of what the facts are, so unless something

7   goes awry today or at the end of the proceeding either side

8   feels like issues arose that would make witness testimony

9   important before I make a decision, my assumption is we're only

10  going to have argument today.

11          So then I'll turn my question to you, Mr. Musico.  Do

12  you want to reserve some time for rebuttal?

13          MR. MUSICO:  I would appreciate that. your Honor.

14          THE COURT:  I don't know if -- my general view is that

15  as long as our conversation is proving interesting and helpful

16  to me, I'm not a big fan of artificial limits on your time.

17  But my general expectation is that you won't go more than 45

18  minutes, to start, same on the other side.

19          I'm going to have a lot -- I expect to have a lot of

20  questions, so I think we're all best served by having our time

21  devoted to my questions, but I think they'll come up naturally

22  as we go.  My expectation is that we'll be done in no more than

23  two hours.  Of course if we find we have a lot to talk about

24  and it's interesting, then I'm happy to give you as much time

25  as you need.

O6CDSabO

1          Any objection?

2          MR. MUNDIYA:  No objection, your Honor.

3          MR. MUSICO:  No objection, your Honor.

4          THE COURT:  With that, Mr. Musico, you're up.

5          MR. MUSICO:  Thank you, your Honor.  Mark Musico on

6   behalf of Saba Capital.

7          THE COURT:  Do you want to speak from the podium?

8          MR. MUSICO:  I'm fine here.  My only concern is for

9   the defendants to be looking at my back.

10          MR. MUNDIYA:  It's fine.  Whatever he feels

11   comfortable with.

12          THE COURT:  If you're comfortable there, that's fine.

13   I would pull the microphone a little closer.  We have this

14   beautiful space, but the acoustics are not really good.  So

15   really for the reporter more than anything else, make sure you

16   have the microphone close to you and straightened.

17          You can begin.

18          MR. MUSICO:  Thank you, your Honor.

19          Your Honor, Saba asks this Court to enforce a

20   foundational requirement of the Investment Company Act that

21   directors of investment companies be elected by their

22   shareholders.  Defendants' reading of the statute, in

23   particular section 16(a), is entirely atextual and inconsistent

24   with the claim and purposes of Congress to protect

25   shareholders' electoral rights.

O6CDSabO

1        In particular, defendants' reading would effectively

2   read annual or special meeting out of the statute entirely, and

3   defendants cannot explain how their interpretation of the

4   statute is consistent with its provision that the term of at

5   least one class of directors must, "expire each year."  That

6   provision strongly implies that Congress intended that there

7   would be an election of directors each year, but, at minimum,

8   the statute sets clear limits on the extent to which directors

9   whose terms have expired without further election can continue

10  to serve.

11        THE COURT:  Well, is that really true?  Right?  I

12  mean, I know throughout Saba's brief you want to characterize

13  the expiration of terms as creating a vacancy, but isn't there

14  some tension between that interpretation and Saba's concession

15  that there's nothing inherently wrong with holdover provisions,

16  which are common throughout corporate law, that when the terms

17  of necessary managers or leaders of a corporate organization

18  would otherwise expire, that no vacancy is created, because the

19  term is deemed to extend until a valid successor is in place?

20        MR. MUSICO:  So, your Honor, I want to make sure our

21  position on holdover directors is clear.  We have not made a

22  direct challenge to the concept of a holdover director in the

23  abstract, in all circumstances, but we were clear, including on

24  page 14 of our opening brief, that the fact that ECAT will have

25  seven unelected incumbents this year, seven incumbents whose

O6CDSabO

1    terms expire.  We took the position, and this is a quote from

2    our brief, "their continued presence as unelected holdovers is

3    flatly contrary to section 16."  And, on that -- sorry.

4              THE COURT:  I just want to push you on this unelected

5    characterization, because, as I understand the facts, those

6    directors were elected within the meaning of the statute.  I

7    know you might disagree with that, but at a time when ECAT had

8    only one shareholder, and so the directors were selected in the

9    appropriate and lawful fashion by the single shareholder, and

10   their status after that point is the status of the holdover

11   director.

12             So what is the basis for characterizing those

13   directors as unelected or directors who have never been

14   elected?

15             MR. MUSICO:  So, your Honor, I can come back to the

16   question of whether these directors were, in fact, elected

17   based on their appointment at BlackRock at the initiation of

18   the fund, but to get to the question about whether they can

19   continue to serve after their terms expire, respectfully, your

20   Honor, we don't understand what the expiration of a term can

21   mean if, by BlackRock's account, those directors can

22   nevertheless continue to serve in perpetuity.  That's

23   effectively their argument, that because they were elected --

24   or their position is that they were elected at the creation of

25   the funds, that thereby they can continue to serve forever.

O6CDSabO

1    And there is no way to reconcile that with the "expiration" of

2    a term.  There has to be a point, if a director's term is

3    expiring, that they come back up for election by the

4    shareholders.

5        Your Honor, again, I think we see this in defendants'

6    own cited authorities, even the *Badlands* case out of the Fourth

7    Circuit recognizes that to the extent holdover directors are a

8    permissible feature of corporate governance, it can only be a

9    temporary or "stopgap" solution.  The full expectation of even

10   the Fourth Circuit in *Badlands* is that holdover directors

11   would -- at some point in time, when the shareholders have

12   another opportunity to elect the directors, will in fact do so.

13        Even in the no action letter cited by the defendants,

14   this is the ICI letter from 1992, the SEC staff expected that

15   even if you count -- you recognized the appointment of

16   directors at the creation of the fund, that they would later be

17   voted on by the public shareholders.  To this point, your

18   Honor, though, whether that initial appointment even qualifies

19   itself as an election, I will note that BlackRock submitted the

20   consent of the sole initial shareholder for the appointment of

21   the directors, and the language of that appointment is

22   conspicuous, your Honor.  It says that the trustees are

23   appointed "as if they had been -- the resolution is adopted, as

24   if it had been adopted at a duly convened meeting of the

25   shareholders of the trust."

O6CDSabO

1          In other words, even the appointment --

2          THE COURT:  Isn't that the standard language in

3    written consent in lieu of a shareholder meeting?

4          MR. MUSICO:  No, your Honor.  Again, section 16(a)

5    says, directors must be elected at an annual or special meeting

6    of the shareholders duly called for that purpose.  The initial

7    appointment recognizes that it is a fix.  It is not even an

8    election at an annual or special meeting of the shareholders.

9          Your Honor, I will note again, even in defendants'

10   cited authorities about whether the expiration of a term

11   qualifies as a vacancy, the Fletcher treatise that they cite,

12   section 344, recognizes that, "officers who were never

13   officially elected as directors after the corporation's

14   inception do not qualify as holdover directors."

15         And then in the Quilin treatise that defendants cite,

16   section 12165, it recognizes that, under certain jurisdictions,

17   it notes -- conspicuously, this is a treatise about municipal

18   corporations, so we're already pretty far afield here, but even

19   that recognizes that, "a legislative intent to depart from the

20   doctrine that expirations are not necessarily treated as

21   vacancies has frequently been expressed."

22         And, your Honor, we believe that intention, to the

23   extent it needed to be made even clearer in the ICA, is clear,

24   given that, again, defendants have provided no explanation for

25   how a term can expire, but a trustee can, nevertheless, remain

O6CDSabO

1    in office in perpetuity.  And so to come back to where we

2    started, at most I think that you can read section 16 to

3    tolerate temporary holdovers up to the percentage limits on how

4    many directors of the fund must have been elected.  That is the

5    most natural reading of the statute.

6         And, again, to the extent there is any ambiguity, as

7    we've argued in our brief, and as the Second Circuit recently

8    affirmed in *Nuveen*, those ambiguities must be resolved in favor

9    of shareholders' electoral rights.

10        THE COURT:  Well, isn't your greater problem

11   shareholder apathy, right, or lack of participation?  Because,

12   if I understand the facts correctly and the sequence of called

13   meetings in 2023, the issue there was less the majority rule

14   than the fact that no quorum could be reached despite, as I

15   understand it, enormous effort and resources expended by both

16   Saba and BlackRock.

17        So does that mean that the quorum rules are unlawful

18   themselves if, in practice, getting more than 50 percent of

19   outstanding shares to even participate has proven difficult, if

20   not impossible?

21        MR. MUSICO:  Your Honor, we don't believe there is any

22   inherent illegality in the quorum requirement or not quorum

23   requirement as applied to ECAT.  It, of course, happens that in

24   funds in certain years they don't reach a quorum, but unlike

25   the standard for receiving the affirmative vote of 50 percent

O6CDSabO

1    of the shares outstanding, which while theoretically possible

2    and in very rare cases has happened, clearly is not attainable

3    in ECAT, a quorum requirement of 50 percent of the shares

4    outstanding, just getting 50 percent of the shares outstanding

5    to vote is fairly routine, and we do expect that that will

6    occur in ECAT this year.

7              The issue with --

8              THE COURT:  But the reason that you think it will --

9    that you'd be able to get over that threshold now is because

10   Saba now has over 25 percent of the shares, so you only need

11   another 25 percent to participate, to get there, right?

12             So if last year's attempted elections failed because

13   of a quorum failure, right -- I mean, I recognize that, also,

14   even if there had been a quorum, no candidate would have gotten

15   more than 50 percent of the outstanding shares, but,

16   ultimately, the reason that those elections did not occur is

17   because there wasn't a quorum.  So how does that create

18   evidence that it's the majority rule, the majority election

19   rule that is the problem?

20             Do you understand what I'm asking?

21             MR. MUSICO:  I think I do, your Honor, but if I end up

22   not being responsive to your question, I'm sure you'll let me

23   know.  In last year's election, you're right that it was the

24   failure to get to a quorum that technically resulted in there

25   being no election.  We do -- as you recognize, we know from

O6CDSabO

```
1    that necessarily that also means that no candidate possibly

2    could have received the affirmative vote of 58 percent of the

3    shares outstanding.  The issue is that the structural

4    impediment to directors being elected in ECAT in a contested

5    election is not the quorum requirement.  We recognize that it

6    is attainable and has been attained in the past and likely will

7    be attained in the future, including this year.  The structural

8    impediment to having directors elected as required by the

9    Investment Company Act is the voting standard that requires the

10   vote be affirmative vote of 50 percent of the shares

11   outstanding.  And so, you know, I suppose we could have come in

12   and sought an injunction against or revision of the quorum

13   requirement as well after last year's election, but, you know,

14   Saba is not here to just be obstructionist.  Saba is here to

15   try to allow shareholders to actually have bondholder -- their

16   rights enforced to elect directors under the Investment Company

17   Act.  And we don't understand the quorum requirement itself to

18   be what's standing in the way.

19           THE COURT:  So just returning to this question of kind

20   of shareholder apathy -- I don't even know if apathy is the

21   right characterization.  We don't really know.  Right?  There's

22   the black box in which exists the shareholders in whom, despite

23   great efforts by both parties, choose not to participate.  So

24   no one is suppressing those votes.  Unlike in some of the cases

25   cited by both parties, there's no effort to, at the last
```

O6CDSabO

1  minute, change the rules, move the meeting, cancel the meeting,

2  make votes returnable in too short of a time so that there's

3  some effective suppression of shareholder participation.

4       And so as we're puzzling through this problem, what

5  weight should be given to the rights, really, the rights of

6  nonvoting shareholders or non-participating shareholders who --

7  one possible interpretation is that they are using their shares

8  and their rights as shareholders to produce, in effect, a

9  continuation of the status quo, that they are expressing -- I

10  don't know how familiar you are with sort of political science

11  voting literature, right, but there's a lot of discussion that

12  people act not only by going to the voting booth but also by

13  choosing not to participate.

14       And so as we're thinking ultimately this is all

15  about -- I think Saba's position is all about a policy that

16  shareholders, all shareholders should have a say in the

17  management of the fund.  So given that, what should I think

18  about what meaning to ascribe to or what weight to give to

19  shareholders who knowing -- presumably knowing the rules, say,

20  you know what; I'm good; everything seems fine to me; and the

21  status quo is good; and I see no need to involve myself in this

22  matter, because I, a shareholder, am comfortable with how

23  things are; and if I do nothing, that will produce a

24  continuation of how things are?  So how should I think about

25  that problem?

