UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SABA CAPITAL MASTER FUND, LTD.,

                    Plaintiff,

       -against-

BLACKROCK ESG CAPITAL ALLOCATION
TERM TRUST et al.,

                  Defendants.

24-CV-01701 (MMG)

**OPINION & ORDER**

---

MARGARET M. GARNETT, United States District Judge:

This case arises from a struggle between the parties to gain and maintain control over the Board of Trustees of an investment fund, and the resulting dispute over whether the shareholder voting rules set forth in the fund's governing documents comport with the requirements of the Investment Company Act of 1940. Before the Court is the Plaintiff's motion for preliminary injunction and Defendants' motion to dismiss the Complaint. For the reasons set forth below, the motion for preliminary injunction is **DENIED**, and the motion to dismiss is also **DENIED**.

## FACTS AND PROCEDURAL HISTORY

Plaintiff Saba Capital Master Fund, Ltd. ("Plaintiff" or "Saba") filed a Complaint on March 6, 2024, against Defendant BlackRock ESG Capital Allocation Term Trust[1] ("ECAT"), as well as against R. Glenn Hubbard, W. Carl Kester, Cynthia L. Egan, Frank J. Fabozzi, Lorenzo A. Flores, Stayce D. Harris, J. Phillip Holloman, Catherine A. Lynch, Robert Fairbairn, and John M. Perlowski, in their capacities as trustees of ECAT (collectively with ECAT, "Defendants"),

---

[1] In the Complaint, Plaintiff names this defendant as "BlackRock ESG Capital Allocation Trust," but Defendants have asserted that the entity's name is as stated above. *See* Opp. to Mot. for Prelim. Inj., Dkt. No. 25 ("Defs.' Opp.") at 1.

asserting claims for rescission and declaratory judgment based on Defendants' purported violation of the Investment Company Act of 1940 ("ICA").

Saba is a Cayman Islands exempted company that, with other investment funds, beneficially owns 25.89% of ECAT.  Complaint, Dkt. No. 1 ("Compl.") ¶ 12.  ECAT is a Maryland business trust; it is a non-diversified, closed-end fund ("CEF") that is registered under the ICA.  *Id.* ¶¶ 13, 28.

ECAT was formed in May 2021 with BlackRock Financial Management, Inc. ("BFM"), an affiliate of ECAT's advisor, BlackRock Advisors, LLC, as its initial sponsor, and it registered with the Securities and Exchange Commission (the "SEC") shortly thereafter.  *See* ECAT, Registration Statement for Closed-End Investment Companies – Amendment (Form N-2/A), at S-58 (Aug. 16, 2021), https://www.sec.gov/Archives/edgar/data/1864843/000119312521248042/d162257dn2a.htm.  As is typical for CEFs, BFM then purchased all of the shares of ECAT and, as sole initial shareholder, selected a slate of 13 trustees for ECAT's Board of Trustees (the "Board" or "Board of Trustees") to serve "until his or her successor is duly elected and qualified[.]"  ECAT, Registration Statement for Closed-End Investment Companies – Amendment (Form N-2/A), at S-42, S-47 (Sept. 24, 2021), https://www.sec.gov/Archives/edgar/data/1864843/000119312521282589/d162257dn2a.htm.  Because BFM was the sole initial shareholder, this initial selection of trustees was accomplished through a written consent, rather than an actual shareholder meeting.  *See* Decl. of Vanessa C. Richardson Ex. A, Dkt. No. 26-1 (Written Consent of Sole Initial Shareholder (Aug. 12, 2021))[2]; Decl. of Paul Kazarian Ex. B, Dkt. No. 11-2 (ECAT Bylaws effective May 12, 2021), Art. I § 15(a) (a written consent, in the proper form, "shall be treated for all purposes as a vote taken at a meeting of shareholders.").

---

[2] At oral argument, counsel for Saba confirmed that Saba did not object to the Court taking judicial notice of this document in connection with the two motions before the Court.  Oral Arg. Tr. 79, June 12, 2024.

ECAT currently has ten trustees on its Board, all of whom were appointed by BFM as part of the initial slate of 13 trustees.  Compl. ¶ 30.  The Board is divided into three classes, and each class is up for election every three years.  *Id.* ¶¶ 30, 54.

ECAT's bylaws prescribe two different voting mechanisms for the election of trustees: one for contested elections, and a different one for uncontested elections.  Where the election for a given Board seat is uncontested (that is, there is only one candidate proposed for the seat), a trustee may be selected by a plurality of the shares actually voted at the meeting, whether in person or by proxy, provided a quorum is reached.  In contrast, where an election is contested (that is, more than one candidate is running for a given seat), a candidate must receive a majority of all outstanding voting shares to win the seat.  The bylaw provision states, in relevant part:

> (i) with respect to the election of Directors, other than a Contested Election, the affirmative vote of a plurality of the Shares represented in person or by proxy at any meeting at which a quorum[3] is present shall be the act of the shareholders with respect to such matter, (ii) with respect to a Contested Election, the affirmative vote of a majority of the Shares outstanding and entitled to vote with respect to such matter at such meeting shall be the act of the shareholders with respect to such matter.

Decl. of Paul Kazarian Ex. B, Dkt. No. 11-2 (ECAT Bylaws, effective May 12, 2021), Art. I § 11(b) (hereinafter, the "Majority Vote Bylaw"[4]).  If a quorum is not reached, or if, in contested elections, no candidate can garner the vote of a majority of the outstanding shares, then the incumbent trustee remains in his or her seat as a holdover.  *See* Compl. ¶ 38.