O6CDSabO

1          MR. MUSICO:  Your Honor, our position on that is we

2     shouldn't be making those kind of assumptions about what might

3     be in shareholders' heads.  The Act is structured to provide

4     for the election of directors, not the assumptions that

5     directors should be allowed to continue in office unless and

6     until shareholders give some kind of affirmative indication

7     that they want them out.

8          And, now, a couple of other points on this, your

9     Honor.  One is that we do have a pretty clear case that at

10    least one of ECAT's suppositions about what shareholders want

11    is incorrect.  Their general thesis is that shareholders invest

12    in these funds knowing that the capital is locked up, they

13    can't redeem it, they're in it for the long term.  That's

14    entirely inconsistent with the fact that at least 25 percent of

15    the shareholders, now close to 30 percent of the shareholders,

16    were willing to sell their shares to Saba within the last two

17    or so years.

18         Those -- we can certainly infer that those

19    shareholders were not, in fact, interested in sticking with

20    ECAT for the long term, but, more generally, your Honor, we

21    don't believe that this ability to presuppose that nonvoting

22    shareholders are comfortable with the status quo is consistent

23    with the requirement of the Act that the directors actually be

24    elected and that their terms expire.  Again, the clear

25    implication of those provisions is that they must receive

O6CDSabO

1    another affirmative vote of the shareholders in order to

2    continue in office.

3            I'll also note, your Honor, you know, you made a

4    comment about how given Saba's stake of about 25 percent, they

5    only need to get another 25 percent.  Well, it's -- you know,

6    we look at that from the inverse, which is that if ECAT is

7    correct that Saba is going to come in and do all these harmful

8    things to the fund and harmful things to shareholders who want

9    to remain in the fund for the long term, there's a whole 75

10   percent who could come in and vote for the incumbents.  And

11   they're well aware of the rules.  They get all of these proxy

12   materials.  They're aware of what the standard is for actually

13   electing directors.  They still sit on their hands.

14           So the fundamental point is that given that we can't

15   just make these suppositions about what shareholders may or may

16   not be thinking, we have to enforce the plain terms of the Act,

17   which is the directors need to be, in fact, elected at the end

18   of their terms.

19           THE COURT:  Is there some tension here like -- it's

20   not totally clear to me whether Saba's position is that rule on

21   its face violates the '40 Act, or whether the argument is that,

22   well, while the rule on its face might be fine, in practice, in

23   this particular fund, the rule produces a result that can't be

24   reconciled with the '40 Act.  And the answer to that question

25   also interacts with this question of the statute of

O6CDSabO

1    limitations, with the question of like how I would know that

2    we've achieved a system that complies with the '40 Act in the

3    case of this particular fund, like if ECAT went to a majority

4    -- let's say a majority of shares present and voting standard,

5    and after multiple years none of Saba's challenging candidates

6    succeeded in supporting management supported candidates, would

7    that then be evidence that that system also was not effective

8    to give shareholders a say in the operation of the fund?

9         Do you understand what -- I've packed a lot into

10   there, but I think this tension between is the rule statutorily

11   barred or can you only succeed based on the argument that, as

12   the rule plays out, in the context of this fund in particular,

13   it can't be reconciled with the Act?

14        MR. MUSICO:  Let me start where you ended, your Honor,

15   which is the question about, assume these directors replaced a

16   majority of shares outstanding with a majority of shares voted

17   standard, but Saba still wasn't able to nominate candidates who

18   were able to unseat them.  I think the answer to your question

19   in that circumstance as to whether the standard is still

20   unlawful is whether the incumbents have been able to be elected

21   under that standard in those interim elections as well.

22        Saba is not just in here as a sore loser.  Saba is in

23   here trying to make sure that shareholders actually have their

24   ability to elect trustees as they are entitled to do under the

25   Act.

O6CDSabO

1    Stepping back then to your question of is this a
2    facial challenge or is this an applied challenge, we do
3    understand both types of challenges to be possible, but our
4    challenge to ECAT's majority of shares outstanding standard is
5    better characterized as an applied challenge.  This type of
6    challenge, your Honor, we understand to be contemplated clearly
7    by the ICA.  Section 80(a)(46)(B), which is the provision
8    regarding the enforcement and revision significance of
9    contracts that violate the ICA, specifically refers to the
10   ability to invalidate contracts not just which are "made in
11   violation of the Act," but also contracts, "whose performance
12   involves a violation of the Act."
13        It's that latter type of challenge that we are
14   pursuing here.  The application of this majority of shares
15   outstanding standard to ECAT is demonstrably operating in
16   violation of the Act.  That occurred at last summer's meeting,
17   when four of ECAT's incumbent directors failed to be elected,
18   and only 60 percent resumed one expired terms, and is
19   imminently going to be the case after this year's election,
20   when a full 70 percent of ECAT's incumbent directors will be
21   continuing without election and expired terms and only
22   30 percent will have been in office actually having been
23   elected without expired terms.
24        Because your Honor raised how this relates to the
25   statute of limitations issue, first, before we get into the

O6CDSabO

1    doctrinal aspects of it, I just want to take a step back and

2    think about what's at issue here in this statute of limitations

3    question.  BlackRock has accused Saba of being overly

4    litigious, but their position that a challenge to a voting

5    standard must be made at the time the contract is formed, at

6    the time that a shareholder buys shares in a fund, is an

7    invitation to spur investors to bring litigation about disputes

8    that might never materialize.  It would require investors to

9    come in and sue immediately upon buying shares in a fund where

10   they -- that has a voting standard that they think might

11   someday result in directors not being elected at some future

12   election that happens to be contested when no one even knows

13   whether there is or will be a contested election on the

14   horizon.

15        Respectfully, your Honor, we don't believe that there

16   is a reasonable construction that would force investors to

17   bring suits about disputes like that that might never actually

18   materialize.  And, you know, we know from the prior control

19   share litigation against BlackRock that, if we had done that,

20   they'd be in here saying we had sued too early, that we don't

21   even yet have standing because we're trying to litigate some

22   kind of abstract dispute.  It would also just be a trap for

23   investors.

24        It's entirely conceivable that investors would come

25   into a fund, never have an intension of running a contested

O6CDSabO

1    election, never have an intension of putting someone up to

2    replace the incumbents, things are humming along fine at the

3    fund, then it turns out those directors start underperforming.

4    They start, you know, enacting other unfair corporate

5    governance rules.

6          At that point it turns out, hey, you know what, we

7    need to try to replace management of this fund; we're

8    disappointed.  It's only at that point, at the earliest, that

9    they would have a real reason to come in and contest a voting

10   standard.

11         And if you look at the Second Circuit's decision in

12   *Williams v. Binance*, for one thing, it reflects this

13   categorical decision that a claim for recision always must

14   accrue when the contract is formed, but it also recognizes that

15   you have to look to when the violation occurs in order to

16   determine when a statute of limitations starts to run.

17         THE COURT:  So when does -- what is Saba's position on

18   when the claim arose or when the claim could have been brought,

19   first brought?

20         MR. MUSICO:  So I actually think there is -- I think

21   the case law is a little loose with that language, your Honor,

22   and I do think there is a little bit of room between when the

23   violation occurs and the claim accrues for purposes of statute

24   of limitations purposes, and when a potential plaintiff might

25   be able to bring suit.

O6CDSabO

1          And I think you see exactly that dynamic in the *Nuveen*

2      case recently decided by the Second Circuit.  The actual

3      representation -- we can talk about *Nuveen* if it's helpful, but

4      in this case, the actual violation occurred at last summer's

5      election, when the directors failed to be elected by the

6      shareholders as required by section 16(a).

7          If we're being precise about it, I actually think the

8      violation didn't happen until the very end of 2023, because

9      that's when that class of directors' terms expired.  So it's

10      after that point that resuming in office without election

11      triggered the violation of section 16(a).  That's a little

12      different, your Honor, than the question of when a plaintiff

13      may be able to bring suit.  And this is the issue that the

14      Second Circuit addressed in *Nuveen*.  Standing doctrine

15      recognizes the ability of a plaintiff to come in and seek

16      relief to prevent imminent and anticipated future harms from

17      occurring, but the fact that a plaintiff can come in and do

18      that, to try to get relief before the harm even occurs, doesn't

19      mean that their calls of action and that their statute of

20      limitations starts to run before the harm has actually occurred

21      and the violation has actually been perpetrated.

22          THE COURT:  Okay.

23          MR. MUSICO:  Your Honor, I'm happy to address issues

24      --

25          THE COURT:  Well, I have many others questions, but I

O6CDSabO

1  --

2          MR. MUSICO:  No.  No.  Please.  We are very confident

3  in our briefing, and I hope we've laid out the issues as

4  clearly as we can, so I'm happy to use as much of my time as

5  you'll indulge to answer your questions.

6          THE COURT:  Sure.  Just sticking with the merits for a

7  minute, before we go on to the other factors, and just

8  returning to this question about how to think about

9  non-participating shareholders, I think throughout Saba's

10  briefing there is a through line, right, that in effect, in

11  practice, these rules give a greater voting weight to the

12  shareholders who prefer a continuation of the status quo, and

13  that's not fair.  I think that that's a bit of a stretch in the

14  language of the '40 Act, because every share still has one

15  vote.  It's a little bit like a Republican voter in Brooklyn

16  who says it's not fair because the people who prefer democrats

17  keep winning, and the problem is you can't convince enough of

18  your fellow citizens to vote the way you would prefer things

19  come out.

20          So looking at just the language of the Act, it's a

21  little bit of a stretch to say that those shareholders who

22  prefer status quo sometimes have a greater say, but just

23  sticking with that theme for a minute, is it true or what would

24  be your response to a view that Saba's proposed rule or

25  preferred voting rule would produce the opposite effect, right?

O6CDSabO

1    A sort of -- a reliance on the fact of either shareholder

2    apathy or widely diffuse and disbursed ownership as weighed

3    against Saba's concentrated ownership to try to give themselves

4    a single holder of approximately 25 percent of the shares now

5    an outsized voice or say.

6            So the fact of low shareholder participation can be

7    viewed as two ways, right?  I think, in Saba's view, the

8    current rules say, well, all those people get greater say,

9    because everything works to continue the status quo, and people

10   who want the status quo to continue can easily get what they

11   want, but isn't an argument that Saba's proposed rule takes

12   those very same facts and inverts them to give Saba an

13   involved, sophisticated, concentrated shareholder who certainly

14   should be allowed to vote their shares, and you succeeded in

15   getting that part of the case in front of Judge Rakoff, that

16   you can vote all your shares without limitations.

17           But what is your response to that argument, right?

18   That taking your same theme and looking at it through a

19   different lens, the rule you're proposing is designed, uses

20   those same underlying facts to gave shareholders like you a

21   greater say.

22           MR. MUSICO:  So a couple points, your Honor, and,

23   first, I just want to start with a framing point.  This

24   disproportionate voting theory only applies to the second prong

25   of our section 18(i) arguments.  Right.  We have our 16(a)

O6CDSabO

1    argument about election and expired terms and whether the

2    directors in fact need to be elected by the shareholders or

3    whether they can just sort of carry on by fiat.  We have our

4    section 18(i) arguments.  The first prong of which basically

5    overlaps with our 16(a) theory, which is that voting in an

6    election that is really just an election in name only, where

7    the outcome is preordained from the start by the director -- by

8    the incumbent's voting standard, that -- that's a fictional

9    vote, and so can't comply with 18(i) in that respect.

10           So we're only now talking about our third alternative

11   theory about disproportionate voting power, and to answer your

12   question about, well, can't you just say the shoe is on the

13   other foot, I don't think that's quite right, your Honor,

14   because under ECAT's majority of outstanding standard, the vote

15   of one percent of shareholders can defeat the vote of

16   49 percent of shareholders, and that's the sense, as we put it

17   in our brief, the voting power of that one percent is

18   essentially super marked.  It is allowed to trump the votes of

19   a vastly larger number of shareholders.