ECAT held its first annual shareholder meeting in July 2022.  Three Board seats were up for election, and each incumbent trustee in that class (Defendants Fabozzi, Holloman, and

---

[3] ECAT's Declaration of Trust provides that "[t]he holders of a majority of the Shares entitled to vote on any matter at a meeting present in person or by proxy shall constitute a quorum at such meeting of the Shareholders for purposes of conducting business on such matter."  Decl. of Paul Kazarian Ex. A, Dkt. No. 11-1 (ECAT Amended and Restated Agreement and Declaration of Trust dated as of Sept. 24, 2021), Art. X § 10.4(a).

[4] Saba's filings refer to this provision as the "Entrenchment Bylaw."

Fairbairn) ran unopposed and was elected to their seat by a vote of a plurality[5] of the shares voted. *Id.* ¶ 31.

As the 2023 annual shareholder meeting approached, a second class of four incumbent trustees (Defendants Egan, Flores, Harris, and Lynch) were up for election. *Id.* ¶ 32. Saba, which by then controlled almost 13% of ECAT's shares, nominated four candidates to run against those incumbents for the Board. *Id.* ¶ 41; *see also* Dkt. No. 10 (Declaration of John Grau) ¶ 26.[6] Leading up to the July 10, 2023, shareholder meeting, Saba and ECAT "engaged in intense proxy solicitation campaigns—including by mail and in the media[.]" Compl. ¶ 42. In spite of these efforts, a quorum could not be reached during the meeting. *Id.* ¶ 43. On July 11, 2023, ECAT adjourned the shareholder meeting to July 25, 2023, and "[a]ctive proxy solicitation efforts continued." *Id.* ¶¶ 44–45. However, the July 25 meeting again failed to achieve a quorum, and the meeting was adjourned a second time, to August 7, 2023. *Id.* ¶ 46. After this third meeting again failed to garner a quorum, according to Saba, "ECAT called off the 2023 election altogether and the four [incumbent trustees] up for election remained in their seats as unelected holdovers." *Id.* ¶ 47.

In the upcoming 2024 shareholder meeting, which ECAT has scheduled to take place on June 26, 2024, *see* Dkt. No. 36, seven incumbent trustees will stand for election. Saba, which now controls approximately 26% of the outstanding shares, has nominated candidates to challenge each of the seven incumbents. Compl. ¶¶ 4, 12.

---

[5] A vote by the plurality of shares voted satisfies the requirement of the Majority Vote Bylaw for uncontested elections. *See* Majority Vote Bylaw. Defendants noted that the trustees were each elected by "a supermajority of at least 86% of outstanding shares." Defs.' Opp. at 6.

[6] On June 29, 2023, Saba brought an action in this District against ECAT and four other Maryland CEFs, challenging "control share" restrictions in voting (voting rules that limited the voting power of shares above a certain percentage of ownership). The court granted summary judgment in favor of Saba, and the case is currently on appeal. *See Saba Cap. Master Fund, Ltd. v. BlackRock Mun. Income Fund, Inc.* (hereinafter, "*ECAT I*"), No. 23-cv-05568 (JSR), 2024 WL 43344 (S.D.N.Y. Jan. 4, 2024).

Saba filed its Complaint on March 6, 2024, seeking relief by way of rescission (under 15 U.S.C. § 80a-46) and/or declaratory judgment, on the same essential claim: that the Majority Vote Bylaw violates two provisions of the ICA—15 U.S.C. § 80a-16(a) (hereinafter, "§ 16") and 15 U.S.C. § 80a-18(i) (hereinafter, "§ 18(i)")—and thus must be either rescinded or declared void. *Id.* ¶¶ 55–65. On the same date, Saba filed a motion for preliminary injunction to prevent Defendants from applying the Majority Vote Bylaw in the 2024 Board election. *See* Mot. for Prelim. Inj., Dkt. No. 8; *see also* Mem. of Law Supp. Mot. for Prelim. Inj., Dkt. No. 9 ("Pl.'s Br."). In addition to opposing the preliminary injunction motion, Defendants have filed a motion to dismiss the Complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* Mot. to Dismiss, Dkt. No. 27; *see also* Mem. of Law Supp. Mot. to Dismiss, Dkt. No. 28 ("Defs.' Br."). The Court held oral argument on both motions on June 12, 2024.

## PRELIMINARY INJUNCTION

Saba has moved for a preliminary injunction to bar Defendants from applying the Majority Vote Bylaw at the upcoming shareholder election for trustees, which is currently set to occur two weeks after oral argument on these motions. If successful on the motion, Saba is not seeking a directive to ECAT to apply a "'particular' [voting] standard[,] . . . [so long as the standard implemented is one that] compl[ies] with the ICA's fundamental requirement that the standard actually allow shareholders to 'elect' their directors." Reply Br., Dkt. No. 34 ("Pl.'s Reply") at 10–11. Because the Court finds that Saba has failed to carry its burden of establishing irreparable harm, the motion for preliminary injunction to bar application of the Majority Vote Bylaw is DENIED.

## I.    Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right.  In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (internal marks and citations omitted); *see also Hanson Tr. PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985) (describing preliminary injunction as "one of the most drastic tools in the arsenal of judicial remedies").