20           On the flip side, as you're saying, you're right that

21   Saba is the largest shareholder in ECAT, but there is no sense

22   in which its shares are being given any greater voting power

23   than anyone else's shares.  Now, I have to also say, your

24   Honor, the assumption in your question seems to be that our

25   proposed remedy here is that the fund must adopt a sort of

O6CDSabO

plurality voting standard.  As you know, we haven't taken that
position.  That's not the relief we're requesting.  We do think
it is the most natural and appropriate solution, but, again,
it's at least theoretically possible that ECAT's directors
could take a look at the fund, take a look at shareholder
voting patterns, and find some other voting standard, other
than a plurality, that is actually attainable, but that might
still in some sense favor the status quo, at least
theoretically.

          The difference, your Honor, is that the incumbents
have set up a standard that they themselves cannot meet, right?
And that is what is so offensive about the majority of
outstanding standard and in particular this tiered standard.
The incumbents want the plurality in an uncontested election,
so when they stand for an election unopposed, they can say,
look, we -- overwhelming victory by the plurality of shares.

          So, as is now occurring, when there are contested
elections and directors' terms start to expire, they have a
backstop of at least the three directors in this case who are
actually in plurality.  But what they refuse to do is when
there is a contested election, create a standard that someone
can meet, right?  But the standard they have set is one that
can't be met either by a challenger or an incumbent, and we
know from the evidentiary submissions we've given you, your
Honor, and this came out in the discovery in the *Eaton Vance*

O6CDSabO

```
1   case, there are these rare cases where candidates get to

2   50 percent of the shares outstanding.  It's very rare.  They're

3   very unusual circumstances.  But in one of those funds, it was

4   the Cabelli election, it was the incumbent who received the

5   vote of 50 percent of the shares outstanding.  So if the -- if

6   ECAT's directors are so insistent about having a heightened

7   voting standard, it should at least be one that they themselves

8   think they are capable of meeting.

9           THE COURT:  Don't these claims really fit better or

10  sound more in a breach of fiduciary duty argument?  I don't

11  mean to give you legal advice.  Right.  You've brought the

12  claims you've brought, and I don't know -- but I'm quite

13  confident Mr. Buchdahl's a better lawyer than I am, but the

14  fitting of this argument into the statute language of the '40

15  Act seems to me a little bit like a square peg in a round hole,

16  right?

17          Normally, the thing that depends on the evidence, of

18  how things actually work in evidence, are brought as a sort of

19  vibe's based claim, for lack of a better term.  Like a breach

20  of fiduciary duty claims or common law rooted claims like that

21  typically depend more on, look, this is how things are actually

22  working in practice.  As a factual matter, that demonstrates

23  that the directors are not running the fund in the interest of

24  shareholders, right?

25          Maybe you can't answer this, but it's curious to me,
```

O6CDSabO

```
1    right, that we're -- usually a statutory challenge, it fits
2    more in the box of the rule on -- the statute prescribes X,
3    particularly the 33 Act, 34 Act, 40 Act, right, and the
4    governing structure of the fund, it's governing documents, its
5    rules are not lawful when you look at the requirements of the
6    statute.  So maybe circling back to the few questions ago about
7    whether this is an as-applied type of challenge or in-practice
8    challenge, why aren't we talking about this case in -- through
9    the lens of a breach of fiduciary duty that the directors owe
10   to all shareholders?
11             MR. MUSICO:  So, your Honor, there --
12             THE COURT:  I mean, I know you haven't brought those
13   claims --
14             MR. MUSICO:  Yeah.
15             THE COURT:  -- no doubt for good reasons, but how does
16   this fit in the claims that you've brought?
17             MR. MUSICO:  I think I should start by saying, as you
18   know from our complaint and our briefing, we do -- I believe
19   that the text and mandates of the statute are clear and
20   enforceable and correct, and that is of course why we've
21   brought them.  But I don't want to suggest that there may not
22   be potential state law breach of fiduciary duty claims here.
23   That, of course, doesn't mean we needed to assert them, but I
24   think the easiest way of answering your question, your Honor,
25   might be to look at the *Eaton Vance* case, which dealt with
```

O6CDSabO

1    Saba's challenge to a very similar majority of shares

2    outstanding voting standard.  Saba brought claims in this case

3    for breach of fiduciary duty, breach of contract, and for

4    violation of the Investment Company Act.  At summary judgment,

5    the breach of fiduciary duty claims got dismissed.  The breach

6    of contract claim survived, and the breach of contract at

7    issue, that Saba was claiming a breach of, is conspicuously

8    similar to the language of the '40 Act itself, calling for the

9    election of directors.  The ICA claim in *Eaton Vance* is also

10   alive.  I believe it wasn't even challenged at summary

11   judgment.

12        So that case is set for trial this fall, and, your

13   Honor, why the -- why the Investment Company Act is arguably

14   the best fit for this case is that in addition to the clear

15   mandate that the directors must be elected by the shareholders,

16   there is this schema of what happens when an insufficient

17   number directors in office have been elected by the

18   shareholders.  And those are the levels that we see ECAT

19   falling below in last year's election and now in this year's

20   election.

21        So it's -- the scenario that section 16 says is

22   impermissible is exactly the scenario that is playing out in

23   ECAT, and that's why that's the right claim for this case, your

24   Honor.

25        THE COURT:  Okay.  I'm turning to the irreparable

O6CDSabO

1    harm.  I guess, first, before we maybe even get there,

2    BlackRock indicated a number of times in their briefing that

3    they believe that the proper standard is a somewhat higher

4    standard than the default preliminary injunction standard,

5    because the relief that Saba is seeking is essentially a

6    complete relief as to all claims, as well as change the status

7    quo, and -- rather than to prevent the responding party from

8    doing something.  So I think let's start there.

9            Do you agree with BlackRock?  Do you agree that the

10   somewhat higher standard that they've articulated in their

11   brief is applicable to this motion?

12           MR. MUSICO:  Your Honor, we certainly believe we

13   satisfy that heightened standard, and we do agree it applies to

14   the extent BlackRock is incorrect about the availability of

15   post-election remedies.  And so, you know, BlackRock is talking

16   out of --

17           THE COURT:  Explain that to me.

18           MR. MUSICO:  Yes.  BlockRock's talking out of both

19   sides of their mouth when they say, Saba, you can't show

20   irreparable harm because after the election you can always

21   basically get a do-over.  You can get another election under a

22   different standard, and you can get our people taken out of

23   office, so on, and so forth.

24           To the extent that's true, it should apply equally

25   well to BlackRock where, if this Court invalidates the voting

O6CDSabO

| | |
|---|---|
| 1 | standard and whatever voting standard this Court puts in place |
| 2 | allows Saba's nominees to be elected but this litigation |
| 3 | continues and is ongoing, by BlackRock's own logic, they should |
| 4 | be able to come and say, well, no, this litigation is still |
| 5 | continuing and that voting standard is wrong, and so we should |
| 6 | be able to remove Saba's nominees and put or directors back in. |
| 7 | So we disagree with that position about the |
| 8 | availability of post-election remedies, but that's BlackRock's |
| 9 | own position.  And so if they really mean that, then they can't |
| 10 | seriously contest that, you know, giving us relief now would |
| 11 | irrevocably give us everything we are entitled to.  Those |
| 12 | positions are inconsistent. |
| 13 | That said, there is irreparable harm here, and Saba |
| 14 | has demonstrated both the substantial likelihood of success on |
| 15 | the merits and a strong showing of irreparable harm.  And -- |
| 16 | THE COURT:  Let's pause on that for a moment, because |
| 17 | I'm curious to hear your best argument for why leaving in place |
| 18 | the rules that existed when Saba purchased its shares until |
| 19 | this litigation can play out fully on the merits, how are |
| 20 | leaving those rules in place irreparably harming Saba's |
| 21 | interests or the interests of other shareholders generally? |
| 22 | MR. MUSICO:  Yes, your Honor.  We have cited cases |
| 23 | from across the country, specifically Delaware and |
| 24 | Massachusetts, as well as federal cases, allowing directors who |
| 25 | have not been actually elected by the shareholders to continue |

O6CDSabO

1    in office and continue to take actions on behalf the fund and

2    on behalf the shareholders.  Every day they do that without

3    being properly elected is an irreparable harm to the

4    shareholders.

5        If we end up down the road, and as -- your Honor finds

6    that the voting standard was, in fact, invalid and BlackRock's

7    director shouldn't have been able to remain in office, in that

8    interim period, they're going to continue to make any number of

9    decisions on behalf of the fund, and the question will be have

10   all of those actions been ultra vires?  Do we need to try to

11   unwind all of them?  That is why, in these cases about

12   elections of directors, Courts routinely find that depriving

13   shareholders of their right to vote, and specifically their

14   right to elect directors, is categorically an irreparable harm.

15       THE COURT:  But don't all or at least the majority of

16   those cases that you've cited involve situations where the

17   existing board or existing directors have themselves taken some

18   steps to prevent election?  Right?  We're canceling the

19   meeting, we are changing the proxy rules, we are eliminating

20   board seats, something that is -- as opposed to I think the

21   situation we have here, and, frankly, the situation that

22   existed last summer, right, like a quorum could not be reached,

23   the existing directors carried on.  So isn't there -- or I

24   guess maybe not isn't there -- is there some fundamental

25   difference, meaningful, substantive difference between a

O6CDSabO

1   circumstance in which the status quo continues for some amount

2   of time that it takes to bring this case to sort of ordinary

3   conclusion, versus the cases that you primarily rely on, which

4   I agree, it can be characterized as something is happening that

5   is depriving shareholders of their right to control the people

6   who control the company.  But is there something substantively

7   different between actions being taken by incumbents to change,

8   diminish, alter the rights of shareholders, as opposed to the

9   situation here where even if the current situation is a bad

10  one, it's the one that you bought into and it's just going to

11  -- the existing situation is just going to stay in place until

12  the case plays out in its ordinary course?

13          MR. MUSICO:  So, your Honor, I see the distinction

14  you're making, but it's one that I don't think makes a

15  difference with respect to the issue of irreparable harm.  So

16  the fact patterns you're describing where directors are

17  changing the rules midstream and doing those sorts of things,

18  those are the types of cases, going back to your earlier

19  question, that typically tend to sound in breach of fiduciary

20  duty.  That's one difference.  That's why I think you see most

21  of those cases being brought as breach of fiduciary duty

22  claims.  They might also go to the issue of balance of the

23  equities.

24          This issue of maintaining status quo or changing

25  status quo I think is typically analyzed under the balance of

O6CDSabO

1    equities problem.  We can get to that in a second, because we

2    do think the equities clearly favor granting injunctive relief

3    to Saba as well, but on the issue of irreparable harm, I don't

4    believe there is a difference, your Honor, because however the

5    incumbent director has managed to do it, whether it's a change

6    or whether it's a rule that they put in at the initiation of

7    the fund, or whatever it is, if it's a rule that is

8    disenfranchising shareholders, that is creating these failed

9    elections that happened last year, that is going to happen

10   again this year, the harm to shareholders of not having a say

11   in the election of their directors is the same.  Reordaining

12   the results of an election in favor of the incumbents is always

13   irreparable harm.

14        As to the balancing of the equities issue and this

15   issue of, you know, maintaining status quo or change the status

16   quo, I take the point that we are seeking a change in the

17   voting standard, but there are a number of ways in which that

18   isn't the status quo.  Status quo, prior to last summer, was

19   applying a plurality standard in the one uncontested election

20   that happened.  The status quo before last summer was that ECAT

21   had an entire board full of people without unexpired terms,

22   right?  Who were still duly serving their term.  That is what

23   changed last summer, and that is the deviation from the status

24   quo.