The party seeking preliminary injunction must establish that:  (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest.  *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Johnson as Trustee of Johnson Family Trust v. Saba Cap. Mgmt., L.P.*, No. 22-cv-04915 (AT), 2023 WL 1345717, at *2 (S.D.N.Y. Jan. 31, 2023).

Of these factors, "[a] showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction. . . . [T]o satisfy the irreparable harm requirement, plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm."  *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal marks and citations omitted). Regardless of the strength of a movant's showing on the other three factors, a failure to demonstrate irreparable harm is dispositive.  *See Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) ("[T]he moving party must first demonstrate that such [irreparable] injury is likely before the other requirements for the issuance of an injunction will be considered.") (quoting *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990)).

The Second Circuit has recognized some circumstances in which the first two requirements—involving the likelihood of success and irreparable harm—become more demanding and require that the moving party "show a *clear or substantial* likelihood of success on the merits and make a *strong showing* of irreparable harm." *See Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024) (emphasis in original) (citing *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)).  For instance, this heightened standard applies when an injunction is "mandatory" rather than "prohibitive," meaning that the injunction seeks to alter the status quo pending resolution of the case, as opposed to merely freezing circumstances in place and preventing change until the resolution of the case.  *See id.*  Additionally, where a plaintiff is seeking a preliminary injunction, the standard applies when the injunction would provide it "substantially all the relief [it] seeks in the litigation, and that cannot be meaningfully undone in the event that the enjoined party prevails at trial on the merits." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023).

In this case, Saba's requested preliminary injunction would change the status quo by requiring ECAT to alter the existing bylaw that applies in the case of a contested election.  Thus, as Saba concedes, the heightened standard applies.  *See* Oral Arg. Tr. 28.

## II.     Irreparable Harm

This Court begins with the most important requirement for a preliminary injunction: irreparable harm.  "Even under the ordinary standard for prohibitive relief, the party seeking a preliminary injunction must demonstrate that irreparable harm is not only possible but likely. Under the heightened standard applicable here, that party must make a strong showing that [it] will be irreparably harmed." *Daileader*, 96 F.4th at 358 (internal marks and citations omitted). Three important factors, viewed in combination, lead to the conclusion that Saba has not established that it will suffer irreparable harm if the preliminary injunction is not granted: *first*,

Saba is seeking a change to the status quo governing the voting rules of the fund (rules in place when Saba purchased its shares and the implications of which were well known to Saba due to its prior litigation, both against ECAT and against other CEFs), rather than seeking to block a change that would erode existing voting rights; *second*, Saba is seeking "emergency" relief that it could have sought at least six months prior; and, *third*, if Saba's prediction of another failed election and the continued "holdover" status of trustees comes true, the potential harm of that outcome could be largely redressed by ordering a new election under new rules, if Saba were to prevail on the claims in the Complaint.[7]

As to the first factor, Saba relies heavily on cases, primarily from state courts applying breach of fiduciary duty law, in which courts remarked on the importance of shareholders' right to vote or found that actions taken by corporate management, such as moving the timing of a shareholder vote or taking actions that impact the value of certain voting shares, threatened the voting franchise for stockholders. *See* Pl.'s Br. at 23–24. It is true that many of these cases frame denial of shareholder rights as a quintessential irreparable harm. *See id.* But nearly all of the cases Saba cited involved different and generally more egregious instances of voter disenfranchisement than that alleged here, and generally involved a *change* imposed or some action taken by corporate management to reduce, alter, or remove existing shareholder voting rights. *See, e.g.*, *Unilever Acquisition Corp. v. Richardson-Vicks, Inc.*, 618 F. Supp. 407, 408,

---

[7] Although Saba's claims are premised in part on the "impossibility" of an effective election under the Majority Vote Bylaw, it is far from clear that the June 26, 2024, shareholder meeting is doomed to end in the same result as the three unsuccessful attempts at a shareholder election in 2023. Each of the three 2023 attempts failed because a quorum could not be reached, not directly because of the Majority Vote Bylaw (although the inability to garner a quorum guarantees that no candidate would secure a majority of all outstanding voting shares). However, Saba has doubled its ownership percentage in the intervening months and now controls over 25% of the voting shares, which may well make achieving a quorum or even a candidate securing a majority-share vote significantly more likely in the 2024 meeting. The Court reserves judgment on whether such a situation is more, or less, consistent with the policy goals of the ICA of avoiding insider control of investment funds.

410 (S.D.N.Y. 1985) (following the plaintiff's announcement of a tender offer, a board vote for the issuance of new preferred stock with limitations on the stock's transfer would make it impossible for the plaintiff to acquire the company at that time; the court held that this would irreparably harm the plaintiff under Delaware law); *Schnell v. Chris-Craft Ind., Inc.*, 285 A.2d 437, 439–40 (Del. 1971) (reversing denial of preliminary injunctive relief where corporate management accelerated the date of the annual stockholder meeting for the purpose of cutting down the time available to wage a proxy battle).

While the Court acknowledges that Saba is arguing that the voting standard at issue here in practice makes it very difficult or perhaps "impossible" for shareholders to meaningfully vote to elect trustees in a contested election, and Saba may well prevail on that argument in the ordinary course, this is a different type of harm than that caused by the corporate action at issue in many of the cases Saba cited, in which corporate management instituted new procedural barriers intended to subvert elections, limit the value of votes, or eliminate existing shareholder rights.