25        With respect to the equities more generally, your

O6CDSabO

1    Honor, there are a number of issues floating around about is

2    Saba coming in and taking self-interested actions and trying to

3    help it, you know, enrich itself at the expense of long-term

4    shareholders.  It's not true.  Saba is coming in, seeing an

5    opportunity to unlock value for all shareholders, but putting

6    that aside, it's an issue that is completely water under the

7    bridge after the Second Circuit's decision in *Nuveen*.  Pages

8    120 and 121 of that opinion in particular, footnote 17 and 18,

9    go through this entire analysis about the policies and purposes

10   of the Investment Company Act and concluded that they favor

11   Saba, that the Investment Company Act always favors protecting

12   the interest of shareholders and their voting rights over the

13   entrenched interests of incumbent management.  It is an issue

14   that is now settled in this circuit, and --

15          THE COURT:  Right, but isn't there a difference

16   between -- I definitely take your point that this will be a

17   preview, but I don't really put much weight on the

18   characterization of Saba as an act of a shareholder, whatever

19   that even means.  You have a right to vote your shares, however

20   many shares you have.  That's well established.  The

21   characterization of the motives of such a shareholder are, it

22   seems to me, largely irrelevant to these questions.  But I

23   think there's also an overstatement on Saba's part on how to

24   think about the balance of equities.  Essentially, who is on

25   which side, who is on the other side of the scale, right?

O6CDSabO

1          Okay.  Clearly, Saba is on one side, and, arguably,

2     the interests of other shareholders who may share Saba's goals,

3     but I think the lens through which you've presented the balance

4     of equities and the cases that you cite is that the other side

5     of the scale is solely in the interest of current directors in

6     staying in their position.  But it seems to me that that's

7     maybe not quite right, because I think what BlackRock would say

8     is that -- and not just BlackRock itself, but the BlackRock

9     defendants generally, including the current board members, is

10     no, no, as current board members, we have a fiduciary duty to

11     act on behalf of all shareholders, and including the

12     shareholders who aren't present as parties in this litigation,

13     who bought into -- I'm just speaking on their behalf, not

14     necessarily adopting it -- but who bought into a fund that was

15     structured in a certain way, that is maybe a little bit sleepy

16     but is providing steady returns, and those folks want their

17     money in a vehicle that has a status quo bias, that is,

18     management maybe has an outside say, but they, as shareholders,

19     are choosing that, right?

20          So is it really right to say that the balance of

21     equities assessment is the way that you've presented it?

22     Right?  That it's Saba on one side, and the other side is only

23     the interest of current directors remaining in their post sort

24     of for themselves?

25          MR. MUSICO:  Your Honor, respectfully, that is exactly

O6CDSabO

the debate that happened in *Nuveen*, and when the Second Circuit

found that the policies and purposes of the ICA favor Saba's

position, that's not to say that there's necessarily nothing on

the other side but it's that, when you look at the totality of

the circumstances and you look at the policies and purposes of

the Act, they favor Saba's position about voting rights and

electoral rights, and, specifically, on the issue you raised,

your Honor, it's footnote 18 of the *Nuveen* decision that

specifically addressed this issue of concentrated shareholder

and whether that is -- whether management can appropriately

take steps to combat concentrated shareholding.

        The Second Circuit said, look, we get it, but even if

there is attention there, I have to come down on the side of

giving shareholders the opportunity to actually elect their

trustees, and the language that the Second Circuit used was,

give shareholders the opportunity to choose new directors when

they cease to meet with their approval.

        And so, you know, I don't want to rehash points we've

already discussed, your Honor, but it does come back to this

point of, if they're right, if there really are so many of

these shareholders out there who like the incumbent management

and want the fund to stay on the course that it's on, they

should get them to come out and vote for the incumbents.

That's especially true when, until recently, BlackRock was the

only party in this proxy fight with the Noble list, the list of

O6CDSabO

1    the shareholders to go out and contact.  And you better believe

2    BlackRock was out there pounding the pavement, trying to turn

3    out their every vote they can, and they couldn't do it.

4            So, at this point, again, when you're going to have

5    only 30 percent of the board whose terms have not expired, we

6    need some affirmative indication from the shareholders of who

7    they want running this fund.

8            THE COURT:  Okay.  So I have one more question just on

9    the public policy arguments or what's in the public interest.

10   So Maryland's corporate statute says, as a default, right, like

11   companies can adopt other rules, trusts can adopt other rules,

12   but if they haven't adopted other rules, then the default is

13   that majority of all shares outstanding is the default for

14   shareholder expressions of their preferences or changes that

15   require shareholder approval.

16           So does your public policy or public interest argument

17   mean that essentially all Maryland investment trusts who have

18   adopted Maryland's default rules are operating unlawfully and

19   against public policy?

20           MR. MUSICO:  No, your Honor.  So, for one thing, that

21   statute in Maryland, the statute's general application, we're

22   specifically here talking about the subset of companies that

23   are regulated under the Investment Company Act.  I think our

24   position on this issue, I'm not sure I have a lot to add to our

25   briefing, but, as you know, we've argued that the Maryland

O6CDSabO

1   default rule specifically gives statutory trusts leeway to

2   deviate from it.  So it is in no sense a requirement of

3   Maryland law, and, as you know, defendants already have

4   deviated from it in the case of an uncontested election, in

5   holding only themselves to a plurality standard, while any time

6   anyone comes in and challenges them, they create this

7   heightened standard.

8           So the idea that they are, you know, going to seek

9   cover in Maryland public policy, for lack of a better word,

10  your Honor, it's a joke, because they have already deviated

11  from it.  They've already abandoned the cover of Maryland

12  public policy when it benefits themselves.

13          THE COURT:  Isn't that really the issue?

14          I guess is this a question really for Mr. Mundiya more

15  than you, but isn't the real issue here having two different

16  voting standards for when an election is contested and when it

17  is not?

18          MR. MUSICO:  Now, I'm not sure I understand the

19  question, your Honor.

20          THE COURT:  Well, to jump off from your point that the

21  fund has put in place a rule that says, where there's only one

22  candidate for each seat, you only need to have a majority of

23  the shares present and voting, whether by proxy or physically

24  present, and then they have a different standard for a

25  contested election, I mean, isn't that gap really the issue?

O6CDSabO

1  What if the fund had the same majority rule for both contested

2  and uncontested elections?  What would Saba's view be of that

3  rule?

4  MR. MUSICO:  Your Honor, the gap is telling, but I do

5  think we'd have a problem even if the standard across the board

6  were majority of shares outstanding, and if these directors,

7  even in an uncontested election, couldn't muster the shares,

8  get -- you know, muster, getting the votes of the shares -- of

9  50 percent of the shares outstanding, right?  That is what is

10  inconsistent with 16(a).  They'd be setting up a voting

11  standard where they are not being affirmatively elected by the

12  shareholders, even after their terms expire.

13  If they can't -- in some sense, your Honor, I think

14  the problem is even more exaggerated.  If they can't even get

15  shareholders to come out and vote for them when no one is even

16  stepping up to say they're doing anything wrong, then we really

17  have a problem, then something is functionally completely off

18  the rails, and I think, yeah, we'd be in the same boat.

19  THE COURT:  So before we switch parties here, I think

20  maybe the last issue, it would be helpful for me to have you

21  address the argument about delay and that Saba is here asking

22  for extraordinary relief out of the ordinary course when, if

23  they had only raised the issue in August, September, October of

24  last year, when it became clear that no election was going to

25  occur in 2023, that there would have been time for this to play

O6CDSabO

1    out in the ordinary course, and that that should weigh against

2    Saba's claim of irreparable harm when they've delayed

3    unreasonably.

4            MR. MUSICO:  Yes, your Honor.  We don't -- there's

5    been no unreasonable delay here.  When the meeting was

6    adjourned in August, Saba had no reason to believe that that

7    was the last shot at it.  The fiscal year ran through the end

8    of 2023.  The ICA, ECAT's own bylaws, New York Stock Exchange

9    rules, said the fund had to have a meeting in 2023.  We

10   obviously have a dispute about the ICA, but there's no dispute

11   about the bylaws and about New York Stock Exchange rules.

12           Under the rules, they were obligated to have that

13   meeting.  We saw them adjourn the meeting twice before.  Our

14   only reasonable expectation from that was that they would keep

15   trying.  It was only by the end of the -- by the end of the

16   year that they didn't actually get anyone elected during their

17   -- before the expiration of their term.

18           Even putting that aside, your Honor, we are -- we did

19   file suit at least four months before when we anticipated the

20   election to occur.  As we know from last year's meeting, there

21   was a possibility of adjournments, that this, that, you know,

22   meeting would actually not conclude until later in the year.

23   Potentially even, you know, later than it happened last year.

24   So there was ample time to have this resolved in an orderly

25   fashion.

O6CDSabO

1          As you've seen from the way this is playing out,

2   defendants had an opportunity to respond to Saba's motion on an

3   even longer schedule than is typically allowed under the rules.

4   They chose not to submit anything in response to our

5   evidentiary submissions, but there was ample time to have done

6   so.  But maybe most importantly, your Honor, it's not clear

7   what else there is to be done.  The main dispute at this point

8   is whether the Investment Company Act actually does what we say

9   it does, which is require them to have directors who are

10  actually elected.

11         This case is unlike, you know, *Eaton Vance*, which has

12  gotten a lot of discussion in BlackRock's briefing, and to some

13  extent in our argument today, where we were to some extent

14  doing that predictive exercise, where Saba was trying to get

15  relief in advance of harm actually occurring.  Here, the harm

16  is happening in realtime.  We're seeing, in last year's

17  election, the director's failing to be elected.  We're seeing,

18  in this year's election, no dispute from BlackRock that no

19  one's going to get elected.  And so we're in the scrum is what

20  I'm trying to say.  And so, inevitably, in the event these

21  things are happening in realtime, you're always going to be a

22  couple months after or a couple months before an election --

23  there's no sense in which we unreasonably delayed before or

24  after another one of them.

25         I'll say, your Honor, in response to a number of cases

O6CDSabO

```
1    that they've cited on this delay issue, they are readily
2    distinguishable, particularly on the equity issue.  Those
3    issues involve delays of several years.  The ones who deal with
4    elections, several of them involve parties letting several
5    elections pass before they even came in to change the rules at
6    issue.  And maybe the most important through line of those
7    cases is the plaintiff comes in and sues so close to the
8    election at issue, or sometimes it's a parade, it's so close to
9    the event, you know, usually like a couple days before, that
10   the request for relief would disrupt the event itself.  Right?
11       Someone is looking to completely change a ballot, or
12   get someone else nominated, or, you know, have someone be able
13   to protest at a parade.  There's types of things that would
14   disrupt the event.
15       THE COURT:  Render the election impossible, right,
16   like the election could not go forward as scheduled if relief
17   were granted, whereas I think is Saba's position would be if
18   the relief were granted, the election could still go forward
19   this summer, just under different rules than exist now.
20       MR. MUSICO:  And to be clear, your Honor, the election
21   is happening.  The meeting is the day the votes are finally
22   tallied and counting, but shareholders are already voting in
23   this process.  So nothing is disrupted in terms of the conduct
24   of the election.  We're only here to figure out what rules will
25   be applied to determine the winner and hopefully have a -- make
```

O6CDSabO

1    sure that the ECAT applies a standard that actually allows

2    someone to emerge from these elections a winner, as the ICA

3    clearly contemplates will be the case.

4              THE COURT:  Okay.  So, Mr. Musico, anything else that

5    you would like to say while you're on your feet that I haven't

6    given you a chance to say with my questions?

7              MR. MUSICO:  Your Honor, I appreciate your time.  I

8    hope I was helpful in responding to your questions, but I will

9    save the rest of my time for rebuttal.

10             THE COURT:  Okay.  Great.  This has been very helpful.

11   Thank you.

12             Because I want to give the reporter a break before too

13   long, and I don't want to interrupt your presentation,

14   Mr. Mundiya -- am I pronouncing it right?

15             MR. MUNDIYA:  That's perfect, Mundiya.

16             THE COURT:  All right.  I'm going to give myself a

17   gold star.