Even the one case Saba cites that involved a challenge to a similar majority vote bylaw, *Saba Cap. CEF Opps. 1 Ltd. v. Voya Prime Rate Trust* ("*Voya*"), No. CV 2020-005293, 2020 WL 5087054, at *2–3 (Ariz. Super. Ct. June 26, 2020), falls within this pattern. In that case, the plaintiff had made a tender offer, and the Board of Trustees, which argued that the offer would benefit the plaintiff to the detriment of remaining shareholders, adopted a bylaw amendment that changed the prior plurality vote rule for electing trustees and instead required that a prospective trustee must receive the votes of at least 60% of the outstanding shares; if no candidate garnered a 60% vote, the existing trustees would retain their offices. The plaintiff successfully sought a preliminary injunction to block the change in voting rules, relying on Massachusetts state law

principles and precedents.  *Id.* at *3–6.  In addition to relying on different legal claims and theories, *Voya* also involved an effort to block a change in the rules that would strip shareholders of existing rights—in line with the other cases Saba cites and quite different from the potential harm presented by the circumstances in this case.

As to the second factor, Saba's position on irreparable harm is further undermined by its delay in bringing this action.  "[I]t is well-established that a court must consider a plaintiff's delay in seeking relief when analyzing whether the plaintiff will suffer irreparable harm in the absence of relief."  *Coscarelli v. ESquared Hosp. LLC*, 364 F. Supp. 3d 207, 222 (S.D.N.Y. 2019) (internal quotation marks omitted).  "Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiff['s] rights.  Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action."  *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985).

In this case, the last annual shareholder meeting occurred in August 2023, and Saba did not bring this action until March 2024, around seven months later.  Saba's failure to act sooner "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury."  *Citibank, N.A.*, 756 F.2d at 277 (internal quotation marks omitted) (citing *Le Sportsac, Inc. v. Dockside Rsch., Inc.*, 478 F. Supp. 602, 609 (S.D.N.Y. 1979)).

Saba argues that it could not have known in August 2023 whether ECAT would reschedule the meeting for later in 2023, as it had twice before, and that it expected ECAT to reschedule the meeting in light of ECAT's bylaws and NYSE regulations requiring an annual meeting of the shareholders.  *See* Pl.'s Reply at 24.  It further argues that ECAT "[held] all the

cards about the timing and administration of its director elections, kept Saba in the dark[,] and now seeks to benefit from its lack of transparency by arguing that Saba filed suit too late."  *Id.*

But on the two prior occasions in 2023, ECAT had rescheduled the shareholder meeting approximately two weeks after a failed quorum.  When ECAT did not schedule a new meeting for two weeks thereafter, or even in September, this should have raised flags for Saba.  Indeed, September, then October, then November, then December went by without action on Saba's part in 2023, and Saba only brought the action in March 2024.

Moreover, Saba has failed to adequately explain *why* it needed to wait until the 2023 shareholder meeting was attempted, or adjourned, for a fourth or fifth time in order to bring suit. Following three failed attempts at a contested election, Saba had all the information it needed to bring this action—indeed, all the information it now relies on in support of its motion—but it did not do so until March 2024, necessitating the need to seek emergency relief if the rules governing the 2024 shareholder meeting were to be voided.

Finally, as to the third factor, Defendants have persuasively argued that, if Saba ultimately prevails in its claims, the remedy of ordering a prompt new election under new rules at that time will be adequate to address the harm alleged.  *See* Defs.' Opp. at 21–22.  No one disputes that if the 2024 election ends as the 2023 attempts did, the holdover trustees will largely continue the current trajectory of the fund and, in contrast, the Saba nominees would change the management of the fund in significant ways.  Thus, while an election under new rules would not succeed in turning back time, the harm, if any, suffered by Saba from delaying such an election until the resolution of this case would be merely additional time holding its shares under the same regime that existed when Saba purchased its initial shares and that existed when Saba continued to purchase additional shares.  Saba has offered no persuasive reason why this state of

affairs has tipped from tolerable to intolerable at a particular point in time, or why the delay of a few months in securing new election rules (assuming Saba prevails on the merits) amounts to irreparable harm.[8]

Because irreparable harm is the most important prerequisite for a preliminary injunction, and because the Court finds that Saba has not met its burden of showing irreparable harm, it need not address any of the other factors to deny the motion. *See Monowise Ltd. Corp. v. Ozy Media, Inc.*, No. 17-cv-08028 (JMF), 2018 WL 2089342, at *1 (S.D.N.Y. May 3, 2018). Particularly in light of the fast-approaching shareholder meeting and the benefit to all parties of having a decision on the motion prior to that meeting, the Court declines to address the other factors, and denies the motion for preliminary injunction on the ground that Saba has failed to meet its burden of showing irreparable harm.