18             Why don't we take a brief break, and give the reporter

19   a little break, and resume at 3:30.

20             All right.  We are adjourned.  Thank you.

21             (Recess taken.)

22             THE COURT:  You can be seated.  Thank you.

23             MR. MUNDIYA:  Your Honor, I have a few slides.  You

24   may or may not refer to them.

25             THE COURT:  I'd love a hard copy if you have them.

O6CDSabO

1    Thank you.

2              MR. MUNDIYA:  Thank you.

3              I have one for my friends here, and one for your

4    clerk.  Thank you.

5              THE COURT:  Thank you.

6              MR. MUNDIYA:  So, your Honor, let me begin by maybe

7    procedurally framing the case.  They moved for a preliminary

8    injunction, extraordinary relief.  We think it's mandatory, we

9    think they need to satisfy the highest standard, but I'm also

10   going to address the 12(b)(6) motion that's part of my

11   likelihood of success on the merits prong, because we think

12   they both dovetail together sufficiently that way.  We don't

13   think they state a claim, and so the case should be dismissed

14   as a matter of law under 12(b)(6), and the injunction should be

15   denied under the heightened standard in the Second Circuit.

16             Let me focus on one of the things your Honor asked my

17   friend, Mr. Musico, which is why federal law here -- what are

18   we doing talking about section 16(a) and section 18(i).  This

19   is a one-count complaint effectively, a section 47(b) complaint

20   under the '40 Act.  This is a claim for declarative relief.

21   But section 47(b) is the vehicle through which they're saying

22   that 16(a) and 18(i) have been violated.

23             I'll get to a threshold issue in a bit about whether

24   they even have standing to seek injunctive relief, because I

25   think that's an important threshold issue given the limited

O6CDSabO

private right of action that the Second Circuit has held in
*Oxford University Bank* as to claims for recision.  We actually
don't think they have standing to seek an injunction.  That is
a cause of action that belongs to the SEC, and that's -- I
don't want to spend too much time on that, but we think it's a
threshold issue.

But the point is there's no state law claim for breach
of fiduciary duty.  There's no state law claim for breach of
contract.  And so we have one federal claim, and in order for
you to grant this extraordinary relief, they would need to show
that, one, they have standing; two, that their claims are not
barred by res judicata, statute of limitations, laches; and
also that the '40 Act actually says what they say it says.

They then have to show strong irreparable harm.  They
then have to show the equities are in their favor, and they
have to run the table to get that relief.  They have to win on
one of those issues to get this extraordinary relief.  And we
don't think they meet any of those standards.

But before we get to those elements, the one thing
that I think you see from what Mr. Musico has said and from
their briefs and from our briefs, what they're asking for is
really very novel.  It's unprecedented.  We aren't aware, and I
don't think they're aware of any case law ever in which a claim
under 16(a) or 18(i) has been found to somehow violate a voting
standard.  It's not surprising, given that the Supreme Court

O6CDSabO

1    has held that states are the primary regulators of the

2    corporate -- of corporate law.  Internal corporate affairs are

3    really issues of state law, and unless you can find a clear and

4    manifest intent to preempt that, state law governs.

5          And we could spend all day, all afternoon, all evening

6    looking for that clear and manifest intent to preempt state

7    law.  You wouldn't find it.  There's nothing in 16(a).  There's

8    nothing in 18(i).  There's nothing in (i) that says state law

9    doesn't apply.  There's nothing in those provisions that talk

10    about a voting standard.

11          And one of the things Mr. Musico did not talk about

12    this afternoon is the fact that in the '40 Act, there are

13    multitudes of instances where Congress has outlined what the

14    voting standard is.  And I'm going to go a little bit out of

15    order here, your Honor, but if you go to slides 6 through 11,

16    we have a -- just a slough of examples where Congress has said

17    that you would require -- when you would require a vote of a

18    majority of its outstanding voting securities, when you want a

19    change in investment policy, when you want to affect the

20    contracts of advisors and underwriters, when you want to change

21    and affect the capital structure of investment companies, when

22    you want to impact close-end companies.  That's section

23    18(a)(23).  When you want to deal with accounts and auditors.

24          I mean, all of this, all of these provisions include a

25    vote standard.  So if Congress had wanted to have a vote

O6CDSabO

1    standard in 16(a) or 18(i), it could have done so.  And we have

2    case law in our brief that shows when Congress uses a

3    particular word or standard in one section of a statute but

4    doesn't in another, that's some indication of what Congress's

5    intent is.

6            THE COURT:  Right.  But let me ask you this question,

7    setting -- I agree with you that I don't think that the '40 Act

8    prescribes a particular method of voting or way of counting or

9    standard, but I think kind of the gravamen of Saba's argument

10   is less than that this particular standard by itself is

11   unlawful, but, rather, that any standard, a standard, whatever

12   it might be, that produces these results cannot be consistent

13   with the '40 Act.

14           So I guess my question to you is how long can this

15   situation continue before BlackRock would concede it's a

16   problem?  Right?

17           So let's imagine that year after year Saba, or some

18   other shareholder, or someone comes out of the woodwork and

19   says, boy, I'd like to be on the board of this fund, and they

20   -- I actually don't know how someone becomes a nominee for a

21   spot.  I don't think it matters.  They're contested elections.

22   A contested election triggers this majority of all shares

23   outstanding standard or whatever the standard is, right?  It

24   triggers a standard for a contested election, and year after

25   year that standard can't be met.  So the existing directors are

O6CDSabO

1    in a holdover status.

2              Is there any point where that's a problem, given the

3    requirements of the '40 Act for the governance of funds of this

4    type?

5              MR. MUNDIYA:  I think I have two responses to that.

6    One is that situation is a function of what your Honor

7    identified at 2:00 this afternoon, which was that's just a

8    function of maybe voter lack of engagement, of voter -- I think

9    you used the word apathy, but the fact that shareholders decide

10   not to show up to vote is itself an expression of choice.

11             Those shareholders know what the vote standard is.

12   They bought into these funds knowing of the long-term

13   investment horizon.  They knew the consequences of not showing

14   up and not voting.  And if that is -- if holdovers are the

15   consequence of voter lack of engagement, because that voter

16   decides that he or she is okay with the status quo, that's

17   consistent with voter choice, it's consistent with the board's

18   fiduciary duties.

19             However, if there was a -- if there did come a point

20   where directors who were elected initially, to be sure,

21   continue as holdovers, if shareholders like Saba wish to

22   challenge that, there is a vehicle for that under state law.

23   They could go to Maryland State Court and address those issues,

24   either as a breach of fiduciary duty, a breach of contract,

25   what have you.  One the questions you asked Mr. Musico is why

O6CDSabO

1   not a fiduciary duty claim?  Why not go to court and say, this

2   is outrageous?  What's going on?  The reason they couldn't do

3   that is because they would be litigating in Maryland State

4   Court.

5           There is a forum selection clause in our

6   organizational documents, and they don't want to be in Maryland

7   Court, because they know, consistent with Maryland law, that

8   they would have a hard time finding a judge, certainly on the

9   basis of one election, that says there's a breach of fiduciary

10  duty.  But there are remedies for them under state law, just

11  not under federal law.

12          So to answer your question, there might come a time

13  where shareholders such as Saba wish to displace the directors

14  under some law, but that law is not the law of 16(a), it's not

15  the law of 18(i).

16          THE COURT:  Well, so does that mean that your answer

17  to my question is that 30 years of holdover directors would not

18  violate the '40 Act?

19          MR. MUNDIYA:  We're not talking --

20          THE COURT:  Is there no point at which a board

21  composed entirely of holdover directors would violate the '40

22  Act?

23          MR. MUNDIYA:  That's not the case before us.

24          THE COURT:  But it's a question I'm asking you,

25  because I think it is a relevant question.

O6CDSabO

1          MR. MUNDIYA:  It is a relevant question.  At that

2    point, perhaps the SEC would get involved, perhaps there would

3    be a regulatory issue.  But, certainly, it's not an issue that

4    the private shareholder would have standing to bring.  So we're

5    not saying that that wouldn't be an issue.  It might be an

6    issue for some other body, but --

7          THE COURT:  Right.  So I think, if I'm right, their

8    answer is if that situation were to come to pass, it doesn't --

9    it wouldn't change your fundamental point that individual

10   shareholders couldn't bring that action.

11         MR. MUNDIYA:  That's right.

12         THE COURT:  At least couldn't bring that action under

13   the '40 Act.

14         MR. MUNDIYA:  Under the '40 Act for sure.

15         THE COURT:  Okay.  What if -- I know this is not the

16   facts here, but I just want to push you a little bit.  Even

17   directors of BlackRock don't live forever, so vacancies are

18   created, because they die, they say, you know what, I don't

19   want to do this anymore, I'm moving to Florida to play golf,

20   whatever.  I guess you could probably move to Florida and play

21   golf and still be a director of this fund.  But if there are

22   vacancies, I mean, I think we would all agree, you'll tell me

23   if you don't agree, but that vacancies, actual vacancies, not

24   term expiration but vacancies created through death or

25   resignation can never be more than a third of the --

O6CDSabO

1          MR. MUNDIYA:  Right.

2          THE COURT:  -- board, because I don't know what the

3    ECAT rules are, but I would assume most funds have a vacancy

4    replacement, a mid-term vacancy replacement practice where a

5    majority of the board, or some other means, can appoint

6    directors, right?  Typical --

7          MR. MUNDIYA:  That's right, as long as -- sorry.  I

8    didn't mean to interrupt you.

9          THE COURT:  No.  That's fine.

10          So if there are vacancies, and the elections to fill

11    those vacancies are contested ones, and they result in a null

12    set, no candidate has successfully won, then what happens?

13          Does the board just dwindle down to zero?  That can't

14    be right.

15          MR. MUNDIYA:  No.  The vacancy would be filled by the

16    directors, and as long as the board consists of two-thirds of

17    directors or trustees who were elected by shareholders, those

18    vacancies can be filled by the existing trustees.  And then

19    those trustees that were -- whose vacancies -- who assumed

20    those vacancies, they would be up in the next class.

21          So if they were Class 1 or Class 2 or Class 3, they

22    would then come up with a natural course at the next election,

23    and if there was a contest, it would be a contest for those

24    trustees.  And if there was no contest, it would be

25    uncontested.  But those trustees would be -- those vacancies

O6CDSabO

```
1   would be filled.  And so long as the board existed of

2   two-thirds of trustees who were elected, then those new

3   directors would then be up for election in the normal course.

4          But here every one of these trustees was, in fact,

5   elected and will serve until their successor is elected.  So

6   there were no -- and I know your Honor -- I think your Honor

7   agrees with me there were no vacancies here, right?  They were

8   all trustees until the successor elected.  So there's no

9   vacancies.  They will continue until successors are qualified

10  and elected.  And that may happen this year.  It may happen

11  next year.  But the fact that voter lack of engagement may mean

12  that it may not happen for some time doesn't mean that they

13  have a cause of action under 16(a) or 18(i).

14          THE COURT:  I've taken you off course, so go ahead.

15          MR. MUNDIYA:  I'm sorry.  I actually prefer that.  So

16  when we get to the standard to seek an injunction, strong

17  standard, and because we don't think the S -- they don't have

18  standing, the SEC does to seek injunctive relief, that may be

19  the end of the case for Saba.

20          The two things they say is because 47(b) has a --

21  talks about recision, therefore, they have a right to seek

22  injunctive relief, that one form of equitable relief is

23  consistent with another form of equitable relief, we don't

24  think it's right.  We would refer your Honor to the *FTC* case

25  where the FTC tried to make a similar argument, and in that
```

O6CDSabO

1    case, the Supreme Court said quite clearly that just because

2    the SEC has -- the FTC, rather, has the ability to seek

3    permanent injunctive relief does not give it a right to seek

4    disgorgement.

5         And under *AMG Capital* and the limited private right of

6    action they have under *Oxford University Bank*, we don't think

7    they even have standing to bring a claim for injunctive relief.