## MOTION TO DISMISS

In addition to opposing the motion for preliminary injunction, Defendants have also moved to dismiss the Complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Saba's Complaint makes essentially four claims as to how the Majority Vote Bylaw violates the ICA: First, that the Majority Vote Bylaw violates § 16 of the ICA because, in practice, in contested elections the standard is impossible to meet and thus the lack of a "meaningful opportunity to elect trustees" means that directors are not "elected" by

---

[8] Although, as noted below, the Court need not address the other factors for preliminary injunction, to some extent this factor intertwines with the "balance of the equities" factor. Although Saba characterizes the other side of the "equities" scale as being the interest of current trustees in retaining their seats, and correctly notes that such interest deserves little or no weight, *see, e.g.*, *Pell v. Kill*, 135 A.3d 764, 794 (Del. Ch. 2016) ("The risk that stockholders may elect directors whom the incumbents disfavor is no harm at all."), the Court finds that another interest that would merit weight in the balance of the equities is the interests of other shareholders who, like Saba, purchased ECAT shares with full knowledge of the voting rules and their status-quo-bias, but, unlike Saba, prefer such rules and do not wish to make it easier for challengers to unseat the existing Board. Balancing these equities also supports the conclusion that a preliminary injunction process is not the place to order significant changes in ECAT's governing structure, although Saba may well prevail on the merits with a full record and full process.

shareholders "at an annual meeting," with "the term of office of at least one class [expiring] each year." *See* § 16(a); Compl. ¶¶ 6–7.  Second, the adoption of a plurality-of-voted-shares voting standard for uncontested elections and the Majority Vote Bylaw for contested elections violates § 16 because, in practice, it ensures that only challenger candidates will fail and the trustees selected at formation by ECAT's sponsor will continue to serve in perpetuity (whether as "winners" of uncontested elections or holdovers from failed contested elections), again denying shareholders the right to select ECAT's directors.  Compl. ¶¶ 1–3.  Third, the Majority Vote Bylaw and its unattainable standard violates § 18(i) of the ICA because if the purported elections for directors are shams or never result in a winner, then shares in ECAT are not actually "voting stock" entitled to vote for directors of the fund.  Compl. ¶ 9.  Fourth, the different standard for uncontested elections and the unattainability of the Majority Vote Bylaw standard gives disproportionate power to shareholders who prefer that the sponsor's trustees remain in power, whether as "winners" of uncontested elections or as unelected holdover incumbents.  *Id.*  In factual support of these arguments, Saba outlined the history of the efforts in 2023 to achieve a quorum and hold a contested election for four of the seats on ECAT's Board.  *Id.* ¶¶ 41–48.

In seeking to dismiss the Complaint, Defendants argue, *inter alia*, that the Majority Vote Bylaw is permitted under Maryland law; that the requirement of § 16 that directors be "elected" does not prescribe any particular voting standard; that § 16 only requires that directors "stand for election" annually, not that elections are successfully concluded; that holdover directors do not violate the ICA; that Saba's claims, if any, sound in state law fiduciary duty and such claims may not be "bootstrap[ped]" into federal securities law claims; and, finally, that the Majority Vote Bylaw does not violate § 18(i) because each share has identical voting rights (one vote per share) in any given election.  Defs.' Br. at 13–22.

Saba's claims are novel:  as far as the Court and the parties are aware, no court has previously accepted Saba's proffered interpretation of the ICA in this specific context, nor has any court rejected it, whether on the bases put forward by Defendants or otherwise.  Because Saba need only prevail on one of its theories to support a claim for rescission or a declaratory judgment that the Majority Vote Bylaw is void for violating the ICA, and because Defendants have not cleared the high bar on a motion to dismiss of showing that, accepting all facts as true and drawing all inferences in Saba's favor, the Complaint fails to state any plausible claim, the motion to dismiss is DENIED.

## I.   Applicable Law

### A.  Standard on a Motion to Dismiss

In order to survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim only has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The standard for surviving a motion to dismiss is not difficult to meet. *See Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013) (the issue on a motion to dismiss is whether a plaintiff is entitled to offer evidence to support its claims, not whether the plaintiff will ultimately prevail).

When ruling on a Rule 12(b)(6) motion, the district court must accept all factual allegations contained in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g.*, *Koch v. Christie's Int'l, PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  However, courts are not required to accept as true legal conclusions; "[t]hreadbare recitals of the elements

14

of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft*, 556 U.S. at 678.

In assessing the sufficiency of the complaint, the court may consider documents incorporated into the complaint by reference or attached to the complaint as exhibits, or whose terms and effect are relied upon by the plaintiff in drafting the complaint.  *See Gryl ex rel. Shire Pharm. Grp. PLC v. Shire Pharm. Grp. PLC*, 298 F.3d 136, 140 (2d Cir. 2002), *cert. denied*, 537 U.S. 1191 (2003).  The court may also consider legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which the plaintiff relied in bringing the suit.  *Goldstein v. QVT Assocs. GP LLC*, No. 10-cv-02488 (HB), 2010 WL 4058157, at *2 (S.D.N.Y. Oct. 15, 2010) (citing *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *In re Morgan Stanley Tech. Fund Secs. Litig.*, Nos. 02-cv-6153, 02-cv-8579 (BSJ), 2009 WL 256005 (S.D.N.Y. Feb. 2, 2009), *aff'd*, 592 F.3d 347 (2d Cir. 2010)).

## B.  The ICA

In adopting the ICA, Congress was concerned with the "potential for abuse inherent in the structure of investment companies," and it recognized that the relationship between a fund and its investment advisors "was fraught with potential conflicts of interest."  *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 339 (2010) (internal quotation marks omitted) (citing *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536–38 (1984)).  Thus, "Congress passed the ICA to provide a comprehensive regulatory scheme to correct and prevent certain abusive practices in the management of investment companies for the protection of persons who put up money to be invested by such companies on their behalf, *i.e.*, the shareholders."  *Saba Cap. CEF Opps. 1, Ltd. v. Nuveen Floating Rate Income Fund* ("*Nuveen*"), 88 F.4th 103, 120 (2d Cir. 2023) (internal marks omitted) (quoting *Indep. Inv. Protective League v. Sec. & Exch. Comm'n*, 495 F.2d 311,

312 (2d Cir. 1974)).  There is no dispute that the ICA regulates, among other entities, various

CEFs, including ECAT.