8    But let's assume that they do.  Let's turn to section 16(a) and

9    talk a little bit about the merits.  16(a) makes it pretty

10   clear, and that's -- this is slide three.  Thank you.

11        THE COURT:  I'm there.

12        MR. MUNDIYA:  No person shall serve as a director

13   unless elected to that office.

14        And if we go to slides four and five, I don't think

15   there's any question that they were elected consistent with

16   section 16(a).  16(a) says, at a meeting, annual meeting or

17   special meeting.  Maryland law says that if you have a special

18   meeting, it can be -- it can occur through a written consent.

19        Your Honor asked Mr. Musico, isn't this written

20   consent consistent with every other written consent that we

21   see, and it frankly is.  And so you have a written consent that

22   is the equivalent of a special meeting under the '40 Act,

23   consistent with our bylaws.  So I don't think there's any

24   genuine question that these trustees, all of them, slide five,

25   all of them, were elected, and that terms expired in 2022,

O6CDSabO

2023, and 2024, and there was an election in 2022.  It was

uncontested.  It was after the public shareholders did vote.

        And then in 2023, there was a lack of a quorum, so

they held over.  And so all of these trustees are up for

election in 2024.  And Saba, if it wins under its new standard,

will take control and then do with the fund what it has done at

other fund complexes.

        Now, you know, we agree that Saba is a 28 percent

stockholder.  We agree that it has a right to vote.  But the

notion that there's no irreparable harm here if they take

control is fanciful.  I mean, this is a clear case of

irreparable harm, and the balance of hardships that's decidedly

in our favor.

        We have had a voting standard that has been in place

since the day this fund was formed in 2021.  In 2020, they

challenged an identical bylaw provision in *Eaton Vance*.  They

bought shares in 2022.  They could have sued then.  So they

have known about this bylaw provision from the day they

purchased, and they did nothing.  They did nothing.

        So the notion that, you know, somehow their lack of

engagement with us is justifiable or they were waiting for

something to happen that would trigger their right to a

lawsuit, we think is really, really misplaced.

        THE COURT:  Mr. Mundiya, what's the justification for

having -- for allowing a plurality vote of shares present for

O6CDSabO

uncontested elections but requiring a majority of all -- most

shares standard for contested elections, if not to keep

challengers from coming forward to replace members of the

board?

MR. MUNDIYA:  So we have two standards:  The majority

of the votes present for uncontested elections, and the

majority of the votes outstanding for contested elections.

Where you have a contested election, it's -- there's

going to be dramatic change or certainly potential for dramatic

change, and here you are going to have, in 2024, a potential

change of control where all seven trustees are out.  When you

have -- when you have dramatic change on the table, it is

entirely reasonable to make sure that you have a broad swath of

shareholder support, and that support can be people voting, but

it can also be, as I said at the outset, people saying, with

full knowledge of the voting structure, I'm staying home

because I like the status quo.

And so when you have dramatic change on the table,

like a change in control, the board believes -- and this is

common in most fund complexes, there's nothing unique to

BlackRock.  This is common that when you have dramatic change

on the table with board change and board refreshment, and

potential changes of control, and potential changes of

investment policies, that you want a broad swath of shareholder

support.  That's why you have a broader threshold, where you

O6CDSabO

1    have an uncontested election, and that is not on the table.

2    That's where you have a different standard.

3              THE COURT:  I've sort of two, kind of two offshoot

4    questions from that question.

5              MR. MUNDIYA:  I think I said majority votes present.

6    I think I meant to say plurality.  I apologize.

7              THE COURT:  Yes.  I was going to ask you about that.

8              MR. MUNDIYA:  Right.  No.  I apologize.

9              THE COURT:  My first question is, is it a problem or

10   what should I make of the fact that, in effect, the uncontested

11   election is like supercharged because of broker voting rules?

12   So I recognize, or not, BlackRock's creation or ECAT's

13   creation, but certainly an entity like BlackRock is well aware

14   of the restrictions on broker voting, so that in a situation

15   where there's not really a choice and it's just thumbs up or

16   thumbs down, brokers can vote all their street name shares,

17   right, without securing individualized directives from

18   shareholders.

19             MR. MUNDIYA:  In an uncontested --

20             THE COURT:  Right.  In an uncontested.  So the

21   plurality of all shares present rule is in effect kind of

22   supercharged by the existence of that broker rule, which I

23   know, again, is not of BlackRock's or ECAT's making, whereas in

24   the contested election scenario, having a majority of all

25   shares outstanding rule is really -- again, because the

O6CDSabO

 1    comparison between the two is actually more stark than it

 2    appears on its face, because of the operation of these broker

 3    voting rules.

 4              Should I give that any weight at all?

 5              MR. MUNDIYA:  No.  None.  None.  Because that's the

 6    standard that has been in the industry for years.  It's a

 7    standard that the SEC has known about for years.  And when --

 8    the only vehicle through which you might look at that is

 9    section 18(i), which is where they -- where this is relevant to

10    them.  And with respect to 18(i), every share has an equal

11    vote.

12              THE COURT:  Right.  In either situation --

13              MR. MUNDIYA:  That's right.

14              THE COURT:  Every share has an equal --

15              MR. MUNDIYA:  That's right.

16              THE COURT:  My second sort of sub-question is I think

17    BlackRock would concede that the voting structure of ECAT now

18    contains a status quo bias, and so my question to you is, is

19    there anything about a structural status quo bias itself that

20    is inconsistent with the '40 Act?

21              MR. MUNDIYA:  No, your Honor, there isn't.  The status

22    quo bias is a function of lack of engagement, but it's also

23    consistent with Maryland law, which is I think where you look

24    to.  And unless there was -- unless there's something express

25    that says status quo bias is somehow inappropriate or wrong or

O6CDSabO

1    a problem, I don't think you can imply anything into the '40

2    Act that attacks or, you know, questions or makes relevant

3    status quo bias.

4           And a status quo bias, by virtue of voting standard,

5    because I think that's what we're talking about, a status quo

6    bias by virtue of voting standard, and if you look at other

7    provisions of the '40 Act which lay out a voting standard, if

8    Congress wanted courts to take into account a status quo bias,

9    presumably they would have laid out something about a voting

10   standard in 16(a), which governs election of directors, or

11   18(i), which governs voting rights, but they didn't.  They did

12   in other sections.

13          So I don't think a status quo bias is relevant for a

14   '40 Act analysis vis-a-vis an election of directors.  I don't

15   think it's relevant.  It may be relevant under state law,

16   perhaps, but certainly not under the '40 Act.

17          THE COURT:  The Second Circuit's commentary in *Nuveen*,

18   whether holding or dicta, we can debate, but the commentary,

19   that suggests that you have to look behind the rules to assess

20   whether the function of rules is to privilege management over

21   shareholders.  Does that change the inquiry into whether a

22   status quo bias presents a problem under the '40 Act?

23          MR. MUNDIYA:  We don't think so.  In fact, if you look

24   at *Nuveen* and the legislative history of the '40 Act, we think

25   it's pretty clear that there are two sort of -- two issues that

O6CDSabO

1    Congress was looking at, the concentration of minority stock

2    holders or affiliated interests and management interests, and

3    both were viewed to be pernicious.  And so while there was some

4    dicta to be sure in *Nuveen*, given the way *Nuveen* was litigated,

5    control -- in the context of a controlled shares challenge,

6    which is why I think the *Nuveen* court said some of the things

7    it said, but when you go behind *Nuveen* and you look at the

8    legislative history of the '40 Act, as we lay out in our

9    briefs, I think it's pretty clear that the pernicious acts that

10    Congress was looking at when the '40 Act was passed was not

11    just management entrenching themselves or preserving their

12    power, but also the concentration of affiliated interests,

13    large affiliated interests, like my friends on the other side.

14         And while we're on *Nuveen*, your Honor, the notion that

15    they couldn't, say, bring this claim because they had to see

16    what might transpire in 2023 and 2024, *Nuveen* destroys that

17    argument.  *Nuveen* makes it crystal clear that when you have a

18    contract right and your contract rights are impacted, when your

19    voting rights are being impacted, you have concrete and

20    imminent injury at that point.

21         They had that injury, frankly, in 2022 when they

22    bought their shares, because that's, when, quote, it became, in

23    their words, impossible for them under the majority vote

24    standard to get their trustees, their nominees elected.  That's

25    when they were harmed.  That is when the cause of action for

O6CDSabO

1    breach of contract would have accrued, if that was a claim.

2            THE COURT:  But isn't that a bit of a distortion of

3    Saba's claim?  Right?  Because in response to my questioning, I

4    think Mr. Musico acknowledged that the claim really is an "as

5    applied for" in practice claim, that it's not so much that the

6    rule on its face is improper, because you could well imagine a

7    situation where let's say there were four Saba's.

8            MR. MUNDIYA:  Right.

9            THE COURT:  They bought up -- four shareholders

10   controlled the shares, and everyone engaged, and then, in

11   practice, having a majority of all shares outstanding election

12   would produce an effective election, because four people who

13   are all engaged, motivated shareholders would make it

14   achievable to have an election that produces a winner.

15           So I think the nature of their claim is that what we

16   -- we needed to produce some evidence that, in the context of

17   this fund, despite enormous effort and resources by both

18   BlackRock and Saba, that it's structurally impossible to have a

19   real -- a contested election that produces a winner.  That

20   means that, in practice, the operation of this fund cannot

21   comport with the '40 Act, and so isn't -- if that is the claim,

22   if I've fairly stated that as the claim, then isn't it true

23   that the earliest that that particular claim could have arisen

24   is sometime in the summer of 2023?

25           MR. MUNDIYA:  That assumes a world in which *Eaton*

O6CDSabO

*Vance* never existed, because that's -- they knew about the

voting majority vote by law and the supposed impossibility of

getting to that standard in 2020 when they asserted those

claims, and so --

THE COURT:  But they hadn't tested it in the ECAT

context, right?

Because I recognize, I've read the affidavits and I

understand there were some -- we're like, oh, this is an

endemic problem to close down the fund, but it doesn't seem to

me that that's necessarily true because, again, if you imagine

a world in which you have Carl Icahn and Saba and a number of

other "activist shareholders" decide, you know what, we're

going to fight this out, and we're going to buy up the shares

and a number of these exemplar funds of this type, that it's

not impossible to me that the rule and practice could function

effectively in a fund.

Do you understand what I'm saying?

MR. MUNDIYA:  I totally understand what you're saying,

and in an abstract world, I think your Honor is right.  But

what we're dealing with here is a complaint in which they say

that they're seeking to declare the bylaw void.  That's what

they say, under the Second Circuit's decisions in *Phoenix*,

where you have a contract claim, they're seeking revision of a

contract, that's the only claim they have, 47(b), in a contract

claim, you bring a claim, your cause of action accrues when the

O6CDSabO

1    breach occurs, and their claim is the breach occurred because

2    we have a bylaw that they say is impossible.  Their words.

3    They say it's impossible to meet that standard.

4          Well, nothing changed between the day they filed the

5    loss in *Eaton Vance*, the day we disclosed in 2021 that we had

6    this bylaw, the day that they bought shares in March of 2022.

7    I mean, nothing has changed.  The only thing that's changed is

8    that they decided that they want -- they have an election, and

9    they're trying to use the '40 Act to see if they can get an

10   advantage in this court.  That's all that's changed.

11         We don't think that anything vis-a-vis the cause of

12   action has changed.  They have asserted the possibility of the

13   void position from day one everywhere.  In fact, your Honor, if

14   you look in our briefs, they sued my clients in Delaware in

15   2019 saying that the majority vote bylaw was a breach of

16   fiduciary duty.  So the notion that this is an epiphany in the

17   summer of 2023, it's a fiction.