The ICA itself instructs courts to interpret the statute "in accordance with" its "policy and

purposes" section.  *See* 15 U.S.C. § 80a-1(b).  While a statute's plain meaning always controls,

*Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002), in the event of ambiguity, "Congress's

policy considerations [in enacting the ICA] . . . would lean in [shareholders'] favor."  *Nuveen*, 88

F.4th at 120 (finding that the ICA was enacted for the benefit of investors, not fund insiders, and

is meant to correct self-dealing by investment company management).

The ICA provides for a right of rescission for contracts found to violate the statute, either

on their face or in the performance of them; courts may also declare such contracts void.  15

U.S.C. §§ 80a-46(b)(1)–(2) ("Section 46(b)"); *ECAT I*, 2024 WL 43344, at *6–7.[9]

§ 16(a) of the ICA provides, in relevant part, as follows:

> No person shall serve as a director of a registered investment company unless
> elected to that office by the holders of the outstanding voting securities of such
> company, at an annual or a special meeting duly called for that purpose; except that
> vacancies occurring between such meetings may be filled in any otherwise legal
> manner if immediately after filling any such vacancy at least two-thirds of the
> directors then holding office shall have been elected to such office by the holders
> of the outstanding voting securities of the company at such an annual or special
> meeting.  In the event that at any time less than a majority of the directors of such
> company holding office at that time were so elected by the holders of the
> outstanding voting securities, the board of directors or proper officer of such
> company shall forthwith cause to be held as promptly as possible and in any event
> within sixty days a meeting of such holders for the purpose of electing directors to
> fill any existing vacancies in the board of directors[.]

15 U.S.C. § 80a-16(a).

---

[9] Defendants briefly argued in support of their motion to dismiss that Section 46(b) does not create a
private right of action.  Defs.' Br. at 25.  However, as Defendants acknowledge, "this Court need not
address" this issue because the issue is foreclosed by *Oxford University Bank v. Lansuppe Feeder, LLC*,
933 F.3d 99 (2d Cir. 2019), in which the Second Circuit held that Section 46(b) evinces Congressional
intent to authorize a private right of action for rescission.  *See* Defs.' Br. at 25.

§ 18(i) of the ICA provides, in relevant part:  "Except as provided in subsection (a) of this section, or as otherwise required by law, every share of stock hereafter issued by a registered management company . . . shall be a voting stock and have equal voting rights with every other outstanding voting stock."  15 U.S.C. § 80a-18(i).

The term "voting stock" is not defined by the ICA, but as the Second Circuit has observed, the statute defines the term "voting security" as "any security presently entitling the owner or holder thereof to vote for the election of directors[10] of a company," and "security" encompasses "stock."  15 U.S.C. §§ 80a-2(a)(36), 80a-2(a)(42); *see Nuveen*, 88 F.4th at 117.

## II.   Discussion

At heart, Saba's claim is functionally an "as applied" challenge—that, even if the Majority Vote Bylaw on its face is not barred by the ICA, in practice it operates to strip shareholders of their right to control the management of ECAT and to select the trustees who directly make those management decisions.[11]  In contrast, the essence of Defendants' argument to dismiss is that if the Majority Vote Bylaw on its face complies with each individual word of the ICA, viewed in isolation and without regard to purpose, then the Majority Vote Bylaw cannot violate the ICA even if it produces an outcome where shareholders have no meaningful opportunity to control the management of the fund through the selection of directors, and the Board is composed entirely of trustees selected by the sole initial shareholder who hold their places, even for years, as unelected holdovers following failed elections.[12]

---

[10] 15 U.S.C. § 80a-2(a)(12) defines "director" to include "any natural person who is a member of a board of trustees of a management company created as a common-law trust."

[11] Defendants have attempted, in their briefs and at oral argument, to make much of the characterization of Saba as an "activist investor."  *See, e.g.*, Defs.' Opp. at 5; Defs.' Br. at 1, 6; *see also* Oral Arg. Tr. 64. The Court gives no weight to those characterizations; for purposes of the relevant sections of the ICA, Saba's primary identity is that of "shareholder," entitled to no fewer rights than any other shareholder.

[12] Saba contends that it is challenging "ECAT's unlawful voting standard that prevents shareholders from actually electing directors[,] . . . not the concept of a holdover itself."  Pl.'s Br. at 14.

The text of the ICA, its history and purpose, and wide swaths of corporate law center the voting rights of shareholders. *See* § 18(i); § 16(a); 15 U.S.C. § 80a-1(b); *Nuveen*, 88 F.4th at 120 (the ICA was enacted for the benefit of investors and shareholders, and is meant to correct self-dealing by investment company management); *Pell*, 135 A.3d at 794 ("Shareholder voting rights are sacrosanct.  The fundamental governance right possessed by shareholders is the ability to vote for the directors the shareholder wants to oversee the firm.") (quoting *EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429, 433 (Del. 2012)); *Unilever Acquisition Corp.*, 618 F. Supp. at 410 (finding irreparable injury where corporate action would "severely limit if not eliminate [the] ability [of shareholders] . . . to control and/or influence the management and future course of [the company]").