18         I have addressed 18(i), statute of limitations.  I

19   think you have my position, that the cause of action accrued

20   when the contract executed.  We don't think *Williams v. Binance*

21   applies, because that's a unique case where, to have a cause of

22   action in the Exchange Act, your Honor, you need to actually

23   have a transaction, and there was no transaction in that case

24   under the Securities Exchange Act, I think it was the 34 Act,

25   until there was an actual transaction.  And here, of course,

O6CDSabO

1    the transaction is the purchase of the shares and the assertion

2    that our bylaw is impossible to satisfy.  So we don't think

3    *Binance* applies.

4            Briefly, briefly let me turn to irreparable harm.  And

5    I would encourage your Honor, if you haven't already done so,

6    to read Judge Nathan's decision in *Silverstein*.  Judge Nathan's

7    decision in *Silverstein*, when -- as she applies the *Ebay* case

8    and the *Sallinger* case, I think that really demonstrates why

9    they are dead wrong on irreparable harm, because what they're

10   saying is that there is a per se presumption of irreparable

11   harm whenever you have a dispute in the electoral context.  Not

12   true.  Not true.

13           I think, as Judge Nathan says in *Silverstein*, it's a

14   contextual, fact-by-fact analysis.  And, according to *Ebay* and

15   *Sallinger*, you have to show specific, concrete irreparable

16   harm.  And here the only cases they cite are the cases in

17   which -- the *Pell v. Delaware* state case, where the two seats

18   that were up for election were literally taken out.  There was

19   no -- there was no way you could get into those seats.  *Newton*,

20   the Massachusetts case, they specifically changed the meet, the

21   voting date in contravention of the bylaws, took them away,

22   eliminated the shareholders' right to get any representation.

23           Here we have a majority vote bylaw that's been in

24   place for years, with directors, trustees who are holdovers,

25   and they will continue to be holdovers.  And this can go on,

O6CDSabO

1    and if your Honor decides the case has some legs under

2    12(b)(6), we don't think it does, but if your Honor decides

3    that it does, then the case can continue in the ordinary case.

4    And if, in the unlikely event you find that somehow we violated

5    16(a) or 18(i) under some new vote standard, the way this

6    normally happens is maybe you have a new election, new election

7    with new rules, and we'll figure it out.  But there is no basis

8    to give them a new vote standard, because that is what they're

9    asking for.

10          Now, Mr. Musico was -- I think he did a nice job

11   answering your question, but your question was a good one,

12   which was what standard applies here.  And he said, well, he's

13   not asking for any standard to apply.  Well, we can't go into

14   the election with no standard to apply.  He's essentially

15   asking you for an order that asks -- tells us, tells us to

16   apply a majority of the votes present standard.  That is a

17   changing of status quo, and there is no basis, certainly in

18   16(a) or 18(i), the only claims asserted for that type of

19   drastic mandatory relief.

20          Your Honor, we have some cases on delay.  I think, you

21   know, I've addressed delay.  I've addressed res judicata.  We

22   can rest on our briefs --

23          THE COURT:  I would be interested -- I mean, I'm

24   interesting in hearing anything you'd want to say, Mr. Mundiya,

25   but I don't know if you remember my questions to Mr. Musico

O6CDSabO

about what is the correct lens to view the balance of equities

or balance of hardships, like who is on the other side of the

scale from Saba.  If you could --

MR. MUNDIYA:  I do.

THE COURT:  -- talk a little about that, I'd

appreciate that.

MR. MUNDIYA:  Well, there are three constituencies

here I think.  One is obviously, you know, there's is a point

of view and they obviously prefer their point of view.  Then

there is the point of view of the trustees who are there to

protect all shareholders, right, in the shareholders who bought

into the structure, relying upon long-term distributions,

long-term investment horizon, the hope that there wouldn't be

liquidation, which would create adverse tax consequences if

someone like Saba took control.

So the board of trustees has a fiduciary duty under

Maryland law to look out for the interests of the mass of

retail stockholders that don't have the ability to organize

like an investment hedge fund like Saba, that don't have the

ability to get together and file lawsuits.  So we, BlackRock,

the trustees, have a fiduciary duty to those investors.  Those

investors I think have an interest.

The other important interest I think is a regulatory

interest.  I mean, the SEC -- this is a regulated entity, and

as I said at the outset, there is a standing issue here.  So to

O6CDSabO

1    the extent there are public policy issues here about whether

2    federal law preempts state law given the SEC has issued no

3    action letters in *Nuveen* and *ICI*, and Congress has changed the

4    '40 Act numerous times but hasn't touched those provisions, we

5    think the SEC has an interest here if there's going to be any

6    upsetting of the structure of closed end funds, which is what

7    they are essentially asking you to do.

8            So I think the balance of hardships, the public

9    interest clearly is in our favor, and certainly not decidedly

10   in their favor given that they're a minority stockholder trying

11   to change status quo.

12           Does that answer your question?

13           THE COURT:  Yes.  Yes.  Thank you.

14           MR. MUNDIYA:  Okay.

15           THE COURT:  Sorry.  I just want to make sure that I

16   don't have other questions for you that I haven't asked.

17           Is there anything else that you would like to say,

18   Mr. Mundiya?

19           MR. MUNDIYA:  No.  We rest on our papers for the rest.

20           THE COURT:  Okay.  Terrific.  Thank you very much.  It

21   was very helpful.

22           MR. MUNDIYA:  Thank you.

23           THE COURT:  Mr. Musico.

24           MR. MUSICO:  Thank you, your Honor.  I will try to be

25   brief.

O6CDSabO

1          First, I want to start with defendants' slide three

2     about section 16(a) of the Act.  It conspicuously omits two of

3     the most crucial provisions in section 16(a), specifically, the

4     last paragraph.  Defendants still offered no explanation for

5     how their approach to governing ECAT can be consistent with

6     section 16(a)'s mandate that the term of office of at least one

7     claim class shall expire each year.  That's not on their slide

8     three.  Or how it can be consistent with 16(a)'s mandate that

9     if at any time less than the majority of the directors of such

10     company holding office at the time were elected by the holders,

11     then the fund has to hold an election to fill those seats.

12     That's never addressed in defendants' argument.  Again,

13     conspicuously missing from their slide.

14          Then, looking at slide four, where they try to argue

15     that the appointment by the initial shareholder, BlackRock, the

16     epitome of an insider of this fund, was sufficient to render

17     these directors elected forever.  For one thing, these are

18     provisions of the Maryland code and ECAT's bylaws, not federal

19     law.  And they are provisions that refer to taking actions on

20     behalf of the fund, quote, without a meeting, in direct

21     conflict with section 16(a) that says, directors have to be

22     elected at an annual or special meeting.

23          They're saying these are the things they're authorized

24     to do under Maryland law, under the bylaws, in lieu of a

25     meeting, but federal law clearly requires to do those things at

O6CDSabO

1    an actual meeting.

2            Your Honor asked Mr. Mundiya if defense would

3    recognize if this just continued forever, if you just had

4    failed election after failed election after failed election, is

5    there ever a problem.  I think at one point Mr. Mundiya

6    conceded that at some point there would be an issue.  I still

7    don't think he ever specified when, but he said at most it

8    would be a regulatory issue, it would be one for the SEC.  But

9    there is no theoretical foundation for that position other than

10   this argument that Saba is not entitled to seek injunctive

11   relief.

12           So, for one thing, even if Saba somehow is not

13   entitled to a preliminary injunction, there's no reason that

14   the private right of action established by *Oxford* and *Nuveen*

15   would be inapplicable to Saba to render a harm under section

16   16(a).  But, on that topic of the injunction, your Honor, we

17   largely rest on our papers on this, but we think that the

18   Supreme Court's decision in the *TAMA* case, the Second Circuit's

19   decision in *Oxford*, and the Second Circuit's decision in

20   *Nuveen*, all make clear that the private right of action for

21   recision must come with all of its customary legal incidents.

22           There is no reason that this private right of

23   action -- and this was, you know, specifically an issue of

24   *Oxford*:  Is it limited to just a remedy?  And the whole point

25   of the Second Circuit's decision in *Oxford* is, no, it is a

O6CDSabO

private right of action.  And there is no reason that this

private right of action would not come with its customary

incidents of equitable relief.

You can see that as well all the way back in the

*Dechert* opinion from the Supreme Court.  This is 1940.  It's

cited in our reply brief at 30.  It refers to litigants under

the Securities Act having the power to utilize any of the

procedures or actions normally available to a litigant

according to the exigencies of a particular case.

This Court always has wide equitable discretion to

grant appropriate relief upon finding violations of the

securities laws.  So, if your Honor agrees with us that we have

demonstrated a strong likelihood of success on the merits with

respect to our 16(a) claim, there is absolutely no reason this

Court -- that the remedy of unavailable -- excuse me, that the

remedy of injunctive relief is unavailable to Saba.

There was some discussion about the '40 Act, and the

status quo, and whether standards that favor the status quo are

offensive to the '40 Act across the board.  Once again, your

Honor, the '40 Act is clear, and Congress was clear about the

extent to which defensive mechanisms that favor status quo are

available.

One of the classic forums of a defensive mechanism

that favors the status quo is, again, written into section

16(a) itself.  That's the classified board.  That's a classic

O6CDSabO

1   way that a fund can prevent changes in management from

2   happening overnight.

3          THE COURT:  You mean staggering the -- like having

4   staggered --

5          MR. MUSICO:  Exactly.

6          THE COURT:  There's essentially no limit on the amount

7   of staggering, right?

8          MR. MUSICO:  Well, it's even better than that, your

9   Honor.  There is, and Congress was explicit about it.

10  Directors can serve for a period of no shorter than one year or

11  longer than a period of five years as long as the term of at

12  least one class expires each year.

13         THE COURT:  That's what I mean.  You could have each

14  individual director be in a separate class, so that --

15         MR. MUSICO:  That's sound --

16         THE COURT:  I mean, I'm not good at math.  That's why

17  I'm a lawyer.  But you could have -- you could maximize the

18  number of classes so long as the math worked out to fit within

19  this no less than one year, no more than five, to minimize the

20  number of directors that would be subject to election each

21  year.

22         MR. MUSICO:  That's correct.  That's right, your

23  Honor.

24         And, again, the point here is that is a form of status

25  quo bias that is written into the statute itself.  It's so

O6CDSabO

1    funds, if they choose, can make sure that management of the

2    fund does not turn over overnight in a single election, right?

3    That it at least has to take place over the course of several

4    years.

5         But, again, and this is where Mr. Mundiya had no

6    answer of how you solve this problem, at least one term

7    expiring each year, or at least when that becomes a problem,

8    but it's –– again, it's written into section 16(a) itself.  It

9    tells you that the problem starts when you have less than

10   two-thirds of the directors actually being elected, at which

11   point you can't just fill vacancies willy nilly.  And it really

12   comes to a head when you have less than half of the directors

13   actually elected, and, at that point, the remedy that Congress

14   specified is clear, there has to be an election.

15        And so, again, it's not a –– it's not a mystery.

16   We're not looking to the vagaries of state law to figure this

17   out.  Congress made it clear, here's the extent to which we're

18   willing to tolerate some status quo bias, and here's when that

19   bias can't be tolerated and you actually need to have the

20   shareholders come in and elect their directors.

21        On the topic of timing, your Honor, I candidly don't

22   –– I'm not sure I understand the argument about *Nuveen*, but if

23   you look at the decision, specifically starting at I think it's

24   page 111, the standing analysis, the whole frame of the Second

25   Circuit's analysis was about Saba's ability to come in in

O6CDSabO

advance of harm occurring, in advance of the violation

occurring to seek relief to prevent that harm from coming to

pass.

So *Nuveen* was focused on remedies of future

violations.  That's the point at which the claim would actually

accrue and the statute of limitations would begin to run.

These aspersions about *Eaton Vance* -- and we came in a year

before this case and challenged *Eaton Vance's* majority about

standing bylaw.  Again, there, the context is so important,

your Honor, and you can see all of this in the Court's summary

judgment opinion in the *Eaton Vance* case, but just like in this

case, I think the way I put it before is we are in the scrum.

Saba was in the thick of contested elections and votes with

*Eaton Vance*.