Saba has sufficiently alleged that there is a point where the voting bylaws of ECAT operate to deprive shareholders of their right to select the trustees of the fund, and to circumvent the ICA's requirement that trustees be "elected" at shareholder "meetings" and that a certain number of directors be resubmitted for shareholder approval each year.  Defendants have said there is no such point, so long as the rules are facially valid, using the most pinched and parched approach to statutory construction.  Saba may well not succeed in showing that this point has been reached in this case, but the allegations in the Complaint are sufficient to allow them to try. The alternative proposed by Defendants is simply not plausible:  that even where a fund fails to have successful elections for years and where a fund's board is composed primarily or entirely of holdovers selected by the sole initial shareholder who is affiliated with the investment advisor, even in perpetuity, there is <u>no</u> circumstance where such a fund could be found to be in violation of the ICA's requirements for shareholder elections and board composition, so long as the rules are facially compliant on a word-by-word basis.  The motion to dismiss is denied.

### III.     Defendants' Other Procedural Arguments

In addition to their Rule 12(b)(6) argument, the Defendants also assert that the Complaint should be dismissed for one or more procedural failings:  *res judicata,* statute of limitations, or laches.  None of these arguments provide an alternative basis on which to dismiss the Complaint.

#### A.  Res Judicata

Defendants first argue that Saba's claims are barred by *res judicata*, or issue preclusion, because the claims at issue here could have been raised and decided in a prior lawsuit.  *See* Defs.' Br. at 24–25.

Under the doctrine of *res judicata*, "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."  *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981).  The purpose of the doctrine is to conserve judicial efficiency and prevent piecemeal litigation.  *See Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 600 F.3d 190, 200 (2d Cir. 2010).

*Res judicata* is an affirmative defense that requires Defendants to show that "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action."  *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 285 (2d Cir. 2000).  Whether claims are similar enough to preclude claims asserted in subsequent actions under the third prong "depends in part on whether the same transaction [or] series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first."  *Id.*; *see also SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1464 (2d Cir. 1996).  "To ascertain whether two actions spring from the same 'transaction' or 'claim,' [courts] look to whether the underlying facts are 'related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their

treatment as a unit conforms to the parties' expectations or business understanding or usage.'"
*Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 90 (2d Cir. 1997) (citing Restatement
(Second) of Judgments § 24(b)).

On June 29, 2023, Saba brought an action in this District against ECAT, among other
Maryland CEFs, arguing that control share restrictions in its Declarations of Trust, which
allowed the fund to restrict the voting rights of any shares that would place the holder at 10% or
more of the fund's voting power, violated § 18(i).  *ECAT I*, No. 23-cv-05568 (JSR), Dkt. Nos. 1,
23-1 ¶ 22, 23-31 at 26.  Judge Rakoff granted summary judgment to Saba and ordered rescission
of the control share restriction.  *ECAT I*, 2024 WL 43344, at *6–7.  Defendants argue that
because Saba failed to raise the claims in the instant action at the time it brought *ECAT I*, Saba's
claims are barred by *res judicata*.  *See* Defs.' Br. at 24–25.

In support of their argument, Defendants point out that the Majority Vote Bylaw was in
place at the time *ECAT I* was filed.  See Defs.' Br. at 25; *see also* Decl. of Paul Kazarian Ex. B,
Dkt. No. 11-2 (ECAT Bylaws, effective May 12, 2021).[13]  They further argue that Saba
submitted an expert report in a different case in Massachusetts Superior Court in which Saba
argued that a similar bylaw in a fund advised by Eaton Vance (not ECAT) was unlawful, and that
expert report analyzed "nearly identical data" to the declaration that Saba submitted in this
action; as such, Defendants argue, Saba had evidence at least as early as February 2023 that
"replacing incumbents in funds with a majority vote bylaw was 'impossible.'"  Reply Br., Dkt.
No. 37 ("Defs.' Reply") at 5–6.

---

[13] The Court properly considers ECAT's bylaws in connection with the motion to dismiss because Saba
relied upon the bylaws in framing the Complaint and they are "integral" to the Complaint.  *See Chambers
v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

These arguments are unpersuasive.  The instant action involves a different "transaction" than in *ECAT I*, which challenged provisions in ECAT's Declarations of Trust.  *See Monahan*, 214 F.3d at 285.  The claims involve challenges to entirely different provisions of different governing documents, and Saba would not have been required to bring them in the same action.  Additionally, facts legally significant to the claims in this action occurred after the filing of *ECAT I*.  Specifically, ECAT's first contested election was attempted during a shareholder meeting on July 10, 2023, and Saba discovered during that scheduled meeting and two subsequent scheduled meetings that the election had failed, and as such, Saba's nominees could not be elected in 2023.  Compl. ¶¶ 41–48.  Even if Saba could, in theory, have brought a weaker version of its current claims in the *ECAT I* complaint, the actual application of the Majority Vote Bylaw in a contested election is important to Saba's claims, and Saba's prior awareness of data regarding such bylaws at other funds does not mean that Saba was required to bring the claims it brought here when it filed *ECAT I*.  In short, the claims Saba brings in this action are based in significant part on events that occurred *after* it filed the first action; for this and other reasons, the claims are not barred by *res judicata*.