The suit in *Eaton Vance* followed after a

declassification vote in one fund, where no side got to -- got

the votes of 50 percent of the shares outstanding; a director

election in another fund, where none of the candidates got the

votes of 50 percent of the shares outstanding; and then after

those things occurred, *Eaton Vance's* board -- it was a

situation of changing the rules.  So after those things

happened, *Eaton Vance* raises its threshold for electing

directors, and then *Eaton Vance* sues Saba to get a declaration

that that's A okay.  And this was all on the eve of another set

of director elections that were upcoming.

O6CDSabO

1      So, again, it's not this situation that Mr. Mundiya is

2  describing where a shareholder is just supposed to invest in a

3  fund and take a look at the voting standard and say, you know,

4  someday down the road I might want to run on a contested

5  election, I better sue them right now.  They were in the thick

6  of it.  And that's exactly the situation here.

7      THE COURT:  Well, I mean, it's also -- would you agree

8  with my characterization of the essential nature of Saba's

9  claim in response to Mr. Mundiya's point that Saba's complaint

10  is not so much about the standard itself, which theoretically

11  could comply with the '40 Act, but, rather, sort of the lived

12  experience of this fund in particular, and maybe all funds of

13  this type, is such that, in practice, no election that comports

14  with the '40 Act, either in its terms or its intention, can

15  occur under these rules?  And so merely knowing of the rules'

16  existence at the time that the shares were purchased doesn't

17  necessarily give rise to the claim that you're bringing now.

18      Is that right?

19      MR. MUSICO:  Your Honor, I think that's right.  The

20  only reason I'm hesitating is that I don't want to suggest that

21  a facial challenge is necessarily impossible.

22      THE COURT:  I'm not asking you to give anything away.

23      MR. MUSICO:  But --

24      THE COURT:  No one's asking you to abandon anything.

25      MR. MUSICO:  But I can tell you you're absolutely

O6CDSabO

right about Saba's position in this case.  It's that the

standard is not attainable in ECAT, and the lived experience in

ECAT establishes that.

        Again, we've submitted the declaration from Mr. Grau

in part to give you some context for that phenomenon, to give

you some comfort that what we're saying is not totally whacky.

This is usually what happens when these types of funds use this

type of voting standard.

        But, absolutely, our challenge here, the violation

that we're asserting is that defendants violated the Act when

they allowed these directors to continue serving without being

elected, and the structural reason that that happened is this

voting standard.  And so, you know, to give some context to

that, too, you had a colloquy with Mr. Mundiya about, well, can

the board just kind of dissolve into nothing.  I think that

might actually happen, your Honor, if an investor came in and

sought to rescind the holdover provision.

        And that was one of the concerns that the Fourth

Circuit had in *Badlands*.  Right.  The Court was saying, well,

look, if I'm faced with the choice of letting these holdovers

remain for a bit or we're dissolving the fund, I don't see any

indication from Congress that the fund has to dissolve.  But

section 16(a) -- again, we're only talking about the first two

directors in *Badlands*.  If that kept happening and the fund

fell below this threshold, it may well be that the funds would

O6CDSabO

1      have to dissolve if you rescinded the holdover provision.

2              There is an alternative, and, again, Saba is here not

3      trying to be obstructionist, not trying to just force the fund

4      to dissolve.  This structural impediment to those directors

5      actually getting elected is the voting standard, and so that's

6      why that's the target of this lawsuit.  It's so we don't have

7      to face this situation where the board slowly, you know,

8      shrivels into oblivion and the board has to dissipate.  If so,

9      the shareholders can actually vindicate their right to elect

10     directors as contemplated by 16(a).

11              But now the reason this dissolution point is -- it can

12     happen, and it's, you know, slide seven of defendants'

13     presentation where they talk about this standard for approving

14     the contract of the investment advisor, and whether it needs to

15     be approved by a vote of the majority of the outstanding

16     shares.  What happens if the investment advisor doesn't get to

17     that standard of a vote of the outstanding shares?  They can't

18     keep serving as the investment advisor.  They don't just get to

19     hold themselves over and continue to run the fund.  If the fund

20     ends up without an investment advisor and the directors decide

21     that they can't run the fund without an investment advisor,

22     guess what, it has to dissolve.

23              And so that's a structural feature of these types of

24     voting standards, and it's actually the situation that

25     defendants have created for themselves.  But it's totally

O6CDSabO

1    unnecessary.  It's illegal.  And this Court should not allow

2    them to force that result on the fund.

3         On the topic of irreparable harm, just briefly, Judge

4    Nathan's opinion in *Silverstein* is not the "get out of jail

5    free" card that defendants are hoping for.  That case, for one

6    thing, was not about electing directors.  It was a case about

7    disclosures with respect to political spending, and Judge

8    Nathan, consistent with lots of other cases, held that holding

9    an under-informed vote does not necessarily result in

10   irreparable harm.  You have to look at the context and what

11   that means for the vote and the implications for the fund.

12        And here's maybe the most important thing, the

13   plaintiff in that case did not actually seek to stop the

14   political spending that was the subject of the disclosures,

15   that might have been the thing that would have been hard to

16   unwind.  But the plaintiff was just seeking the information,

17   not seeking relief from the consequences of the vote.

18        But I misspoke when I said that was the most important

19   thing.  The most important thing is that it wasn't a case about

20   electing directors.  As we talked about before, your Honor,

21   cases are legion that -- in every jurisdiction, that depriving

22   shareholders of their right to elect directors necessarily

23   effects irreparable harm.  And Mr. Mundiya said it himself when

24   he described *Pell*.  He characterized the issue in *Pell* as the

25   incumbents in that case, the defendants in that case making it

O6CDSabO

1    so there was no way you can get into those seats.  That's the

2    way he described the situation in *Pell*, there was no way that

3    anyone could get into those seats.  That's exactly the

4    situation we have here, as a result of the majority --

5         THE COURT:  Well, I appreciate the effort, but there

6    is a difference between it's actually impossible, structurally

7    impossible, and I think the argument that Saba's advancing,

8    which is that it's a practical impossibility, that the

9    experience of the last year and the other evidence gathered

10   from the industry generally makes the likelihood so vanishingly

11   small that -- I mean, I recognize where you're going is that

12   there's a convergence point, right, between vanishingly small

13   as a practical matter and structurally impossible, but I think

14   I would just urge you to be careful about conflating those

15   things, even though I understand that part of the argument is

16   that you were practically converging on that point and that

17   you've adequately shown the convergence point has been reached,

18   right, but they're really not the same.

19        MR. MUSICO:  So, your Honor, I take your point, but

20   the relevant piece of it, for purposes of the harm to

21   shareholders, is that we're not -- we're not engaged in a

22   predictive exercise anymore, at least to last year's election,

23   and then even as to this year's election.  Given that they

24   haven't even attempted to contest our evidence, you have to

25   take that predictive exercise as true, so the facts on the

O6CDSabO

ground are that neither the challenger nor the incumbent can
get into the seats.  And that is the harm to the shareholders,
and that is exactly what is prohibited by section 16(a).

            And it is the -- it is the phenomenon that even though
accomplished by other means in some of these other cases,
causes the same form of irreparable harm to the shareholders,
that they end up in a fund that is governed by directors who
have not been duly elected and who have merely installed
themselves in office by their own fiat.

            Your Honor, a last point very quickly on the equities.
So I will again come back to -- I will try not to repeat
myself, but, very briefly, footnote 18 of the *Nuveen opinion*,
it just so clearly lays out where this balance comes out
between the interests of so-called concentrated investors
acquiring control of investment companies and management's
inequitable entrenchment mechanisms.  And the Second Circuit
specifically said that even assuming some tension between those
concepts, you have to take the overarching theme expressed in
the legislative history, and the SEC reports that of primary
importance to the investor is this opportunity to supplant the
management of his investment company when the conduct of those
representatives no longer meets with his approval.

            And in terms of, you know, if one side or the other
has their nominees in office, the difference is that the
fundamental relief Saba is seeking is to have directors in

O6CDSabO

1    office who are actually elected.  And so if this Court grants

2    relief, you're not installing Saba's nominees as directors of

3    the fund.  As we've discussed, you're not dictating any

4    particular voting standard.  You're telling the incumbent

5    directors, hey, set a standard that actually allows someone,

6    anyone to be elected by the shareholders as required under the

7    Act.

8            And what comes out of that, they suspect that whatever

9    standard they get to, Saba's likely to win, right?  If that

10   happens, what we will at least have is a situation where the

11   directors in office have actually been elected by the

12   shareholders, and we'll be operating under a voting standard

13   where shareholders don't like what they're doing, they'll

14   actually have an opportunity to vote them out.

15           And with respect to this idea that only the incumbent

16   director can possibly look out for the interests of all of the

17   shareholders in the fund, as soon as Saba's nominees are

18   elected as directors of the fund, they will have exactly the

19   same fiduciary duties to act in the best interest of the fund

20   as every other director would.  So this idea that, again, they

21   can just run roughshod over the fund and favor Saba's interests

22   over everyone else's is not the law.  It's not the reality.

23           But the most important feature of the balance of the

24   equities with respect to the relief you would be granting is

25   that you would have the comfort of knowing that whatever

O6CDSabO

1     directors end up in office of this fund are actually directors

2     who have been affirmatively elected by the shareholders.

3           THE COURT:  Before you sit down, Mr. Musico, let me

4     ask you a technical question.

5           Does Saba have an objection to me taking judicial

6     notice of the written consent shareholder document that is

7     attached to the -- either in the context of the motion to

8     dismiss or -- I recognize it's outside the pleadings, but it

9     seems to me an uncontested document.

10          Can I take judicial notice of that document?

11          MR. MUSICO:  You absolutely may, your Honor.

12          THE COURT:  Okay.

13          MR. MUSICO:  Because, as we've discussed, we think

14    that consent only highlights the illegality of it.

15          THE COURT:  Right.  I'm not asking you to concede

16    anything as to what weight or import I should give to that

17    document.  I just want to make sure you don't have an objection

18    to me considering it, even though it's outside the pleadings.

19          MR. MUSICO:  No.  No objection.

20          THE COURT:  Thank you very much.

21          Mr. Mundiya, do you want a brief --

22          MR. MUNDIYA:  Very brief.

23          THE COURT:  I see you desperate to stand up, so go

24    ahead.

25          MR. MUNDIYA:  Not desperate, but just a minute.

O6CDSabO

1    On this notion that it's not a facial challenge, if

2    you look at the Grau Declaration, it's virtually identical to

3    the challenges they had in the *Eaton Vance* case.  And the Grau

4    Declaration, again, we think it's speculative.  We don't think

5    it's -- it's really relevant to a '40 Act analysis, but even

6    Grau, even Grau, you know, says that there are instances when

7    you can meet the '40 Act -- the majority votes outstanding

8    standard, and he assumes, if you read it, a 50 percent

9    participation rate.  He also says, the mean participation rate

10   is 62 percent, and then he says he's had participation as high

11   as 75 percent.

12       If you use those higher participation rates, then the

13   percentage of shares present to get to a 50 percent number is

14   much, much lower than the numbers they talk about.  So this

15   notion of impossibility and the convergence that you spoke

16   about between the *E.R. Newton* case and what we have here, when

17   you look at some of the things that Grau actually says, you're

18   not converging as quickly as -- as closely as Mr. Musico

19   indicated.  There's actually a gap.  There's actually a gap.

20       If you -- if you question some of Grau's assumptions,

21   which we do, but -- again, the reason we don't want to

22   elaborate on that is because we don't think it really helps you

23   interpret 16(a) and 18(i), which we think are clear on their

24   face.

25       THE COURT:  Thank you.

O6CDSabO

1          MR. MUNDIYA:  Thank you.

2          THE COURT:  Last word.

3          MR. MUSICO:  Thank you, your Honor.

4          THE COURT:  Okay.  I found this extremely helpful, so

5    I really appreciate the time and the excellent advocacy.  We'll

6    try to get you a decision as soon as we can.

7          We're adjourned.  Thank you.

8          (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25