### B.  Statute of Limitations and Laches

Defendants next contend that Saba's claims are time-barred, either via the expiration of the statute of limitations under the ICA or through the equitable doctrine of laches.  *See* Defs.' Br. at 22–24.  The statute of limitations for a rescission claim under Section 46(b) is one year from discovery of the alleged violation or three years from the violation itself, whichever is earlier.  *See* Defs.' Br. at 22 (citing *Phoenix Four, Inc. v. Strategic Res. Corp.*, No. 05-cv-04837 (HB), 2006 WL 399396, at *5–6 (S.D.N.Y. Feb. 21, 2006)).  Defendants argue that Saba's claims accrued on May 12, 2021, when ECAT adopted the bylaw in question, or in any event no

later than the date Saba first acquired shares in ECAT on March 28, 2022,[14] which is outside the one-year limitations period.  *Id.*  They further argue that the claims are barred by laches because Saba knew about the bylaw before it first purchased shares in ECAT and has no excuse for its delay in bringing this action, and because the delay prejudiced ECAT by undermining its ability to seek an orderly review on the merits and to seek appellate review (if the Court were to grant preliminary injunction) before the 2024 shareholder meeting.  *Id.* at 23–24.

With respect to the statute of limitations argument, Defendants assert that this case falls within the framework set forth by the Second Circuit in *Kahn v. Kohlberg, Kravis, Roberts & Co.* ("*KKR*").  *See* Defs.' Reply at 8.  In *KKR*, the Second Circuit differentiated between the "continuing wrong theory," under which a claim "accrues each time the plaintiff sustains damages," and the "commitment theory," under which a claim accrues when the plaintiff "makes a completed sales transaction."  *KKR*, 970 F.2d 1030, 1039–40 (2d Cir. 1992).  The court noted that the continuing wrong rule is "based primarily upon the impracticality and unfairness of requiring a plaintiff to institute his action before he can predict his damages."  *Id.* at 1039.  In *KKR*, the plaintiffs sought rescission of a contract that required a board to invest money; the court noted that the commitment theory applies to contracts calling for subsequent payments when the plaintiff is committed to pay the amount under the contract and does not retain the right to terminate the contract.  *Id.* at 1040.  The court held that the claim accrued when the contract was executed because the plaintiffs alleged that the contract violated the Investment Advisers

---

[14] Defendants urge that Saba's May 23, 2023, Proxy Statement, which Saba included as an attachment in support of its preliminary injunction motion and which states that Saba first acquired shares in ECAT on March 28, 2022, *see* Dkt. No. 10-1 at 22, is "integral" to the Complaint and a public SEC filing subject to judicial notice.  *See* Defs.' Br. at 11 n.10.  The Court agrees that this document is properly before the Court for the Defendants' motion to dismiss and will consider the document with respect to the Defendants' statute of limitations argument.  However, as set forth below, the statute of limitations has not run.

Act "at the moment it was entered into." *Id.* In *Williams v. Binance*, the Second Circuit contrasted the "completed sales transaction" in *KKR*, which committed the plaintiffs to certain transactions and which "in and of itself violated the Investment Advisers Act," with a user agreement in that case that "simply outlined the governing rules if [the plaintiffs] did choose to trade." 96 F.4th 129, 144 (2d Cir. 2024).

This case does not fall under the *KKR* framework for accrual of claims because the Majority Vote Bylaw does not require a contested election to occur, but if and when such an election occurs, it sets forth particular procedures for such an election. For the same reasons discussed above with respect to Defendants' *res judicata* claim, Saba's claims did not accrue until, at the earliest, the failed contested election in the summer of 2023, when Saba became aware of facts giving rise to its allegations that the Majority Vote Bylaw violates the ICA by, in practice, denying shareholders a meaningful opportunity to select directors other than those originally selected by the single initial shareholder. *See KKR*, 970 F.2d at 1042 ("Discovery takes place when the plaintiff obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge."). The mere fact that the bylaw was adopted or even that Saba acquired shares in ECAT prior to then did not trigger the limitations period because Saba is not contesting majority vote bylaws in general, but rather is challenging the Majority Vote Bylaw in ECAT's case, based on how that bylaw functions in practice.

Finally, with respect to Defendants' laches argument, a party asserting laches must establish both the plaintiff's "unreasonable lack of diligence under the circumstances in initiating an action, as well as prejudice from such a delay." *King v. Innovation Books*, 976 F.2d 824, 832 (2d Cir. 1992). Saba's claims are not barred by laches. Saba did not—as Defendants suggest—

"wait[] years to bring a claim."  *See* Defs.' Reply at 10.  Rather, Saba brought the action reasonably promptly after it became clear that no shareholder meeting would achieve a quorum in 2023 and that ECAT apparently intended to maintain the same voting rules going into the 2024 shareholder meeting.

Moreover, the prejudice Defendants assert—that they would be unable to seek appellate review before the next shareholder meeting—only arises if the Court were to grant Plaintiff's motion for preliminary injunction, which it is not; Defendants are not prejudiced merely because the Court denies their motion to dismiss the Complaint.

## CONCLUSION

Defendants' motion to dismiss is **DENIED**, and Plaintiff's motion for preliminary injunction is **DENIED**.  By separate order, the Court will schedule an Initial Pretrial Conference.

The Clerk of Court is respectfully directed to terminate Dkt. Nos. 8 and 27.


Dated: June 25, 2024
       New York, New York

                                        SO ORDERED.

                                        MARGARET M. GARNETT
                                        United States District Judge